UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| STATE OF MINNESOTA, BY ITS ATTORNEY GENERAL, KEITH ELLISON,<br><br>                          Plaintiff,<br><br>       v.<br><br>AMERICAN PETROLEUM INSTITUTE, EXXON MOBIL CORPORATION, EXXONMOBIL OIL CORPORATION, KOCH INDUSTRIES, INC., FLINT HILLS RESOURCES LP, and FLINT HILLS RESOURCES PINE BEND,<br><br>                          Defendants. | Case No. 20-cv-1636-JRT-HB |

## BRIEF OF DEFENDANTS IN OPPOSITION TO PLAINTIFF'S MOTION TO REMAND

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES .......................................................................iii

PRELIMINARY STATEMENT................................................................ 1

BACKGROUND...................................................................................... 6

THE COMPLAINT .................................................................................. 9

LEGAL STANDARD ............................................................................ 11

ARGUMENT ........................................................................................ 12

I.  This Court Has Original Jurisdiction over the Attorney General's
    Claims, Which Necessarily Arise under Federal Common Law...................... 12

   A.  The Attorney General's Claims Arise under Federal Common Law
       Because They Are Based on Interstate Pollution ................................... 13

   B.  The Attorney General's Claims Arise under Federal Common Law
       Because They Are Based on Navigable Waters ..................................... 18

   C.  The Attorney General's Claims Arise under Federal Common Law
       Because They Implicate Foreign Affairs................................................ 20

   D.  State Law *Cannot* Apply to the Attorney General's Claims ................. 24

   E.  The Applicability of Federal Common Law Provides a Basis for
       Removal ............................................................................................. 28

II.  This Action Satisfies the *Grable* Doctrine's Jurisdictional Prerequisites......... 32

   A.  The Complaint Necessarily Raises Substantial Federal Issues That Are
       Actually Disputed .............................................................................. 33

   B.  Federal Jurisdiction Would Protect, Not Disturb, Federalism Principles
       ........................................................................................................... 41

III.  This Action Meets the Elements of the Federal Officer Removal Statute ........ 44

   A.  Defendants Have, for Many Decades, Acted under the Direction and
       Subject to the Control of the Federal Government .................................. 46

      1.  The Federal Government Has Directed and Controlled
          Defendants' Conduct Since at least World War II....................... 46

      2.  Defendants Have Engaged in the Exploration and
          Production of Fossil Fuels under Agreements with Federal
          Agencies Exercising Supervision and Control............................. 50

   B.  Defendants' Activities, Undertaken at Federal Direction, Are
       "Connected or Associated" with the Attorney General's Claims........... 54

i

**<u>TABLE OF CONTENTS</u>**
**(Continued)**

<u>**Page**</u>

IV.   This Action Is Removable under the Outer Continental Shelf Lands Act ........ 58

V.   This Action Arises Out of Federal Enclaves ...................................................... 61

VI.   This Action Satisfies the Class Action Fairness Act's Requirements .............. 66

VII.   This Court Has Diversity Jurisdiction Because the Real Parties in
Interest Are Completely Diverse from All Defendants .................................... 71

CONCLUSION ......................................................................................................... 75

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Addison Automatics, Inc.* v. *Hartford Cas. Ins. Co.*,
731 F.3d 740 (7th Cir. 2013) ........................................................... 67, 70

*Alfred L. Snapp & Son, Inc.* v. *Puerto Rico ex rel. Barez*,
458 U.S. 592 (1982) ................................................................................ 72

*Am. Elec. Power Co.* v. *Connecticut*,
564 U.S. 410 (2011) ....................................................................... *passim*

*Am. Ins. Ass'n* v. *Garamendi*,
539 U.S. 396 (2003) .......................................................................... 42, 45

*State* v. *Am. Petrol. Inst.*,
Civ. No. 20-3837 (Minn. Dist. Ct. June 24, 2020) ................................... 8

*Amoco Prod. Co.* v. *Sea Robin Pipeline Co.*,
844 F.2d 1202 (5th Cir. 1988) ................................................................ 60

*Baker* v. *Atl. Richfield Co.*,
962 F.3d 937 (7th Cir. 2020) ............................................................ 44, 55

*Baker* v. *Hercules Offshore, Inc.*,
713 F.3d 208 (5th Cir. 2013) .................................................................. 59

*Banco Nacional de Cuba* v. *Sabbatino*,
376 U.S. 398 (1964) .......................................................................... 20, 24

*Nevada* v. *Bank of Am. Corp.*,
672 F.3d 661 (9th Cir. 2012) .................................................................. 74

*Battle* v. *Seibels Bruce Ins. Co.*,
288 F.3d 596 (4th Cir. 2002) ............................................................ 30, 37

*Bd. of Comm'rs of Southeast La. Flood Protection Authority—East* v.
*Tenn. Gas Pipeline Co., LLC*,
850 F.3d 714 (5th Cir. 2017) .................................................................. 34

*Betzner* v. *Boeing Co.*,
910 F.3d 1010 (7th Cir. 2018) ................................................................ 48

iii

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*BMW of N. Am., Inc.* v. *Gore*,
517 U.S. 559 (1996) ................................................................ 3

*Board of County Commissioners of Boulder County* v. *Suncor Energy (U.S.A.) Inc.*,
405 F. Supp. 3d 947 (D. Colo. 2019), *aff'd*, 965 F.3d 792 (10th Cir. 2020) ................................................................ 43

*Bor-Son Bldg. Corp.* v. *Heller*,
572 F.2d 174 (8th Cir. 1978) ................................................ 11

*State* v. *BP Am. Inc.*,
Civ. No. 20C-09-097 (Del. Super. Ct. Sept. 9, 2020) ............... 8

*California* v. *BP p.l.c.*,
No. C 17-06011 WHA, 2018 WL 1064293 (N.D. Cal. Feb. 27, 2018), *vacated and remanded sub nom. City of Oakland* v. *BP p.l.c.*, 969 F.3d 895 (9th Cir. 2020) ................................................ 41

*Brooklyn Union Expl. Co.* v. *Tejas Power Corp.*,
930 F. Supp. 289 (S.D. Tex. 1996) ....................................... 61

*Bryan* v. *BellSouth Commc'ns, Inc.*,
377 F.3d 424 (4th Cir. 2004) ............................................... 34

*Buckman Co.* v. *Pls.' Legal Comm.*,
531 U.S. 341 (2001) ........................................................... 35

*Camacho* v. *Autoridad de Telefonos de Puerto Rico*,
868 F.2d 482 (1st Cir. 1989) ............................................... 49

*Caudill* v. *Blue Cross and Blue Shield of N.C.*,
999 F.2d 74 (4th Cir. 1993) ........................................... 29, 35

*Cent. Iowa Power Co-op* v. *Midwest Indep. Transmission Sys. Operator, Inc.*,
561 F.3d 904 (8th Cir. 2009) ............................................... 39

*Rhode Island* v. *Chevron Corp.*,
393 F. Supp. 3d 142 (D.R.I. 2019), *aff'd*, No. 19-1818, 2020 WL 6336000 (1st Cir. Oct. 29, 2020) ....................................... 43

iv

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*State* v. *Chevron Corp.*,
Civ. No. 18-4716 (R.I. Super. Ct. July 2, 2018) ....................................................... 8

*City of Milwaukee* v. *Illinois*,
451 U.S. 304 (1981) .............................................................................. 24, 25, 38

*Illinois* v. *City of Milwaukee, Wis.*,
406 U.S. 91 (1972) ................................................................................ 13, 19, 28

*City of New York* v. *BP P.L.C.*,
325 F. Supp. 3d 466 (S.D.N.Y. 2018), *appeal pending*, No. 18-2188
(2d Cir. argued Nov. 22, 2019) ............................................................... 15, 23, 36

*City of Oakland* v. *BP p.l.c.*,
325 F. Supp. 3d 1017 (N.D. Cal. 2018), *vacated on other grounds*,
*sub nom. County of San Mateo* v. *Chevron Corp.* 960 F.3d 570 (9th
Cir. 2020) ............................................................................................... 33

*City of Oakland* v. *BP p.l.c.*,
969 F.3d 895 (9th Cir. 2020) ................................................................. 31, 41, 43

*City of San Francisco* v. *Exxon Mobil Corp.*,
Civ. No. 18-106, 2020 WL 3969558 (Tex. App. June 18, 2020) ........................ 8, 63

*Comer* v. *Murphy Oil USA, Inc.*,
839 F. Supp. 2d 849 (S.D. Miss. 2012) ................................................................. 27

*Cont'l Prop. Grp., Inc.* v. *City of Minneapolis*,
2009 WL 282096 (D. Minn. Feb. 5, 2009) ............................................................ 75

*Corley* v. *Long-Lewis, Inc.*,
688 F. Supp. 2d 1315 (N.D. Ala. 2010) ................................................................. 65

*County of San Mateo* v. *Chevron Corp.*,
294 F. Supp. 3d 934 (N.D. Cal. 2018), *aff'd on other grounds*, 960
F.3d 586 (9th Cir. 2020) .......................................................................... 43

*D'Oench, Duhme & Co., Inc.* v. *Fed. Deposit Ins. Corp.*,
315 U.S. 447 (1942) ................................................................................. 19

*Dart Cherokee Basin Operating Co.* v. *Owens*,
574 U.S. 81 (2014) .................................................................................. 69

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*In re Deepwater Horizon*,
745 F.3d 157 (5th Cir. 2014) ................................................................. 60

*Dep't of Fair Empl. & Hous.* v. *Lucent Techs., Inc.*,
642 F.3d 728 (9th Cir. 2011) ................................................................. 72

*In re Dicamba Herbicides Litig.*,
No. 1:18-CV-21-SNLJ, 2018 WL 2447792 (E.D. Mo. May 31, 2018) ................ 39

*Durham* v. *Lockheed Martin Corp.*,
445 F.3d 1247 (9th Cir. 2006) ................................................................. 45

*Empire Healthchoice Assurance, Inc.* v. *McVeigh*,
547 U.S. 677 (2006) ................................................................. 30

*EP Operating Ltd.* v. *Placid Oil Co.*,
26 F.3d 563 (5th Cir. 1994) ................................................................. 59, 60

*Massachusetts* v. *EPA*,
549 U.S. 497 (2007) ................................................................. 41

*Massachusetts* v. *Exxon Mobil Corp.*,
2020 WL 2769681 (D. Mass. May 28, 2020) ................................................ 38, 39

*State* v. *Exxon Mobil Corp.*,
Civ. No. 20-6132568-S (Conn. Super. Ct. Sept. 14, 2020) ........................... 8

*Exxon Mobil Corp.* v. *Allapattah Servs., Inc.*,
545 U.S. 546 (2005) ................................................................. 11

*Exxon Mobil Corp.* v. *United States*,
Civ. No. H-10-2386, 2020 WL 5573048 (S.D. Tex. Sept. 16, 2020) ......... 47, 48, 49

*People* v. *ExxonMobil Corp.*,
Civ. No. 18-45044 (N.Y. Sup. Ct. Oct. 24, 2018) ................................... 8

*Commonwealth* v. *ExxonMobil Corp.*,
Civ. No. 19-3333 (Mass. Super. Ct. Oct. 24, 2019) ................................ 8

*Federated Dep't Stores, Inc.* v. *Moitie*,
452 U.S. 394 (1981) ................................................................. 29

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*Franchise Tax Bd. of Cal.* v. *Hyatt*,
139 S. Ct. 1485 (2019) ............................................................... 27

*Fung* v. *Abex Corp.*,
816 F. Supp. 569 (N.D. Cal. 1992) ........................................ 64

*Gore* v. *Trans World Airlines*,
210 F.3d 944 (8th Cir. 2000) .................................................. 29

*Grable & Sons Metal Prods., Inc.* v. *Darue Eng'g & Mfg.*,
545 U.S. 308 (2005)................................................. 4, 32, 38, 41

*Graves* v. *3M Co.*,
447 F. Supp. 3d 908 (D. Minn. 2020), *appeal docketed*, No. 20-1635
(8th Cir. Mar. 26, 2020) ........................................... 45, 54, 57

*In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*,
428 F. Supp. 2d 1014 (D. Minn. 2006)................................... 57

*New York* v. *Gutierrez*,
2008 WL 5000493 (E.D.N.Y. Nov. 20, 2008)......................... 73

*Hagen* v. *McAlpine & Co. Ltd.*,
2015 WL 321428 (D. Minn. 2015) ......................................... 39

*Healy* v. *Beer Inst.*,
491 U.S. 324 (1989)................................................................. 45

*Hill* v. *BellSouth Telecomms., Inc.*,
364 F.3d 1308 (11th Cir. 2004) .............................................. 34

*Hines* v. *Davidowitz*,
312 U.S. 52 (1941)................................................................... 42

*Humble Pipe Line Co.* v. *Waggoner*,
376 U.S. 369 (1964) ................................................................ 62

*Int'l Paper Co.* v. *Ouellette*,
479 U.S. 481 (1987)................................................... 13, 14, 26

*Isaacson* v. *Dow Chem. Co.*,
517 F.3d 129 (2d Cir. 2008).................................................... 54

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*Jacks* v. *Meridian Res. Co., LLC*,
   701 F.3d 1224 (8th Cir. 2012) .................................................................. 45, 46, 54

*Jefferson County* v. *Acker*,
   527 U.S. 423 (1999)......................................................................................... 44

*Jograj* v. *Enter. Servs., LLC*,
   270 F. Supp. 3d 10 (D.D.C. 2017) ........................................................................ 62

*Jones* v. *John Crane-Houdaille, Inc.*,
   Civil No. CCB-11-2374, 2012 WL 1197391 (D. Md. Apr. 6, 2012) .................... 64

*Juliana* v. *United States*,
   947 F.3d 1159 (9th Cir. 2020) ............................................................................. 33

*K&D LLC* v. *Trump Old Post Office LLC*,
   951 F.3d 503 (D.C. Cir. 2020) .............................................................................. 55

*Kansas* v. *Colorado*,
   206 U.S. 46 (1907).................................................................................... 27, 38

*Kemp* v. *Medtronic, Inc.*,
   231 F.3d 216 (6th Cir. 2000) ................................................................................ 35

*Klausner* v. *Lucas Film Ent. Co.*,
   No. 09-03502 CW, 2010 WL 1038228 (N.D. Cal. Mar. 19, 2010)....................... 65

*Missouri ex rel. Koster* v. *Portfolio Recovery Assocs., Inc.*,
   686 F. Supp. 2d 942 (E.D. Mo. 2010) .................................................................. 71

*Laredo Offshore Constructors, Inc.* v. *Hunt Oil Co.*,
   754 F.2d 1223 (5th Cir. 1985) ........................................................................ 59, 61

*Latiolais* v. *Huntington*,
   951 F.3d 286 (5th Cir. 2020) ............................................................................... 45

*Leite* v. *Crane Co.*,
   749 F.3d 1117 (9th Cir. 2014) ............................................................................. 44

*Lincoln Prop. Co.* v. *Roche*,
   546 U.S. 81 (2005)............................................................................................. 71

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*Maryland* v. *Louisiana*,
451 U.S. 725 (1981)................................................................. 74

*Martin* v. *Franklin Cap. Corp.*,
546 U.S. 132 (2005)................................................................. 75

*Maugnie* v. *Compagnie Nationale Air France*,
549 F.2d 1256 (9th Cir. 1977) ................................................ 36

*Mayor & City Council of Baltimore* v. *BP p.l.c.*,
388 F. Supp. 3d 538 (D. Md. 2019), *aff'd*, 952 F.3d 452 (4th Cir.
2020), *cert. granted*, No. 19-1189, 2020 WL 5847132 (U.S. Oct. 2,
2020) ........................................................................ 38, 42, 43

*State* v. *Minnesota Sch. of Bus., Inc.*,
935 N.W.2d 124 (Minn. 2019)................................................. 73

*Missouri, K. & T. Ry. Co.* v. *Hickman*,
183 U.S. 53 (1901)............................................................. 72, 73

*Nat'l Farmers Union Ins. Cos.* v. *Crow Tribe of Indians*,
471 U.S. 845 (1985)................................................................. 13

*In re Nat'l Sec. Agency Telecomms. Records Litig.*,
483 F. Supp. 2d 934 (N.D. Cal. 2007) .................................... 36

*Nationwide Eng'g & Control Sys., Inc.* v. *Thomas*,
837 F.2d 345 (8th Cir. 1988) .................................................... 6

*Native Vill. of Kivalina* v. *ExxonMobil Corp.*,
663 F. Supp. 2d 863 (N.D. Cal. 2009)........................... 16, 56, 60

*Native Vill. of Kivalina* v. *ExxonMobil Corp.*,
696 F.3d 849 (9th Cir. 2012) .................................................. 15

*Pennsylvania* v. *New Jersey*,
426 U.S. 660 (1976)................................................................. 72

*Newton* v. *Capital Assurance Co.*,
245 F.3d 1306 (11th Cir. 2001) .......................................... 30, 37

*Norsyn, Inc.* v. *Desai*,
351 F.3d 825 (8th Cir. 2003) .................................................... 6

ix

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*In re Otter Tail Power Co.,*
  116 F.3d 1207 (8th Cir. 1997) ................................................................ 30

*Pet Quarters, Inc.* v. *Depository Tr. & Clearing Corp.,*
  559 F.3d 772 (8th Cir. 2009) ................................................. 11, 34, 35

*United States* v. *Pink,*
  315 U.S. 203 (1942) .................................................................. 24, 41

*Popp Telecom, Inc.* v. *Am. Sharecom, Inc.,*
  361 F.3d 482 (8th Cir. 2004) ........................................................... 40

*Pub Sch. Ret. Sys. of Missouri* v. *State St. Bank & Trust Co.,*
  640 F.3d 821 (8th Cir. 2011) ........................................................... 72

*Quackenbush* v. *Allstate Ins. Co.,*
  517 U.S. 706 (1996) ......................................................................... 12

*R.I. Fishermen's All., Inc.* v. *R.I. Dep't of Env't Mgmt.,*
  585 F.3d 42 (1st Cir. 2009) ............................................................. 42

*Republic of Philippines* v. *Marcos,*
  806 F.2d 344 (2d Cir. 1986) .................................................. 20, 30, 36

*Richards* v. *Lockheed Martin Corp.,*
  2012 WL 13081667 (D.N.M. Feb. 24, 2012) ................................... 64

*Ronquille* v. *Aminoil Inc.,*
  Civ. No. 14-164, 2014 WL 4387337 (E.D. La. Sept. 4, 2014) ............ 59

*Rosseter* v. *Indus. Light & Magic,*
  No. C 08-04545 WHA, 2009 WL 210452 (N.D. Cal. Jan. 27, 2009) ... 64

*Sam L. Majors Jewelers* v. *ABX, Inc.,*
  117 F.3d 922 (5th Cir. 1997) ....................................................... 12, 29

*Sawyer* v. *Foster Wheeler LLC,*
  860 F.3d 249 (4th Cir. 2017) ........................................................... 52

*United States* v. *Shell Oil Co.,*
  294 F.3d 1045 (9th Cir. 2002) ......................................................... 47

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*Shell Oil Co.* v. *United States*,
    751 F.3d 1282 (Fed. Cir. 2014) ............................................................. 47

*Song* v. *Charter Commc'ns Inc.*,
    2017 WL 1149286 (S.D. Cal. Mar. 28, 2017) ................................. 67, 68

*Sparling* v. *Doyle*,
    No. EP-13-CV-00323-DCG, 2014 WL 2448926 (W.D. Tex. May 30,
    2014) ............................................................................................................ 62

*United States* v. *Standard Oil Co. of Cal.*,
    332 U.S. 301 (1947) .................................................................................. 25

*State Farm Mut. Ins. Co.* v. *Campbell*,
    538 U.S. 408 (2003) .................................................................................. 45

*Stiefel* v. *Bechtel Corp.*,
    497 F. Supp. 2d 1138 (S.D. Cal. 2007) .................................................. 65

*United States* v. *Swiss Am. Bank, Ltd.*,
    191 F.3d 30 (1st Cir. 1999) ...................................................................... 25

*Taft* v. *Burlington N. R.R. Corp.*,
    926 F. Supp. 866 (D. Minn. 1996) .......................................................... 29

*Taylor* v. *Lockheed Martin Corp.*,
    78 Cal. App. 4th 472 (2000) .................................................................... 65

*Tenn. Gas Pipeline* v. *Houston Cas. Ins. Co.*,
    87 F.3d 150 (5th Cir. 1996) ............................................................... 58, 59

*Texas Indus., Inc.* v. *Radcliff Materials, Inc.*,
    451 U.S. 630 (1981) ........................................................... 13, 25, 26

*United States* v. *Todd*,
    245 F.3d 691 (8th Cir. 2001) ................................................................... 45

*Torres* v. *S. Peru Copper Corp.*,
    113 F.3d 540 (5th Cir. 1997) ................................................................... 37

*Treiber & Straub, Inc.* v. *UPS, Inc.*,
    474 F.3d 379 (7th Cir. 2007) ................................................................... 29

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*Michigan* v. *U.S. Army Corps of Engineers*,
    667 F.3d 765 (7th Cir. 2011) .................................................................. 19

*United Offshore* v. *S. Deepwater Pipeline Co.*,
    899 F.2d 405 (5th Cir. 1990) .................................................................. 60

*Watson* v. *Philip Morris Cos.*,
    551 U.S. 142 (2007) ............................................................... 44, 46, 49, 53

*Wecker* v. *Nat'l Enameling & Stamping Co.*,
    204 U.S. 176 (1907) ............................................................................... 62

*Williams* v. *Emps. Mut. Cas. Co.*,
    845 F.3d 891 (8th Cir. 2017) .................................................................. 67

*Willingham* v. *Morgan*,
    395 U.S. 402 (1969) ............................................................................... 44

*Yearsley* v. *W.A. Ross Constr. Co.*,
    309 U.S. 18 (1940) ................................................................................. 45

**STATUTES**

28 U.S.C. § 1331 ........................................................................... *passim*

28 U.S.C. § 1332 ....................................................................................... 71

28 U.S.C. § 1332(a) .................................................................................. 71

28 U.S.C. § 1332(d) ...................................................................... *passim*

28 U.S.C. § 1332(d)(1) ............................................................................ 66

28 U.S.C. § 1332(d)(1)(B) ....................................................................... 67

28 U.S.C. § 1332(d)(2) ............................................................................ 66

28 U.S.C. § 1332(d)(5) ............................................................................ 66

28 U.S.C. § 1367 ...................................................................................... 11

28 U.S.C. § 1441(a) .................................................................................. 11

28 U.S.C. § 1442 ...................................................................................... 45

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

28 U.S.C. § 1442(a) ........................................................................................... 45

28 U.S.C. § 1442(a)(1) .......................................................................... 44, 45, 54

28 U.S.C. § 1453 ...................................................................................... *passim*

28 U.S.C. § 1453(b) ......................................................................................... 66

28 U.S.C. § 1653 ............................................................................................... 6

33 U.S.C. § 401 *et seq.* .................................................................................. 37

33 U.S.C. § 403 *et seq.* .................................................................................. 37

33 U.S.C. § 426i .............................................................................................. 37

33 U.S.C. § 1343 ............................................................................................. 37

33 U.S.C. § 1344 ............................................................................................. 37

42 U.S.C. § 6231(b) ........................................................................................ 22

42 U.S.C. § 6241(d)(1) .................................................................................... 53

42 U.S.C. § 7401 *et seq.* ...................................................................... *passim*

42 U.S.C. § 15927(b) ...................................................................................... 33

43 U.S.C. § 1331 *et seq.* ...................................................................... *passim*

43 U.S.C. § 1344(a)-(e) .................................................................................. 51

43 U.S.C. § 1349(b) ................................................................................. 58, 59

43 U.S.C. § 1353(a)(1) .................................................................................... 52

Act of July 1, 1954, 68 Stat. 360, ch. 445, § 2, *as amended by* Act of
      Aug. 20, 1958, Pub. L. No. 85-686, § 8(a), 72 Stat. 673, 678 ............................. 21

Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 4 ..................... *passim*

Defense Production Act of 1950, Pub. L. 81-774, 64 Stat. 798 ......................... 49

Minn. Stat. § 8.31 .......................................................................................... 73

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

Minn. Stat. § 325D.44 ................................................................. 40

Minn. Stat. § 325F.67 .................................................................. 40

Minn. Stat. § 325F.69 .................................................................. 40

Removal Clarification Act of 2011, Pub. L. No. 112-51, 125 Stat. 545 ..................... 45

**OTHER AUTHORITIES**

30 C.F.R. § 250.1165 ................................................................... 52

33 C.F.R. § 320.4(a)(1)-(2) ............................................................. 37

Agency Information Collection Activities, 83 Fed. Reg. 23296 (May 18, 2018) ............................................................................. 23

Agreement on an International Energy Program art. 2, Nov. 18, 1974, 1040  U.N.T.S. 271 ................................................................. 21

1 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 1.1 (4th ed. 2002) ............................................................... 69

Andrew Goldman, The Billionaire's Party, *New York Magazine* (July 23, 2010) ......................................................................... 17

Anthony Andrews, Cong. Rsch. Serv., R40459, Department of Defense Fuel Spending, Supply, Acquisition, and Policy 10 (2009) .................................. 49

14C Charles Alan Wright et al., Federal Practice and Procedure § 3722.1 (4th ed. 2020) ............................................................... 11

Final List of Critical Minerals 2018, 83 Fed. Reg. 23295 (May 18, 2018) ................ 23

Fourth Annual Report on the Activities of the Joint Committee on Defense Production, 84th Cong., 1st Sess., H. Rep. No. 1, at 122 (Jan. 5, 1955) ...................................................................... 49

H.R. Rep. No. 94-1084 (1976) ............................................................ 51

John P. Frank, *Historical Bases of the Federal Judicial System*, 13 Law & Contemp. Probs. 3, 22-28 (1948) ......................................................... 69

## TABLE OF AUTHORITIES
### (Continued)

Page(s)

Juliet Eilperin, NYU Law Launches New Center to Help State AGs
Fight Environmental Rollbacks, Wash. Post, Aug. 16, 2017,
https://www.washingtonpost.com/politics/nyu-law-launches-new-
center-to-help-state-ags-fight-environmental-
rollbacks/2017/08/16/e4df8494-82ac-11e7-902a-
2a9f2d808496_story.html ................................................................................... 9

NAT'L ENERGY POLICY DEV. GRP., NAT'L ENERGY POLICY 8-17 (2001),
https://www.nrc.gov/docs/ML0428/ML042800056.pdf ......................................... 22

Noelle Straub, Obama Proposes Opening Vast Offshore Areas to
Drilling, N.Y. Times, Mar. 31, 2010,
https://archive.nytimes.com/www.nytimes.com/gwire/
2010/03/31/31greenwire-obama-proposes-opening-vast-offshore-
areas-to-74696.html?src=tptw ............................................................................... 22

Office of Minnesota Attorney General Keith Ellison, *AG Ellison Sues
ExxonMobil, Koch Industries & American Petroleum Institute for
Deceiving, Defrauding Minnesotans about Climate Change*,
https://www.ag.state.mn.us/Office/
Communications/2020/06/24_ExxonKochAPI.asp (last visited Nov.
3, 2020) .................................................................................................................. 74

Petroleum Administration for War, *A History of the Petroleum
Administration for War, 1941-1945* (John W. Frey & H. Chandler Ide
eds. 2005) ............................................................................................................... 48

Press Release, Office of the Press Secretary, Obama Administration
Holds Major Gulf of Mexico Oil and Gas Lease Sale (Dec. 13, 2011),
https://obamawhitehouse.archives.gov/the-
pressoffice/2011/12/13/obama-administration-holds-major-gulf-
mexico-oil-and-gas-lease-sale .............................................................................. 22

Proclamation No. 3279, 24 Fed. Reg. 1781 (Mar. 12, 1959)....................................... 21

S. Rep. No. 109-14 (2005) ................................................................................... 67, 69

S. Res. 98, 105th Cong., 1st Sess. (1997) ................................................................. 22

Statement by the President Upon Signing Proclamation Governing
Petroleum Products, 1 Pub. Papers 240-41 (Mar. 10, 1959) ................................. 21

**TABLE OF AUTHORITIES**
(Continued)

**Page(s)**

U.S. Army Corps of Eng'rs, *Climate Preparedness and Resilience*,
https://www.usace.army.mil/corpsclimate/ (last visited July 24, 2020)................. 37

U.S. Army Corps of Eng'rs, Eng'g Circular 1105-2-186, Planning
Guidance on the Incorporation of Sea Level Rise Possibilities in
Feasibility Studies (Apr. 21, 1989) ...................................................................... 37

U.S. Const. amend. I ...................................................................................... 45, 66

U.S. Const. amends. V and XIV ........................................................................... 45

U.S. Const. art. I, § 8, cl. 3 .................................................................................. 45

U.S. Const. art. I, § 8, cl. 17 ...................................................................... 61, 62, 66

U.S. Dep't of Energy, Department of Energy Awards Strategic
Petroleum Reserve Lease to ExxonMobil (Oct. 28, 2019),
https://www.energy.gov/articles/department-energy-awards-strategic-
petroleum-reserve-lease-exxonmobil ...................................................................... 53

U.S. Dep't of Energy, DOE Signs Major Agreement with Exxon
Pipeline to Lease Idle Pipelines at Strategic Reserve (Jan. 14, 1999),
https://fossil.energy.gov/techline/techlines/1999/tl_bmlse.html ........................... 53

U.S. Dep't of Energy, Filling the Strategic Petroleum Reserve,
https://www.energy.gov/fe/services/petroleum-reserves/strategic-
petroleum-reserve/filling-strategic-petroleum-reserve (last visited
Nov. 8, 2020) ...................................................................................................... 52

U.S. Dep't of Energy, History of SPR Releases,
https://www.energy.gov/fe/services/petroleum-reserves/strategic-
petroleum-reserve/releasing-oil-spr (last visited Nov. 8, 2020) ............................ 53

U.S. Dep't of Energy, Strategic Petroleum Reserve Annual Report to
Congress for Calendar Year 2010 (2011) ................................................................ 53

U.S. Dep't of Interior, Bureau of Safety & Env't Enf't, *Gulf of Mexico
Region: Annual Summary of Production for Entire Region*,
https://www.data.bsee.gov/Main/HtmlPage.aspx?page=annualRegion
(last visited Oct. 16, 2020) ...................................................................................... 51

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

U.S. Dep't of Interior, Mins. Mgmt. Serv., *Gulf of Mexico Region: Production by Operated Ranked by Volume* (Dec. 22, 2000), https://www.data.bsee.gov/Production/ Files/Rank%20File%20Oil%201947-1995.pdf ...................................................... 51

U.S. Dep't of Interior, Mins. Mgmt. Serv., Sample Dear Operator Letter (Dec. 14, 1999), https://onrr.gov/ReportPay/PDFDocs/991214.pdf ..................... 53

U.S. Gov't Accountability Off., GAO-02-64F, U.S. Fish & Wildlife Service Information on Oil and Gas Activities in the National Wildlife Refuge System 1, 12 (Oct. 31, 2001), http://www.gao.gov/new.items/d0264r.pdf ............................................................ 62

The White House, Statement by President Trump on the Paris Climate Accord (June 1, 2017), https://www.whitehouse.gov/briefings-statements/statement-president-trump-parisclimate-accord/ ................................. 23

## PRELIMINARY STATEMENT

In this case of national and global dimension, federal jurisdiction is not merely permissible, but necessary.  Plaintiff the State of Minnesota ("State"), acting through the Office of the Attorney General ("Attorney General"), cannot avoid federal court simply by omitting the language of federal law from its Complaint.  The interstate and international theories of both liability and harm must be adjudicated, if at all, in a federal forum.

The Attorney General seeks to use Minnesota state law as a vehicle to force Defendants[1] to discontinue or reduce their extraction, production, promotion, and sale of fossil fuels around the world.  But United States federal policy has, for many decades, expressly recognized the fundamental strategic importance of oil and gas to secure our national defense and spur the economic development and prosperity the United States has enjoyed over the past several decades.  Federal law provides for removal to prevent interference with longstanding federal policy.  Moreover, because climate change as alleged in the Complaint is an inherently global phenomenon, any liability imposed by state courts under state law would have global effects, undermining the federal government's foreign-policy prerogatives in an area where comprehensive international solutions are paramount.  This case belongs in federal court.

---

[1]   Where used in this brief, "Defendants" refers to American Petroleum Institute ("API"), Exxon Mobil Corporation, ExxonMobil Oil Corporation (collectively, "ExxonMobil"), and Koch Industries, Inc., Flint Hills Resources LP, and Flint Hills Resources Pine Bend (collectively, "FHR").

In a transparent attempt to evade federal jurisdiction, the Attorney General *now* claims not to "seek to limit the extraction of fossil fuels or otherwise regulate greenhouse-gas emissions." Br. 4. The Attorney General implausibly claims that its lawsuit has "nothing to do with" interstate pollution. *Id.* at 11, 14. Indeed, if the Attorney General will not seek to prove that Defendants are liable for harms allegedly resulting from global climate change, it should say so now. Likewise, if the Attorney General will not seek to hold Defendants liable for harms allegedly caused by fossil fuels extracted, produced, promoted, marketed or sold *outside* Minnesota, it should say so.

The Complaint's allegations contradict those litigation positions, as the Attorney General seeks to hold Defendants liable for the "unabated and expanded extraction, production, promotion, marketing, and sale of [] fossil-fuel products" and attacks their allegedly deficient "commitment to renewable energy," under various theories. Compl. ¶¶ 4, 90. The Complaint also makes clear that the alleged harms arise from greenhouse gases "emitted through the use of Defendants' products." *Id.* ¶ 181. The Complaint targets Defendants' nationwide and global activities, depending necessarily on the activities of billions of oil and gas consumers, including not only entities like the U.S. government and military, but also countless hospitals, schools, manufacturing facilities, and households around the world. The State *itself* is a prodigious consumer and user of fossil fuels. By "seek[ing]" to ensure that Defendants "bear the costs" of alleged climate change injuries, Br. 15; Compl. ¶ 7, and to recover both fines and restitution for

2

*all* alleged climate change injuries purportedly suffered by the State of Minnesota, Compl. ¶¶ 139-171, 230, 248, the Attorney General cannot plausibly deny that its lawsuit seeks to curtail the worldwide production and sale of fossil fuels. The Supreme Court has recognized that a State lawsuit for damages can be a regulatory act, designed to affect the conduct of the defendant, not just its pocketbook. *BMW of N. Am., Inc.* v. *Gore*, 517 U.S. 559, 572 (1996).

Curtailing domestic production of oil and gas, however, is fundamentally inconsistent with and contrary to longstanding federal policy. Because of the nation's vital economic and security needs, every administration since at least Franklin D. Roosevelt's has taken active steps to increase domestic oil production. Through a variety of means, the federal government regulates greenhouse gas emissions and seeks to balance the nation's energy needs with environmental considerations. Any attempt by a state court to balance the costs and benefits of the use of oil and gas will constitute a collateral attack on the balance already struck under the laws, regulations, and treaties of the United States. This case therefore belongs in federal court.

Seven separate grounds provide independent bases for federal subject matter jurisdiction:

*First*, the Attorney General's claims implicate a broad scope of "uniquely federal interests" including the regulation of transboundary pollution, U.S. navigable waters, and foreign affairs and commerce. The Supreme Court has made clear that these claims arise exclusively under federal common law—an independent ground for removal of

3

claims nominally pled under state law.  Federal common law also provides a ground for removal under *Grable & Sons Metal Prods., Inc.* v. *Darue Eng'g & Mfg.*, 545 U.S. 308 (2005), because the existence of a federal common law claim is itself a substantial federal question.

*Second*, this lawsuit requires the resolution of substantial, disputed questions of federal law about national and international energy policy and environmental protection.  Congress and federal agencies have already decided—over the course of several decades and administrations—that domestic oil and gas production should be promoted.  The Attorney General disputes that long-held conclusion, and would have this Court declare that fossil fuel products are so "dangerous" that statements promoting oil and gas are inherently misleading.  Compl. ¶ 200.  Indeed, a substantial question of constitutional law exists as to whether there can be a state claim for climate change allegations under our constitutional structure.

*Third*, the Attorney General's claims implicate many actions Defendants allegedly conspired to undertake at the direction of federal officers, requiring removal under the Federal Officer Removal Statute.  Certain Defendants have engaged in substantial activities at federal direction since the 1940s, including through (i) the production and transportation of fuels indispensable to the Allied effort in World War II; (ii) production of specialized jet fuels throughout the Cold War and up to the present; (iii) fossil fuel exploration and extraction on the federally managed Outer Continental Shelf ("OCS"); and (iv) exploration and production pursuant to agreements

with federal agencies.  The Attorney General ignores the fact that the federal officer removal statute is to be liberally construed and that Defendants' allegations in the Notice of Removal must be construed in their favor in this context.  Thus, any doubt about federal officer removal must be resolved in favor of the Defendants.

*Fourth*, the Attorney General challenges Defendants' fossil fuel promotion and production activities including, necessarily, their activities on the OCS.  Federal jurisdiction is thus authorized under the Outer Continental Shelf Lands Act ("OCSLA").  The Attorney General's motion focuses on torts occurring on the OCS, but an action that challenges and attempts to reduce production on the OCS is subject to federal jurisdiction.

*Fifth*, the Attorney General seeks to hold Defendants liable for sales of fossil fuels on federal enclaves located within the State of Minnesota, supporting federal enclave jurisdiction.

*Sixth*, because this suit is in substance a class action, it qualifies for removal under the Class Action Fairness Act.

*Seventh*, diversity jurisdiction is satisfied because the Minnesota consumers on whose behalf the Attorney General sues are completely diverse from all Defendants, and the relief the Attorney General seeks exceeds the jurisdictional threshold.

Litigation about the appropriate level of fossil fuel energy in our national energy mix and the international issues presented by global climate change allegations belongs

in a federal forum.  Because of the federal nature of this lawsuit, removal is proper.  The

Motion to Remand should be denied.[2]

## BACKGROUND

This action is part of a long-standing effort by state officials and climate activists

to limit and ultimately end Defendants' production, promotion, and sale of fossil fuels.

In 2016, a coalition of state attorneys general, including the Attorney General, joined a

"Climate Change Coalition Common Interest Agreement" to advance their agenda of

"limiting climate change" and pursuing litigation to accelerate the "deployment of

renewable energy technology."  Ex. 1 at 1.  Those officials called themselves the "Green

20."[3]

That same year, the Green 20 held a press conference, titled "AGs United for

Clean Power," with at least one representative of the Minnesota Attorney General's

office in attendance.  Ex. 2 at 1.  There, they unveiled a plan to promote "clean power"

as the only legitimate response to climate change.  *Id.* at 13.  Noting what he

characterized as a "gridlock in Washington," the New York Attorney General urged his

---

[2]   By filing this brief in opposition to the Attorney General's Motion to Remand,
Defendants do not waive any right, defense, affirmative defense, or objection,
including any challenges to personal jurisdiction over Defendants.  *See Norsyn,
Inc.* v. *Desai*, 351 F.3d 825, 828 n.3 (8th Cir. 2003); *Nationwide Eng'g & Control
Sys., Inc.* v. *Thomas*, 837 F.2d 345, 347-48 (8th Cir. 1988).  Defendants also reserve
the right to supplement the factual bases supporting removal.  *See* 28 U.S.C. § 1653.

[3]   The "Green 20" comprises the attorneys general of California, Connecticut,
Delaware, D.C., Illinois, Iowa, Maine, Maryland, Massachusetts, Minnesota, New
Mexico, New York, Oregon, Rhode Island, Vermont, Virginia, Washington, and
U.S. Virgin Islands.  *See* Ex. 2 at 1.

colleagues to "step into this [legislative] breach" through the "creative[]" and "aggressive[]" use of their respective offices to end the world's reliance on fossil fuels. *Id.* at 1, 3, 18. This press conference drew criticism from thirteen other state attorneys general, who challenged the coalition's attempt to "[u]s[e] law enforcement authority to resolve a public policy debate." Ex. 3 at 3.

The AGs United for Clean Power press conference echoed themes expressed in June 2012 by climate activists gathered in La Jolla, California for a "Workshop on Climate Accountability, Public Opinion, and Legal Strategies." Ex. 4 at 1. There, they began to formulate a plan to utilize the law enforcement powers of "sympathetic" attorneys general and civil litigation to "maintain[] pressure on the [fossil fuel] industry that could eventually lead to its support for legislative and regulatory responses to global warming." *Id.* at 11, 27. The activists hoped that such "pressure" would force energy companies to reduce their production, promotion, and sale of fossil fuels in favor of "converting to renewable energy." *Id.* at 27-28. A few years later, climate activists reconvened in New York City to formulate an "Exxon Campaign" to "delegitimiz[e] [ExxonMobil] as a political actor," "establish in [the] public's mind that Exxon is a corrupt institution that has pushed humanity (and all creation) toward climate chaos and grave harm," and "driv[e] divestment from Exxon." Ex. 5 at 1.[4]

---

[4] One of the activists behind the "Exxon Campaign" conducted a closed-door briefing on the campaign for members of the Green 20 before the AGs United for Clean Power press conference. A state official cautioned the activist that, "if you speak to

Nearly one third of the Green 20 have since filed lawsuits against ExxonMobil and other energy companies, all with the purpose of curtailing Defendants' production, promotion, and sales of fossil fuels, including by stifling speech on political issues.[5] The first of these lawsuits, brought by the New York Attorney General, went to trial in October 2019, and concluded with a complete defense verdict for ExxonMobil.

Municipal governments also filed lawsuits expressly targeting efforts to "promot[e] fossil fuels and undercut[] non-dangerous renewable energy and clean technologies." *City of San Francisco* v. *Exxon Mobil Corp.*, Civ. No. 18-106, 2020 WL 3969558, at *5 (Tex. App. June 18, 2020). A Texas trial court found this litigation campaign to be "aimed to chill and suppress ExxonMobil's speech through legal actions & related campaigns," *id.* at *3, *8, and a Texas appellate court characterized the campaign as "[l]awfare"—"an ugly tool by which to seek the environmental policy changes the California Parties desire, enlisting the judiciary to do the work that the other two branches of government cannot or will not do," *id.* at *20.

---

the [Wall Street Journal] reporter, do not confirm that you attended or otherwise discussed the event." Ex. 6 at 1.

[5] *See State* v. *Exxon Mobil Corp.*, Civ. No. 20-6132568-S (Conn. Super. Ct. Sept. 14, 2020); *State* v. *BP Am. Inc.*, Civ. No. 20C-09-097 (Del. Super. Ct. Sept. 9, 2020); *State* v. *Am. Petrol. Inst.*, Civ. No. 20-3837 (Minn. Dist. Ct. June 24, 2020); *Commonwealth* v. *ExxonMobil Corp.*, Civ. No. 19-3333 (Mass. Super. Ct. Oct. 24, 2019); *People* v. *ExxonMobil Corp.*, Civ. No. 18-45044 (N.Y. Sup. Ct. Oct. 24, 2018); *State* v. *Chevron Corp.*, Civ. No. 18-4716 (R.I. Super. Ct. July 2, 2018).

The climate activists continue to facilitate similar litigation to subvert national energy policy.  Recently, Bloomberg Philanthropies joined their cause by funding the creation of a State Energy & Environmental Impact Center (the "Impact Center").[6]  The Impact Center encourages state attorneys general to bring climate change lawsuits by providing them with extensive litigation resources—including Special Assistant Attorneys General ("SAAGs"), whose salaries and benefits it pays—on the condition that they do so.  Indeed, the Complaint here is signed by two SAAGs who were selected by the Impact Center.  Compl. ¶ 83.  These SAAGs are leading the prosecution of this case and have been the only representatives of the Attorney General to communicate with Defendants about this litigation.  The Complaint advances strategies announced at the AGs United for Clean Power press conference and the objectives of the Impact Center; namely to curtail Defendants' production, promotion, and sales of fossil fuels.

## THE COMPLAINT

The Complaint's allegations demonstrate that this lawsuit is an artfully pleaded effort to use claims nominally asserted under state consumer-protection laws to discourage federally promoted fossil-fuel production, reduce federally regulated interstate and international carbon emissions, and undermine federal energy and

---

[6]  *See* Juliet Eilperin, NYU Law Launches New Center to Help State AGs Fight Environmental Rollbacks, Wash. Post, Aug. 16, 2017, https://www.washingtonpost.com/politics/nyu-law-launches-new-center-to-help-state-ags-fight-environmental-rollbacks/2017/08/16/e4df8494-82ac-11e7-902a-2a9f2d808496_story.html.

environmental policy.   The Attorney General alleges that Defendants violated Minnesota consumer protection laws by engaging in a "campaign of deception" that involved "promot[ing], campaign[ing] against regulation of, and conceal[ing] the hazards of use of their fossil-fuel products."  *Id.* ¶¶ 87, 179.  Yet, at the heart of the Complaint is the Attorney General's true goal: to force reductions in and eventually end worldwide fossil fuel production and sales.

The Complaint unequivocally asserts the Attorney General's view that fossil fuel products produced and sold by ExxonMobil and FHR around the world, as well as API's promotion of the industry, are to blame for alleged climate change injuries and that its preferred solution is to end reliance on those products.   According to the Complaint, Defendants' conduct enabled the "unabated and expanded extraction, production, promotion, marketing, and sale of their fossil-fuel products."  *Id*. ¶ 4.  Those products, the Complaint alleges, led to additional greenhouse gas emissions which "have accelerated the rate of climate change."  *Id*. ¶ 181.  These claims are, at bottom, interstate and international pollution claims.  And the Complaint's reliance on "the role that [ExxonMobil's and FHR's] products play in causing climate change, the consequences of continued unabated fossil-fuel emissions, and the need to act quickly," *id.* ¶ 204, makes clear that the Attorney General, like its Green 20 colleagues, wants Defendants to cease their production and promotion of fossil fuel energy and "pursue less hazardous alternative products," *id.* ¶ 174.

The Complaint further seeks to limit Defendants' constitutional rights to participate in public discourse about climate and energy policy, by attacking Defendants' alleged ties to think tanks, including the Cato Institute, Competitive Enterprise Institute, and Heritage Foundation, and by requesting an order forcing Defendants to fund a "public education campaign" espousing the Attorney General's preferred views on climate change and the appropriate responses to it. *Id.* ¶¶ 117, 246. The Complaint also challenges the conduct of API, a nonprofit corporation with the mission of "influenc[ing] public policy in support of a strong, viable U.S. oil and natural gas industry." *Id.* ¶ 16. The Attorney General's antipathy to constitutionally protected speech at odds with its own preferences on national energy and climate policy is unmistakable.

## LEGAL STANDARD

A defendant may remove "any civil action brought in State court of which the district courts of the United States have original jurisdiction." 28 U.S.C. § 1441(a). Although the removing party "has the burden of showing that the federal court has jurisdiction," *Bor-Son Bldg. Corp.* v. *Heller*, 572 F.2d 174, 182 n.13 (8th Cir. 1978), removal is proper so long as jurisdiction exists over a single claim. *See* 28 U.S.C. § 1367; *Exxon Mobil Corp.* v. *Allapattah Servs., Inc.*, 545 U.S. 546, 563 (2005); *Pet Quarters, Inc.* v. *Depository Tr. & Clearing Corp.*, 559 F.3d 772, 779 (8th Cir. 2009). The inherently federal nature of the claims stated on the face of the complaint, not the plaintiff's characterization of them as state law claims, controls. 14C Charles Alan

11

Wright et al., Federal Practice and Procedure § 3722.1 (4th ed. 2020); *Sam L. Majors Jewelers* v. *ABX, Inc.*, 117 F.3d 922, 928 (5th Cir. 1997). Whether a case arises under state or federal law, and is, therefore, properly removable, is a question of subject matter jurisdiction that the federal removal court must resolve for itself, subject to the court's "unflagging obligation" to exercise such jurisdiction where it exists. *Quackenbush* v. *Allstate Ins. Co.*, 517 U.S. 706, 716 (1996).

## ARGUMENT

I.   **This Court Has Original Jurisdiction over the Attorney General's Claims, Which Necessarily Arise under Federal Common Law**

In a transparent attempt to circumvent federal question jurisdiction, the Attorney General, to use its own words, has "recast this case into one that finds no basis in the Complaint." Br. 2. The Attorney General represents that this case "***has nothing to do with***" interstate pollution. *Id*. 14. That representation is not credible: on the next page, the Attorney General acknowledges that its claims seek to ensure that Defendants "bear the costs" of "dealing with global warming." *Id*. 15. Notwithstanding the Attorney General's misrepresentation of its own claims as having "***no relationship to***" interstate pollution, *id*. 14 (emphasis added), the Attorney General's claims are inherently predicated on alleged climate change injuries, and therefore arise exclusively under federal common law.

As an initial matter, a federal district court has "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. It is "well settled" that this statutory grant of original jurisdiction extends to

12

claims that arise under federal common law.  *Nat'l Farmers Union Ins. Cos.* v. *Crow Tribe of Indians*, 471 U.S. 845, 850 (1985); *Illinois* v. *City of Milwaukee, Wis.*, 406 U.S. 91, 100 (1972) ("*Milwaukee I*") ("[Section] 1331 jurisdiction will support claims founded upon federal common law.").

Federal common law applies "where the basic scheme of the Constitution so demands," *Am. Elec. Power Co.* v. *Connecticut* ("*AEP*"), 564 U.S. 410, 421 (2011), and where, as here, the "federal system *does not permit the controversy to be resolved under state law*," because "the interstate or international nature of the controversy makes it *inappropriate for state law to control*."  *Texas Indus., Inc.* v. *Radcliff Materials, Inc.*, 451 U.S. 630, 641 (1981) (emphasis added).  The Attorney General's claims necessarily arise under federal common law applicable to (1) interstate pollution, (2) the navigable waters of the United States, and (3) foreign affairs.  Because the Attorney General's claims are governed by and arise under federal common law, this Court has federal question jurisdiction and removal is proper.

A.   **The Attorney General's Claims Arise under Federal Common Law Because They Are Based on Interstate Pollution**

The United States Supreme Court has repeatedly held that federal common law applies to claims based on interstate pollution.  Thus, federal common law applies to claims that "deal with air and water in their ambient or interstate aspects," including suits asserting claims rooted in the effects of global greenhouse gas emissions.  *AEP*, 564 U.S. at 421 (quoting *Milwaukee I*, 406 U.S. at 103); *see also, e.g.*, *Int'l Paper Co.* v.

13

*Ouellette*, 479 U.S. 481, 487-88 (1987).  Actions like the Attorney General's, which seek to use state law to limit the production, sale, and use of fossil fuels not just in Minnesota but in all 50 states (and internationally), many of which disagree with the Attorney General's policy preferences and explicitly *encourage* the production of oil and gas, are precisely those that necessitate the application of federal law.  *See* Brief for the United States, *City of Milwaukee* v. *Illinois*, 451 U.S. 304 (1981) (No. 79-408), 1980 WL 339512, at *18 ("*Milwaukee II*").

In *AEP*, for example, the plaintiffs brought federal and state public nuisance claims against power companies for their alleged carbon dioxide emissions and contributions to climate change.  564 U.S. at 418.  Because these claims necessarily implicate interstate concerns, the Court reasoned that federal common law applies: "When we deal with air and water in their ambient or interstate aspects, there is federal common law."  *Id*. at 421 (quoting *Milwaukee I*, 406 U.S. at 103); *Int'l Paper Co.* v. *Ouellette*, 479 U.S. 481, 492 (1987) ("[T]he control of interstate pollution is primarily a matter of federal law.").  The Court expressly rejected the application of state law to plaintiffs' claims, reasoning that "borrowing the law of a particular State would be inappropriate" given the federal concerns at issue.  *AEP*, 564 U.S. at 422.  The Court held plaintiffs could not state viable federal common law claims because the Clean Air Act, and the EPA actions it authorizes, "displace any federal common-law right to seek abatement of carbon-dioxide emissions from fossil-fuel fired power-plants."  *Id.* at 424.

14

Following Supreme Court precedent, federal courts have held that federal common law applies to claims based on greenhouse gas emissions given their inherently interstate nature. For example, in *Native Vill. of Kivalina* v. *ExxonMobil Corp.*, the Ninth Circuit held that federal common law applied to a public nuisance claim against defendants for damages allegedly resulting from greenhouse gas emissions. 696 F.3d 849, 855–56 (9th Cir. 2012). The court reasoned that "federal common law includes the general subject of environmental law and specifically includes ambient or interstate air greenhouse and water pollution." *Id.* Similarly, in *City of New York* v. *BP P.L.C.*, the court held that the City's nuisance and trespass claims, which were pled under state law, and alleged injuries arising from defendants' greenhouse gas emissions, were "ultimately based on the transboundary emission of gases, indicating that these claims arise under federal common law and require a uniform standard of decision." 325 F. Supp. 3d 466, 472 (S.D.N.Y. 2018), *appeal pending*, No. 18-2188 (2d Cir. argued Nov. 22, 2019) (citations omitted).

The Attorney General's claims here are premised upon interstate pollution, such that federal common law governs. For example, the terms "greenhouse gas," "air pollution," "emissions," and "climate change" collectively appear approximately 300 times in the Complaint. The Attorney General alleges that "Defendants' conduct caused a substantial portion of *global* atmospheric greenhouse-gas concentrations." Compl. ¶ 175 (emphasis added). And greenhouse gas emissions are inherently transboundary in nature. *See AEP*, 564 U.S. at 422 ("Greenhouse gases once emitted

15

become well mixed in the atmosphere."); *Native Vill. of Kivalina* v. *ExxonMobil Corp.*, 663 F. Supp. 2d 863, 880 (N.D. Cal. 2009) ("[T]he source of the greenhouse gases are undifferentiated and cannot be traced to any particular source, let alone defendant, given that they 'rapidly mix in the atmosphere' and 'inevitably merge[] with the accumulation of emissions in California and the rest of the world.'").

Additionally, the Attorney General is seeking remedies for injuries it contends were *"caused by global warming,"* Compl. ¶ 54 (emphasis added)—including flooding damage, damage to infrastructure, personal injuries, damage to forests, and adaptation costs, *id*. ¶¶ 142-171. The Attorney General seeks to "disgorge all profits" earned by the ExxonMobil and FHR Defendants from the *production* and *sale* of fossil fuels, with no limitation to Minnesota or even the United States. *Id*. ¶¶ 4, 249. The Attorney General has not even attempted to disclaim injuries allegedly arising from the production and sale of fossil fuels, or emissions, to the extent they occurred outside Minnesota or the United States. Rather, according to the Attorney General, it "seeks to ensure" that Defendants "bear the costs" of "*global* warming." Br. 15; Compl. ¶ 7 (emphasis added). These allegations belie the Attorney General's argument that its Complaint "**has nothing to do with**" interstate pollution. Br. 14. To the contrary, this case has **everything to do with** interstate pollution.

The Attorney General's attempts to distance its own allegations from interstate pollution are unavailing. The Attorney General characterizes its claims as "traditional" state-law consumer protection claims that "rest on Defendants' campaign to deceive

and mislead the public and consumers." *Id*. 3, 11-12.  This facade collapses, however, upon review of the sparse allegations in the Complaint.  Notwithstanding the Attorney General's argument that its Complaint is premised upon consumer protection—as opposed to interstate pollution—the Attorney General does not allege any actionable statements attributable to Defendants.  For example, with respect to FHR, the Attorney General attacks a *single*, *constitutionally protected* statement of opinion, with which the Attorney General apparently disagrees, that is not even attributable to FHR.  Compl. ¶ 90.[7]  The Attorney General likewise pleads only non-actionable, constitutionally protected statements of opinion against ExxonMobil and API.  The Complaint takes issue with statements in the New *York Times* that the Attorney General attributes to ExxonMobil, including statements acknowledging a "range" of "views on the climate

---

[7]  That statement appears in a profile of the late Mr. David Koch published in *New York Magazine* in July 2010.  *Id*.  The biographical profile spans the gamut from Mr. Koch's philanthropic endeavors, upbringing, and family life, to Mr. Koch's personally held "political views"—as termed by the reporter—on, for example, the Iraq war, stem-cell research, health care reform, and financial regulation.  Andrew Goldman, The Billionaire's Party, *New York Magazine* (July 23, 2010) (cited by the State at paragraph 90 in the State's Complaint).  In that context, the author reported:

> [Mr. David] Koch says he's not sure if global warming is caused by human activities, and at any rate, he sees the heating up of the planet as good news.  Lengthened growing seasons in the northern hemisphere, he says, will make up for any trauma caused by the slow migration of people away from the disappearing coastlines.  "The Earth will be able to support enormously more people because a far greater land area will be available to produce food," he says.

*Id*.

17

change debate" and expressing the opinion that "[t]here is not enough information to justify harming economies and forcing the world's population to endure unwarranted lifestyle changes by dramatically reducing the use of energy now." *Id.*[8]

The Attorney General's Complaint—lacking any allegations to support a consumer protection claim—illustrates that this case is not about consumer protection at all, but rather, as the Attorney General alleges, "global warming and its physical, environmental, social, and economic consequences." Br. 15; Compl. ¶ 7. The Attorney General cannot avoid the application of federal common law in a case seeking redress for interstate pollution by claiming that it is about consumer protection when its own allegations demonstrate otherwise. Accordingly, the Attorney General's claims are necessarily governed by and arise under federal common law, providing this Court with jurisdiction under Section 1331.

**B.  The Attorney General's Claims Arise under Federal Common Law Because They Are Based on Navigable Waters**

The Attorney General claims injuries for "environmental and economic destruction" by way of federal "navigable waters" in Minnesota; consequently, federal common law applies. Federal common law governs claims that arise out of the

---

[8]   The Attorney General also faults Mobil, an ExxonMobil predecessor, for a 1997 *New York Times* advertorial expressing that "[t]he science of climate change is too uncertain to mandate a plan of action that could plunge economies into turmoil," and advising that the United States "not rush to a decision at Kyoto." Compl. ¶ 90. Not only are those plainly statements of opinion on an issue of public policy, they reflect the views of the United States Senate which, as noted below, unanimously opposed President Clinton's decision to sign the Kyoto Protocol.

"interstate or navigable waters" of the United States.  *Milwaukee I*, 406 U.S. at 102;

*D'Oench, Duhme & Co., Inc.* v. *Fed. Deposit Ins. Corp.*, 315 U.S. 447, 470 (1942)

(Jackson, J., concurring) ("[I]n a case decided on the same day as *Eri[e] R. Co.* v.

*Tompkins*, Justice Brandeis said that 'whether the water of an interstate stream must be

apportioned between the two States is a question of 'federal common law' upon which

neither the statutes nor the decisions of either State can be conclusive.'") (quoting

*Hinderlider* v. *La Plata River & Cherry Creek Ditch Co.*, 304 U.S. 92, 110 (1938)).

In *Milwaukee I*, the Supreme Court held that federal common law governed a

nuisance claim brought by the State of Illinois against cities in Wisconsin, relating to

the pollution of Lake Michigan.  406 U.S. at 93, 103.  The Court reasoned that there

was an "overriding federal interest in the need for a uniform rule of decision" applicable

to plaintiff's claim, based on "the pollution of a body of water such as Lake Michigan

bounded, as it is, by four States."  *Id.* at 105, n.6.  Similarly, in *Michigan* v. *U.S. Army*

*Corps of Engineers*, the Seventh Circuit held that federal common law applied to a

nuisance action brought by several states, alleging that defendants' operation of the

Chicago Area Waterway System threatened to introduce an invasive species into the

Great Lakes.  667 F.3d 765, 771 (7th Cir. 2011).  The court reasoned that federal

common law extended "to the environmental and economic destruction" caused by

introducing the invasive species into the Great Lakes.  *Id.*

Here, the Attorney General alleges harm by flooding purportedly caused by

climate change, as flooding "can result in mass evacuations, damage to buildings,

19

drinking water contamination" and personal injuries.   Compl. ¶¶ 142-149.   The

Attorney General directly links such harms to navigable waterways, alleging, for

example, that in 1997, the Red River—a navigable waterway spanning from Minnesota

to North Dakota and into Canada—flooded, resulting in billions of dollars in damage.

*Id*. ¶ 145.   As set forth in the Notice of Removal, and unrebutted by the Attorney

General, the navigable waters of the United States in Minnesota include approximately

170 lakes, 110 bays, 50 rivers, 15 narrows, 5 creeks, and 5 sloughs, including, notably,

the Red River, the Mississippi River, and Lake Superior.   Notice ¶ 34.   The Attorney

General's claims for injuries arising from flooding of navigable waters of the United

States in Minnesota allegedly due to climate change are necessarily governed by federal

common law and provide this Court with jurisdiction under Section 1331.

### C.   The Attorney General's Claims Arise under Federal Common Law Because They Implicate Foreign Affairs

Federal common law likewise applies given the inherently international nature

of the Attorney General's claims.   As the Supreme Court has held, issues involving "our

relationships with other members of the international community must be treated

exclusively as an aspect of federal law."   *Banco Nacional de Cuba* v. *Sabbatino*, 376

U.S. 398, 425 (1964) ("[R]ules of international law should not be left to divergent and

perhaps parochial state interpretations.").   Thus, "actions having important foreign

policy implications" should be governed by federal common law and be heard in federal

court.   *Republic of Philippines* v. *Marcos*, 806 F.2d 344, 353 (2d Cir. 1986) ("[T]here

20

is federal question jurisdiction over actions having important foreign policy implications" under federal common law).

The United States' regulation of energy production through foreign policy traces its origins to at least the 1950s.  In 1959, President Eisenhower invoked statutory authority to impose quotas on imports of petroleum and petroleum-based products into the United States "to avoid discouragement of and decrease in domestic oil production, exploration and development to the detriment of the national security."[9]  The import system was "mandatory" and "necessary" to "preserve to the greatest extent possible a vigorous, healthy petroleum industry in the United States" and to regulate "patterns of international trade."[10]  As a matter of United States foreign policy, President Eisenhower explained, "[p]etroleum, wherever it may be produced in the free world, is important to security, not only of ourselves, but also of the free people of the world everywhere." *Id.*

After the 1973 oil embargo, the United States signed a treaty that requires member countries of the International Energy Agency to hold emergency oil stocks equivalent to at least 90 days of net oil imports.[11]  The United States meets part of its

---

[9]   Proclamation No. 3279, 24 Fed. Reg. 1781 (Mar. 12, 1959); *see* Act of July 1, 1954, 68 Stat. 360, ch. 445, § 2, *as amended by* Act of Aug. 20, 1958, Pub. L. No. 85-686, § 8(a), 72 Stat. 673, 678.

[10]   Statement by the President Upon Signing Proclamation Governing Petroleum Products, 1 Pub. Papers 240-41 (Mar. 10, 1959).

[11]   *See* Agreement on an International Energy Program art. 2, Nov. 18, 1974, 1040 U.N.T.S. 271.

obligation through government-owned stocks held in the U.S. Strategic Petroleum Reserve.[12]

In the 1990s, the Senate responded to President Clinton's signing of the Kyoto Protocol by resolving on a 95-0 vote that the nation should not be a signatory to any protocol that "would result in serious harm to the economy" or fail to regulate the emissions of developing nations.[13]   In May 2011, President Obama issued a series of directives "which included additional lease sales, certain offshore lease extensions, and steps to streamline permitting, all towards the President's goal of expanding safe and responsible domestic oil and gas production . . . as part of his long-term plan to reduce our reliance on foreign oil."[14]   President Obama explained, "Given our energy needs, in order to sustain economic growth and produce jobs, and keep our businesses competitive, we are going to need to harness traditional sources of fuel even as we ramp up production of new sources of renewable, homegrown energy."[15]

---

[12]   *See*, *e.g.*, 42 U.S.C. § 6231(b); NAT'L ENERGY POLICY DEV. GRP., NAT'L ENERGY POLICY 8-17 (2001), https://www.nrc.gov/docs/ML0428/ML042800056.pdf.

[13]   *See* S. Res. 98, 105th Cong., 1st Sess. (1997).

[14]   Press Release, Office of the Press Secretary, Obama Administration Holds Major Gulf of Mexico Oil and Gas Lease Sale (Dec. 13, 2011), https://obamawhitehouse.archives.gov/the-pressoffice/2011/12/13/obama-administration-holds-major-gulf-mexico-oil-and-gas-lease-sale.

[15]   Noelle Straub, Obama Proposes Opening Vast Offshore Areas to Drilling, N.Y. Times, Mar. 31, 2010, https://archive.nytimes.com/www.nytimes.com/gwire/2010/03/31/31greenwire-obama-proposes-opening-vast-offshore-areas-to-74696.html?src=tptw.

President Trump cited foreign-affairs implications in withdrawing from the Paris Agreement, after his administration concluded the treaty did not strike the proper balance between environmental and national economic and security concerns.[16]  In a similar case, the United States explained as amicus that "federal law and policy has long declared that fossil fuels are strategically important domestic resources that should be developed to reduce the growing dependence of the United States on politically and economically unstable sources of foreign oil imports."[17]

The Attorney General's case is intended to—and would—have significant impacts on United States foreign policy.  And as the federal district court recognized in *City of New York*, claims similar to those here—seeking to hold defendants liable "for the emissions that result from their worldwide production, marketing, and sale of fossil fuels"—"implicate countless foreign governments and their laws and policies."  325 F. Supp. 3d at 475-476 (acknowledging that climate change "is the subject of international agreements.").  A court adjudicating the State's claims must consider United States foreign policy, a consideration protected by federal law and federal court

---

[16]  *See* The White House, Statement by President Trump on the Paris Climate Accord (June 1, 2017), https://www.whitehouse.gov/briefings-statements/statement-president-trump-parisclimate-accord/; *see also* Final List of Critical Minerals 2018, 83 Fed. Reg. 23295 (May 18, 2018); Agency Information Collection Activities, 83 Fed. Reg. 23296 (May 18, 2018).

[17]  Brief of the United States as Amicus Curiae in Support of Petition for Rehearing at 10, *City of Oakland* v. *BP p.l.c.*, 960 F.3d 570 (9th Cir. 2020) (No. 18-16663) (hereafter, "U.S. Amicus Br., *City of Oakland* v. *BP p.l.c*") (ECF No. 198) (quoting 42 U.S.C. § 15927(b)(1)).

jurisdiction. *See United States* v. *Pink*, 315 U.S. 203, 233 (1942) ("Power over external affairs is not shared by the States; it is vested in the national government exclusively."); *see also Banco Nacional de Cuba*, 376 U.S. at 427 (1964) ("The problems surrounding the act of state doctrine are . . . intrinsically federal."). Accordingly, the Attorney General's claims arise under federal common law and provide this Court with jurisdiction under Section 1331.

### D. State Law *Cannot* Apply to the Attorney General's Claims

Importantly, the Attorney General's claims arise exclusively under federal common law, which cannot be supplanted with state law claims. The need for a coherent federal approach to interstate pollution, navigable waters, and international affairs makes it inappropriate to apply a particular state's law in cases seeking remedies for injuries allegedly caused by climate change. By seeking to hold Defendants liable for activities that, the Attorney General alleges, ultimately implicate "air and water in their ambient or interstate aspects," *AEP*, 564 U.S. at 421 (citing *Milwaukee I*), the Attorney General has brought an interstate pollution suit for which federal common law must govern, and "state law cannot be used." *Milwaukee II*, 451 U.S. at 313 n.7. The Attorney General argues to the contrary, however, asserting that to the extent federal common law applies to its claims on the basis of interstate pollution, "it was displaced by the CAA [Clean Air Act], and therefore cannot provide a basis for removal." Br. 17.

24

As an initial matter, whether federal common law has been displaced is not relevant to the jurisdictional inquiry. The jurisdictional inquiry determines whether federal common law governs in the first instance and depends on the important federal interests at stake and the inability of state law to govern interstate and international disputes. *AEP*, 564 U.S. at 420-23. If a claim arises under federal common law, a federal court proceeds to the merits inquiry to determine if the plaintiff has stated a claim for relief, including whether its claim has been displaced by a federal statute. *See United States* v. *Standard Oil Co. of Cal.*, 332 U.S. 301, 310, 316-17 (1947) (holding, in a two-step analysis, that (1) federal—not state—common law applied to the government's claim; and (2) nevertheless declining to fashion a new substantive legal liability under federal common law); *see also United States* v. *Swiss Am. Bank, Ltd.*, 191 F.3d 30, 43 (1st Cir. 1999) (describing analysis as "binary" and explaining that the "two-part approach involves what may be characterized as the source question and the substance question").

Moreover, the Attorney General's approach would turn the *Erie* doctrine on its head. That Congress, through the Clean Air Act, would have so comprehensively addressed the question at issue so as to leave no room for *federal* common law remedies cannot mean that *state* remedies suddenly become viable. Federal common law only exists in the first place to the extent that it would be "*inappropriate for state law to control.*" *Texas Indus., Inc.*, 451 U.S. at 641 (emphasis added); *see also Milwaukee II*, 451 U.S. at 313 n.7 ("[I]f federal common law exists, it is because *state law cannot be*

*used*.") (emphasis added); *Ouellette*, 479 U.S. at 488 ("*Milwaukee I* [] held that these cases should be resolved by reference to federal common law; *the implicit corollary of this ruling was that state common law was preempted*.") (emphasis added).

In *AEP*, the Court left "open for consideration" the narrow question of whether the Clean Air Act preempted state-law nuisance claims based on "the law of each State where the defendants operate power plants."[18]   564 U.S. at 429.   Claims seeking to regulate the interstate and international production and sale of fossil fuels—such as those brought by the Attorney General here—however, arise under federal law because "the basic scheme of the Constitution so demands."   *AEP*, 564 U.S. at 415, 422. "[B]orrowing the law of a particular State would be inappropriate."   *Id*.

By repeatedly holding that federal common law applies to cases addressing interstate pollution, the Supreme Court has *already* determined that it would be "inappropriate for state law to control" in such cases.   *Texas Indus., Inc.*, 451 U.S. at 641.   The enactment of the Clean Air Act does not change this.   The Supreme Court expressly stated as much in the context of greenhouse gas emissions, finding in *AEP* that "borrowing the law of a particular State would be inappropriate" where plaintiffs sued to limit defendants' carbon dioxide emissions.   564 U.S. at 422.

---

[18]   For that reason, the Attorney General is wrong to suggest that *AEP* left open the possibility that its claims are viable under state law.   Br. 12. The Attorney General has not pled claims based on the law of each state where Defendants' alleged conduct occurred; instead, it pled state law claims that challenge fossil fuel production, sales, and related emissions without geographic limitation.

*Comer* v. *Murphy Oil USA, Inc.*, a case that applied *AEP's* reasoning in holding that state law claims were displaced by the Clean Air Act, illustrates this.  There, the federal district court dismissed plaintiffs' federal and *state* common law claims as displaced by the Clean Air Act, reasoning that although the Supreme Court "did not reach the issue of whether the Clean Air Act preempted the plaintiffs' state common law nuisance claims"[19] in *AEP*, the *AEP* court "expressed concern that the plaintiffs were calling upon the federal courts" to make determinations "entrusted by Congress to the EPA."  839 F. Supp. 2d 849, 865 (S.D. Miss. 2012).

It would likewise be "inappropriate" for the Attorney General to "borrow the law" of Minnesota to effectively regulate Defendants' production and sale of fossil fuel energy in each of the 50 states, particularly where many such states and the federal government have *rejected* the very policies that the Attorney General seeks to advance in this lawsuit.  Because "[e]ach state stands on the same level with all the rest," no state "can impose its own legislation on [] one of the others."  *Kansas* v. *Colorado*, 206 U.S. 46, 97 (1907); *see also Franchise Tax Bd. of Cal.* v. *Hyatt*, 139 S. Ct. 1485, 1497–98 (2019) (because "[t]he Constitution [] reflects implicit alterations to the States' relationships with each other," states may not "supply rules of decision governing disputes implicating their conflicting rights," like "interstate disputes over borders" or

---

[19]  Neither the plaintiffs in *Kivalina* or *AEP* attempted to pursue state common law claims following the Ninth Circuit's and Supreme Court's respective holdings that federal common law governed the climate change claims in those cases.

"the interpretation of interstate compacts"). Thus, allowing a state court to adjudicate this case would allow Minnesota to impose its law nationwide. Adjudicating cases alleging injuries based on climate change in state courts will inevitably create interstate friction, as states will take different views about balancing the benefits of oil and gas production against environmental concerns. *See Milwaukee I*, 406 U.S. at 107 n.9 (without a uniform federal rule for transboundary pollution claims, "proliferating contentions [between the states] would seem to be inevitable"). This is thus precisely the type of case that necessitates the application of federal common law, such that state law cannot apply.

## E. The Applicability of Federal Common Law Provides a Basis for Removal

The Attorney General does not dispute that this Court has original jurisdiction over federal common law claims. However, according to the Attorney General, even if federal common law applies to the Attorney General's claims, removal on this basis is precluded by the well-pleaded complaint rule. The Attorney General is incorrect for two reasons: (1) courts have recognized an exception to the well-pleaded complaint rule where the plaintiff's putative state-law claims arise under federal common law, and (2) federal common law presents a substantial federal question for purposes of *Grable* jurisdiction, as set forth in § II below.

First, many federal appellate courts have recognized that claims asserted in an exclusively federal area arise under federal common law and create federal

28

jurisdiction—no matter how they are pled.[20]  For example, in *Sam L. Majors Jewelers*, the Fifth Circuit held that removal was proper where the plaintiff's state law negligence claim arose under federal common law.   117 F.3d at 929.   The court expressly recognized that "[t]here are three theories that . . . support federal question jurisdiction," including "if the cause of action arises under federal common law principles."  *Id*. at 924.   Thus, federal jurisdiction was proper, notwithstanding that the plaintiff's action did not arise under a federal statute and was not completely preempted.  *Id*. at 926.[21] *See also Treiber & Straub, Inc.* v. *UPS, Inc.*, 474 F.3d 379, 384 (7th Cir. 2007) (finding a state-law claim arose under federal common law "and thus falls within the district court's federal question jurisdiction"); *Caudill* v. *Blue Cross and Blue Shield of N.C.*, 999 F.2d 74, 77-78 (4th Cir. 1993) (affirming removal of a complaint alleging a state-

---

[20]  As an initial matter, as cases in this District have correctly recognized, "even where it appears a plaintiff's complaint exclusively sets forth state law claims, removal may be proper . . . [where] plaintiff has attempted to avoid removal jurisdiction by artfully casting its essentially federal law claims[] as state-law claims."  *Taft* v. *Burlington N. R.R. Corp.*, 926 F. Supp. 866, 868 (D. Minn. 1996) (citations omitted); *see also Federated Dep't Stores, Inc.* v. *Moitie*, 452 U.S. 394, 398 n.2 (1981); *Gore* v. *Trans World Airlines*, 210 F.3d 944, 950 (8th Cir. 2000).

[21]  The Attorney General contends that "Defendants' insistence that federal common law 'governs,' is a euphemism to disguise their argument that federal common law preempts the Attorney General's claims."  Br. 13.  Not so.  Contrary to the Attorney General's argument, complete preemption is *not* required for removal of the Attorney General's claims, which inherently arise under federal common law. Artful pleading that disguises what is really a federal cause of action is a separate and distinct basis for removal than an argument that a claim is completely preempted by federal law.  *Taft*, 926 F. Supp. at 868; *Sam L. Majors Jewelers*, 117 F.3d at 924, 929.

29

law claim for breach of a federal health insurance contract, recognizing that "some areas involving 'uniquely federal interests' may be so important to the federal government that a 'federal common law' related to those areas will supplant state law . . . regardless of whether Congress has shown any intent to preempt the area");[22] *Battle* v. *Seibels Bruce Ins. Co.*, 288 F.3d 596, 607-08 (4th Cir. 2002) (reversing remand of a homeowner's state-law claims against his flood insurer because "federal common law alone governs the interpretation" of flood insurance policies); *Newton* v. *Capital Assurance Co.*, 245 F.3d 1306, 1309 (11th Cir. 2001) (similar).

The Eighth Circuit has similarly found federal jurisdiction over a removed complaint that raised putative state-law claims. *In re Otter Tail Power Co.*, 116 F.3d 1207, 1213-15 (8th Cir. 1997) (finding plaintiff's characterization of a claim as based solely on state law "not dispositive"). And the Second Circuit has upheld federal jurisdiction over claims governed by the federal common law of foreign relations. *Marcos*, 806 F.2d at 346, 352-54 (finding that although "the face of the complaint" asserted state-law claim, removal was proper because the action "necessarily require[s] determinations that will directly and significantly affect American foreign relations").

To the extent that a few courts in related cases have come to a contrary conclusion, they have misinterpreted the well-pleaded complaint rule. Those decisions

---

[22] Although the Supreme Court later disagreed that federal common law governs such contracts, *see Empire Healthchoice Assurance, Inc.* v. *McVeigh*, 547 U.S. 677, 693 (2006), it did not disturb *Caudill*'s holding that state-law claims are removable if they arise in an area implicating uniquely federal interests.

have given dispositive force to the *label* a plaintiff applies to the claims in its complaint, rather than the *substance* of the allegations. For example, in *City of Oakland* v. *BP PLC*, the Ninth Circuit failed to recognize the exception to the well-pleaded complaint rule, as set forth in the cases in the paragraph above, where federal common law applies. 969 F.3d 895, 906 (9th Cir. 2020).

Second, for the reasons set forth in § II below, federal common law presents a substantial federal question pursuant to the *Grable* doctrine. The Attorney General argues to the contrary, based on the Ninth Circuit's statement that "the Supreme Court has not yet determined that there is a federal common law of public nuisance relating to interstate pollution," and to the extent such federal common law exists, it has been displaced by the Clean Air Act. *Id.* at 906. However, the Supreme Court has *repeatedly* held that claims of interstate pollution arise under federal common law. *Supra* § I(A).[23] Moreover, even to the extent that the Attorney General's inherently federal common law claims have been displaced by the Clean Air Act, state law *cannot* then apply, as a constitutional matter and pursuant to Supreme Court precedent. *Supra* § I(D).

In sum, although the Attorney General labels its claims as arising under state law, the federal issues implicated by the substance of its allegations are unavoidably

---

[23] S*ee also* U.S. Amicus Br., *City of Oakland* v. *BP p.l.c.*, at 6 ("The panel did not address a longstanding line of Supreme Court cases . . . under which the Cities' claims are governed by federal common law.").

31

governed by federal law.  Because the Attorney General's claims are inherently federal, federal jurisdiction over the Complaint is proper.

## II.    This Action Satisfies the *Grable* Doctrine's Jurisdictional Prerequisites

This action, which purports to allege claims only under Minnesota state law, "arises under" federal law pursuant to the *Grable* doctrine.  That doctrine provides federal jurisdiction over a putative state law claim if a federal issue is (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress.  *Grable & Sons Metal Prods., Inc.*, 545 U.S. at 314.  Determining whether federal jurisdiction is present "calls for a common-sense accommodation of judgment to [the] kaleidoscopic situations that present a federal issue" and thus "justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues." *Id.* at 312-13 (citations omitted).

While the Complaint asserts violations of state consumer protection laws, the Attorney General's allegations demonstrate an attempt to countermand federal energy and environmental policy.  The federal government has already addressed, and is currently addressing, climate change concerns through domestic statutes and regulations, and international agreements.  The Attorney General's allegations implicate those federal issues, requiring the application of *Grable* here.

### A.   The Complaint Necessarily Raises Substantial Federal Issues That Are Actually Disputed

*Grable* jurisdiction is appropriate here because the Complaint (1) "necessarily raise[s] a stated federal issue" that is (2) "actually disputed" and (3) "substantial." *Id.* at 314.

*First*, Congress has already struck a careful balance between energy production and environmental protection by passing federal statutes such as the Clean Air Act, 42 U.S.C. § 7401(c), that regulate greenhouse emissions, and otherwise directing the EPA to regulate ExxonMobil's and FHR's conduct. *See AEP*, 564 U.S. at 421; *see also* Compl. ¶¶ 81-82 (discussing national and international energy and climate policies). The federal government "affirmatively promotes fossil fuel use in a host of ways, including beneficial tax provisions, permits for imports and exports, subsidies for domestic and overseas projects, and leases for fuel extraction on federal land." *Juliana* v. *United States*, 947 F.3d 1159, 1167 (9th Cir. 2020). These federal statutes and regulations demonstrate that Congress *already weighs* the costs and benefits of fossil fuels, and nonetheless permits and encourages their sale in part because affordable energy is critical for economic stability and national security. *See, e.g.*, 42 U.S.C. § 15927(b); *City of Oakland* v. *BP p.l.c.*, 325 F. Supp. 3d 1017, 1023 (N.D. Cal. 2018), *vacated on other grounds*, *sub nom. County of San Mateo* v. *Chevron Corp.* 960 F.3d 570 (9th Cir. 2020).

The Eighth Circuit has made clear that claims present substantial federal questions when they "directly implicate[] action taken by [federal agencies] in approving the creation of [federal programs] and the rules governing [them]." *Pet Quarters, Inc.*, 559 F.3d at 779. The plaintiff in *Pet Quarters*, like the Attorney General here, argued that "its state law claims do not depend on resolution of any federal question" because "federal law is implicated only as part of the defendants' preemption defense, which is not a proper basis for removal." *Id*. at 779; *see also* Br. 10. The Eighth Circuit rejected that argument and held that the challenge to the stock borrower program at issue raised substantial federal questions because the program had been approved by the Securities and Exchange Commission. *Id.*

Similarly, the Attorney General's request here that a state court substitute its judgment for that of Congress and the EPA is a "collateral attack" on an "entire [federal] regulatory scheme . . . premised on the notion that [the scheme] provides inadequate protection." *Bd. of Comm'rs of Southeast La. Flood Protection Authority—East* v. *Tenn. Gas Pipeline Co., LLC*, 850 F.3d 714, 724 (5th Cir. 2017). Removal is thus essential. *See, e.g.*, *Pet Quarters*, 559 F.3d at 779; *Bryan* v. *BellSouth Commc'ns, Inc.*, 377 F.3d 424, 432 (4th Cir. 2004); *Hill* v. *BellSouth Telecomms., Inc.*, 364 F.3d 1308, 1317 (11th Cir. 2004).

This action second-guesses congressional judgments and would thus upset the careful balance Congress has struck regarding energy production, greenhouse gas emissions, and climate change concerns. The Attorney General is thus forced to argue

34

that its collateral attack is "irrelevant" to federal question jurisdiction because it has lodged a consumer-protection action rather than a nuisance claim.   Br. 15.   That argument fails because "some areas involving 'uniquely federal interests' may be so important to the federal government that a 'federal common law' related to those areas will supplant state law . . . regardless of whether Congress has shown any intent to preempt the area." *Caudill*, 999 F.2d at 78.   The Complaint alleges that Defendants misled consumers by concealing the "dangers" of their products.   Compl. ¶ 174.   But the extent to which the production and use of fossil fuels should be restricted as unduly "dangerous" due to greenhouse gas emissions is *precisely* the question Congress and the EPA have addressed through legislation and national policy.

*Second*, to the extent the Attorney General asserts that federal policymakers would have adopted different energy and climate policies absent alleged misrepresentations, the Complaint asserts federal claims. In particular, the Complaint alleges that Defendants engaged in a civil conspiracy "to mislead the public and decision makers about the consequences of using their products," Compl. ¶ 206, and the alleged targets of the conspiracy included "regulators[]," "policy makers[]," and "the White House," *id*. ¶¶ 100, 216. Defendants reject any suggestion that one or more Defendants misled decision makers. Nevertheless, claims based on any such assertions arise under federal law. See *Buckman Co.* v. *Pls.' Legal Comm.*, 531 U.S. 341, 347 (2001); *Pet Quarters*, 559 F.3d at 779; *Kemp* v. *Medtronic, Inc*., 231 F.3d 216, 235 (6th Cir. 2000).

*Third*, as described in detail *supra* § I(C), the foreign policy of the United States reflects the federal government's careful balancing of a variety of interests relevant to the regulation of energy production, greenhouse gas emissions, and climate change. For example, the United States decided to leave the Paris Accord in part because it believed that the treaty wrongly balanced economic growth against environmental conservation. To adjudicate the Attorney General's claims, a state court would have to interpret the Paris Accord, whether approved or not by this or the next President to determine the balance of costs and benefits struck by the treaty or Presidential action rejecting the treaty. Under well-settled precedent, only a federal court can undertake this task. *Maugnie* v. *Compagnie Nationale Air France*, 549 F.2d 1256, 1258 (9th Cir. 1977) (explaining that the scope of a treaty "is a matter of federal law and federal treaty interpretation"). Further, any such judicial evaluation of the wisdom of the federal government's foreign policy judgments "will directly and significantly affect American foreign relations," *Marcos*, 806 F.2d at 352; *see also City of New York*, 325 F. Supp. 3d at 475. Because foreign policy inherently implicates national security, the need for federal jurisdiction in this case is only heightened. *See In re Nat'l Sec. Agency Telecomms. Records Litig.*, 483 F. Supp. 2d 934, 943 (N.D. Cal. 2007).

*Fourth*, as described in detail *supra* § I(B), the Complaint necessarily raises the substantial federal question of whether a cognizable injury has been suffered by way of navigable waters of the United States and, if so, whether such injury can be remedied in a manner consistent with federal law. *See* Compl. ¶¶ 46, 142-49. Congress has given

the U.S. Army Corps of Engineers jurisdiction to regulate the navigable waters of the United States, *see* 33 U.S.C. § 401 *et seq.*, including sea level rise, *see* 33 U.S.C. § 426i.[24]  The Attorney General is thus asking a state court to second-guess the efficacy of the Corps's programs, to interpret an extensive web of federal statutes and regulations, *see*, *e.g.*, 33 U.S.C. § 403 *et seq.*; 33 U.S.C. §§ 1343, 1344; 33 C.F.R. § 320.4(a)(1)-(2), and to evaluate whether the Corps has appropriately exercised its authority over interstate and international bodies of water.

*Fifth*, by implicating the federal common law of transboundary pollution, navigable waters, and foreign relations as discussed, *supra* § I, the Attorney General's claims necessarily raise substantial questions of federal law. *Torres* v. *S. Peru Copper Corp.*, 113 F.3d 540, 542-43 (5th Cir. 1997) (upholding removal of claims raising foreign relations issues); *see also Battle* v. *Seibels Bruce Ins. Co.*, 288 F.3d 596, 607 (4th Cir. 2002) (a claim in an area where "federal common law *alone* governs" "necessarily depends on resolution of a substantial question of federal law") (citation omitted); *Newton* v. *Cap. Assurance Co.*, 245 F.3d 1306, 1309 (11th Cir. 2001) (a claim

---

[24] *See*, *e.g.*, U.S. Army Corps of Eng'rs, Eng'g Circular 1105-2-186, Planning Guidance on the Incorporation of Sea Level Rise Possibilities in Feasibility Studies (Apr. 21, 1989) (providing "guidance for incorporating the effects of possible changes in relative sea level in Corps of Engineers feasibility studies"); U.S. Army Corps of Eng'rs, *Climate Preparedness and Resilience*, https://www.usace.army.mil/corpsclimate/ (last visited July 24, 2020) (demonstrating that the Army Corps has its own program for responding to rising navigable waters).

that requires applying "principles of federal common law . . . satisfies § 1331 by raising a substantial federal question").

*Sixth*, this action raises important constitutional questions, most notably the question of whether there can be a state-law action for alleged climate change injuries at all. *See, e.g.*, *Milwaukee II*, 451 U.S. at 313 n.7. The action also requires the Court to consider the relationship between states and the constitutional division of authority between the federal government and the states, thus raising important issues of federalism that should be decided by a federal court. *See Kansas*, 206 U.S. at 97. A substantial constitutional issue embedded in a state-law claim, such as these, is the "classic example" of substantial question removal. *Grable*, 545 U.S. at 312.

The Attorney General argues that Defendants have not explained in sufficient detail how the Complaint necessarily raises federal issues. Br. 7-8.[25] This is false.

_____

[25] The Attorney General seeks refuge in the assertion that "[e]very court to consider the question has rejected the oil-industry defendants' arguments." Br. 6, 7-8. But not one of those decisions is binding on this Court or even from within the Eighth Circuit. Additionally, most of those decisions pertained to claims based on nuisance, not consumer protection theories. *See, e.g.*, *Baltimore*, 388 F. Supp. 3d at 559 (declining *Grable* jurisdiction where plaintiff "relies exclusively on state nuisance law"). Accordingly, those courts did not consider whether the courts would be forced to second guess federal decision-making on the propriety of their fossil-fuel-production activities in the process of deciding whether defendants' advertisements of those activities were materially misleading. *See supra* § II.A. In the lone opinion cited by the Attorney General that did consider a consumer protection theory, *Massachusetts* v. *Exxon Mobil Corp.*, the court did not consider whether plaintiff's causation theory depended on proof that federal policymakers would have adopted different policies absent the alleged conduct; whether the complaint necessarily raised the question of whether a cognizable injury has been suffered by way of

Defendants have shown that the true *purpose* of the Attorney General's lawsuit is to supplant the federal government's authority over substantial federal questions. *Supra* at 8-9.[26]

In any event, it is clear that "specific elements" of the state law claims here raise disputed and substantial federal questions. *Cent. Iowa Power Co-op* v. *Midwest Indep. Transmission Sys. Operator, Inc.*, 561 F.3d 904, 914 (8th Cir. 2009). For example, to establish a negligent or strict liability failure to warn claim under Minnesota law, the Attorney General must demonstrate *inter alia* that a product is "unreasonably dangerous." *Hagen* v. *McAlpine & Co. Ltd.*, 2015 WL 321428, at *5 (D. Minn. 2015). Determining "[w]hether a product is unreasonably dangerous requires the balancing of several competing factors," including "the likelihood of harm," "the gravity of harm," and the "burden of the precaution which would be effective to avoid the harm." *Id.* (quoting *Forslund* v. *Stryker Corp.*, 2010 WL 3905854, at *2 (D. Minn. Sept. 30, 2010)). That is *precisely* the weighing Congress and the EPA have already addressed through legislation and national policy related to fossil fuel production, sale, use, and

---

navigable waters of the United States; or whether the action raises important constitutional questions. 2020 WL 2769681, at *9 (D. Mass. May 28, 2020).

[26] The Attorney General relies on *In re Dicamba Herbicides Litig.*, No. 1:18-CV-21-SNLJ, 2018 WL 2447792, at *1 (E.D. Mo. May 31, 2018), which it claims rejected "analogous state-law claims." *See* Br. 9. But claims by soybean growers about harms caused by neighboring crops are not analogous to claims based on global climate change, which would directly interfere with federal regulatory and statutory decisions as well as international affairs.

combustion, and greenhouse gas emissions, and which the Attorney General would invite a state court to second guess. *See, e.g.*, 42 U.S.C. § 7401(c).

Similarly, in order to prove claims for common law fraud and violations of the Minnesota Consumer Fraud Act ("CFA"), the Minnesota Deceptive Trade Practices Act ("DTPA"), and the Minnesota False Statement in Advertising Act ("FSAA"), the Attorney General must demonstrate that any Defendants' statements in advertisements actually misrepresented "the role of Defendants' products in causing climate change, the potential harmful consequences of climate change, and the urgency of action required to mitigate climate change." Compl. ¶ 84; *see Popp Telecom, Inc.* v. *Am. Sharecom, Inc*., 361 F.3d 482, 491 (8th Cir. 2004) ("In order to maintain a common law fraud claim under Minnesota law, a plaintiff must prove," among other elements, "a false representation of material fact that is susceptible of knowledge"); Minn. Stat. § 325F.69 (CFA requires showing that the statements made were "false, misleading or deceptive"); Minn. Stat. § 325D.44 (DTPA requires showing that the defendant "engages in . . . conduct which . . . creates a likelihood of confusion or of misunderstanding"); Minn. Stat. § 325F.67 (FSAA requires showing that an advertisement contained a material statement "which is untrue, deceptive, or misleading"). Accordingly, the Attorney General's claims require that it show, and a state court decide, that the use and sale of fossil fuel energy is unsafe and detrimental in light of its alleged role in causing climate change. Yet Congress has already decided, through a myriad of statutes and accompanying regulations, the appropriate level of

fossil fuel energy balanced against economic interests and alleged environmental harms.[27]

## B.    Federal Jurisdiction Would Protect, Not Disturb, Federalism Principles

Federal jurisdiction over this case would be fully "consistent with congressional judgments about the sound division of labor between state and federal courts." *Grable*, 545 U.S. at 313.  Federal courts are the traditional fora for adjudicating claims involving the federal issues implicated here: environmental regulation, regulation of vital national resources, foreign policy, and national security.  *Cf., e.g.*, *Massachusetts* v. *EPA*, 549 U.S. 497, 519 (2007).

In fact, permitting these claims to be governed by state law would *threaten* the balance of federal-state relations.  "Power over external affairs is not shared by the States; it is vested in the national government exclusively."  *United States* v. *Pink*, 315 U.S. 203, 233 (1942).  State governments must yield to the federal government in foreign affairs so that this exclusively national power is "entirely free from local

---

[27] The Attorney General places great reliance on the Ninth Circuit's decision in *City of Oakland*.  Br. at 7-8, 13-14, 16.  But *City of Oakland* addressed only whether federal common law created a substantial federal question under *Grable*.  *City of Oakland* v. *BP p.l.c.*, 969 F.3d 895, 906-11 (9th Cir. 2020).  It did not address other grounds for *Grable* jurisdiction in the Notice of Removal.  In any event, this Court is not bound by *City of Oakland,* and Defendants respectfully submit that Judge Alsup's opinion below upholding federal jurisdiction was well-reasoned. *California* v. *BP p.l.c.*, No. C 17-06011 WHA, 2018 WL 1064293, at *5 (N.D. Cal. Feb. 27, 2018), *vacated and remanded sub nom. City of Oakland* v. *BP p.l.c.*, 969 F.3d 895, 912 (9th Cir. 2020) ("Federal jurisdiction exists in this case if the claims necessarily arise under federal common law.").

interference." *Hines* v. *Davidowitz*, 312 U.S. 52, 63 (1941).  It is even more important for foreign policy matters to be free from state *judicial* interference.  The Supreme Court has recognized that courts should not "judge the wisdom of the National Government's [foreign] policy; dissatisfaction should be addressed to the President or, perhaps, Congress." *Am. Ins. Ass'n* v. *Garamendi*, 539 U.S. 396, 427 (2003).[28]

Arguing that the Complaint does not support *Grable* jurisdiction, the Attorney General relies on rulings in several climate-change tort actions brought against certain Defendants in other jurisdictions.  Br. 13-14.  But in those cases, plaintiffs advanced claims largely based on nuisance, not consumer protection theories.[29]  Here, federal jurisdiction exists because the Attorney General's claims would force a court to second-guess federal decision-making on the propriety of fossil-fuel-production activities in

---

[28] In a footnote, the Attorney General asserts that the balance of state and federal responsibility favors adjudication in state court because "the State seeks to enforce its own law in its own courts, and product defect and consumer protection claims are squarely within traditional state police authority." Br. 10 n.4.  As noted above, this is not a traditional consumer protection enforcement action; it is an attempt to change federal policy by reducing the production and use of fossil fuels and regulating global greenhouse gas emissions. *See supra* § I.A.  Moreover, even assuming this was purely a consumer protection action, this case's resolution—even on state consumer protection grounds—could have sweeping impacts on national and international economies and policies. *See supra* § I.A. Exercising jurisdiction over this unique case will not meaningfully alter the relative caseloads of state and federal courts. *Cf. R.I. Fishermen's All., Inc.* v. *R.I. Dep't of Env't Mgmt.*, 585 F.3d 42, 52 (1st Cir. 2009).

[29] *See, e.g.*, *Mayor & City Council of Baltimore* v. *BP p.l.c.*, 388 F. Supp. 3d 538, 559 (D. Md. 2019), *aff'd*, 952 F.3d 452 (4th Cir. 2020), *cert. granted*, No. 19-1189, 2020 WL 5847132 (U.S. Oct. 2, 2020).

the process of deciding whether alleged advertisements of those activities were misleading. The Complaint criticizes certain Defendants' alleged "unabated and expanded extraction, production . . . and sale of [] fossil fuel products." Compl. ¶ 4. Moreover, all but one of the other decisions the Attorney General cites remain subject to further review, and in only one has the *Grable* ruling been subject to appellate consideration.[30] In none of those cases did a court address "defendants' arguments" as to whether federal adjudication would disrupt the principles of federalism,[31] and in only two did the court consider whether the federal interests were substantial.[32]

---

[30] The Supreme Court recently granted Defendants' petition for certiorari in *BP plc* v. *Mayor & City Council of Baltimore*, No. 19-1189, 2020 WL 5847132 (U.S. Oct. 2, 2020), to determine whether a court of appeals may review any issue encompassed in a district court's remand order where the removing defendant premised removal in part on the Federal Officer Removal statute, or the Civil Rights Removal Statute. Thus, the prior decisions to which the Attorney General refers may be subject to further review should the Supreme Court rule in defendants' favor. It is possible that the Supreme Court will also reach the issue whether these cases arise under federal law. Petition for a Writ of Certiorari at 20 & n.3, *BP plc* v. *Mayor & City Council of Baltimore*, No. 19-1189 (2020) (asking Supreme Court to reach merits and noting that merits were "briefed at length" in court of appeals).

[31] *Rhode Island* v. *Chevron Corp.*, 393 F. Supp. 3d 142, 150-51 (D.R.I. 2019), *aff'd*, No. 19-1818, 2020 WL 6336000 (1st Cir. Oct. 29, 2020); *Baltimore*, 388 F. Supp. 3d at 559; *County of San Mateo* v. *Chevron Corp.*, 294 F. Supp. 3d 934, 938 (N.D. Cal. 2018), *aff'd on other grounds*, 960 F.3d 586 (9th Cir. 2020).

[32] *City of Oakland*, 969 F.3d at 906-07; *Board of County Commissioners of Boulder County* v. *Suncor Energy (U.S.A.) Inc.*, 405 F. Supp. 3d 947, 968 (D. Colo. 2019), *aff'd*, 965 F.3d 792 (10th Cir. 2020).

### III.    This Action Meets the Elements of the Federal Officer Removal Statute

Defendants may also remove this action because the federal government directed Defendants to engage in activities relating to the Attorney General's claims.  *See* 28 U.S.C. § 1442(a)(1).  "[D]efendants enjoy much broader removal rights under the federal officer removal statute than they do under the general removal statute." *Leite* v. *Crane Co.*, 749 F.3d 1117, 1122 (9th Cir. 2014).  A defendant's allegations "in support of removal" need only be "facially plausible." *Baker* v. *Atl. Richfield Co.*, 962 F.3d 937, 941 (7th Cir. 2020).  A court must "credit [the defendant's] theory of the case," *Jefferson County* v. *Acker*, 527 U.S. 423, 432 (1999), and grant it the "benefit of all reasonable inferences from the facts alleged," *Baker*, 962 F.3d at 945.

It is well settled that unlike other removal statutes, the Federal Officer Removal Statute is to be liberally construed.  The Supreme Court has warned against "frustrat[ing]" the policy of providing the protection of a federal forum to federal officers with a "narrow, grudging interpretation of § 1442(a)(1)." *Willingham* v. *Morgan*, 395 U.S. 402, 407 (1969); *see also Watson* v. *Philip Morris Cos.*, 551 U.S. 142, 147 (2007) ("The words 'acting under' are broad, and this Court has made clear that the statute must be 'liberally construed.'" (quoting *Colorado* v. *Symes*, 286 U.S. 510, 517 (1932))).

The Federal Officer Removal Statute authorizes removal of claims when (1) a defendant has acted under the direction of a federal officer; (2) there was a some relation or connection between the defendant's actions and the official authority; (3) the

defendant has a colorable federal defense to the plaintiff's claims; and (4) the defendant is a "person," within the meaning of the statute.[33]  *Jacks* v. *Meridian Res. Co., LLC*, 701 F.3d 1224, 1230 (8th Cir. 2012).  As part of the Removal Clarification Act of 2011, Congress amended section 1442(a) to add "relating to" to the statutory text, thereby "broaden[ing] federal officer removal to actions, not just *causally* connected, but alternatively *connected or associated*, with acts under color of federal office." *Latiolais* v. *Huntington*, 951 F.3d 286, 292 (5th Cir. 2020) (emphasis in original); *see also Graves* v. *3M Co.*, 447 F. Supp. 3d 908, 913 (D. Minn. 2020), *appeal docketed*, No. 20-1635 (8th Cir. Mar. 26, 2020) (same).  A defendant entitled to exercise federal officer removal can "unilaterally remove" the entire case to federal court, even without the consent of its co-defendants, *Durham* v. *Lockheed Martin Corp.*, 445 F.3d 1247, 1253 (9th Cir. 2006), although each defendant consents here.

---

[33]  The fourth element is not disputed here—Defendants, all of which are corporations, are "person[s]" within the meaning of Section 1442.  *See Jacks,* 701 F.2d at 1230 n.3.  In a footnote, the Attorney General contests the third element, arguing that Defendants do not have a colorable federal defense.  Br. 25 n.11.  The argument is wrong.  Defendants have several colorable (indeed, meritorious) federal defenses, including under the Clean Air Act, *AEP*, 564 U.S. at 424, the Commerce Clause, *Healy* v. *Beer Inst.*, 491 U.S. 324, 336-37 (1989), Due Process Clause, *State Farm Mut. Ins. Co.* v. *Campbell*, 538 U.S. 408, 421 (2003), First Amendment, *Yearsley* v. *W.A. Ross Constr. Co.*, 309 U.S. 18, 20-21 (1940), and the foreign affairs doctrine, *see Garamendi*, 539 U.S. at 413-20.  Each of these defenses is more than sufficient to satisfy Section 1442.  *See United States* v. *Todd,* 245 F.3d 691, 693 (8th Cir. 2001) ("For a defense to be considered colorable, it need only be plausible; § 1442(a)(1) does not require a court to hold that a defense will be successful before removal is appropriate.").

### A. Defendants Have, for Many Decades, Acted under the Direction and Subject to the Control of the Federal Government

Defendants "acted under" federal officers because the government guided, supervised, and controlled Defendants' actions, and because Defendants engaged in "an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior." *Watson*, 551 U.S. at 152. The Supreme Court has emphasized that "[t]he words 'acting under' are broad," and are satisfied where, "in the absence of [] contract[s] with [] private firm[s], the Government itself would have had to perform." *Id.*, at 147, 154. The Eighth Circuit has already held that "private contractors" who produce products to "help the government conduct a war" are engaged in "the sort of assistance contemplated by the statute." *Jacks*, 701 F.3d at 1231. As established below, Defendants clearly satisfy this requirement.[34]

### 1. The Federal Government Has Directed and Controlled Defendants' Conduct Since at least World War II

Federal officers extensively supervised and controlled certain Defendants' production of fossil fuels and development of specialized military products in support of multiple war efforts.

---

[34] Although the Complaint improperly conflates the activities of Defendants with the activities of their separately organized predecessors, subsidiaries, and affiliates, for purposes of this remand opposition only, Defendants describe the conduct of certain predecessors, subsidiaries, or affiliates to show that the Attorney General's Complaint, as pleaded, was properly removed to federal court.

*First*, the federal government exercised comprehensive control over the entire oil and gas industry during World War II by enlisting and fundamentally reshaping the industry to produce necessary war products. "Because avgas [aviation fuel] was critical to the war effort, the United States government exercised significant control over the means of its production during World War II." *United States* v. *Shell Oil Co.*, 294 F.3d 1045, 1049 (9th Cir. 2002). The "federal government directed the owners and operators of the nation's crude oil refineries to convert their operations" in order to produce avgas and other products which "the military desperately needed." *See Exxon Mobil Corp.* v. *United States*, Civ. No. H-10-2386, 2020 WL 5573048, at *30 (S.D. Tex. Sept. 16, 2020). Avgas was considered indispensable to an Allied victory. *See id.* at *13; *see also Shell Oil Co.* v. *United States*, 751 F.3d 1282, 1285 (Fed. Cir. 2014).

ExxonMobil would not have produced avgas—let alone at the levels the military required—absent federal control and direction. *Exxon Mobil*, 2020 WL 5573048, at *12 (The federal government "insist[ed] that each company utilize[] all of its facilities to make 100 octane aviation gasoline," and "there [wa]s not in fact any freedom to make a choice between contracting and not contracting."). The Petroleum Administration for War ("PAW")—one of the federal entities responsible for directing avgas production— "told the refiners what to make, how much of it to make, and what quality," *Shell Oil*, 751 F.3d at 1286, and issued monthly instructions as to "the composition of [the refiner's] blends, the sources from which he was to obtain components, and to whom he was to ship other components." *Exxon Mobil*, 2020 WL 5573048, at *12.

47

When directing the production of avgas and other essential military products, the federal government disregarded the distinctions among the various private oil and gas companies; the PAW coordinated all of their activities as if they were "units of one enterprise and directed their operations so as to produce the maximum quantities of aviation gasoline at the earliest possible time." *Id.*  In fact, the federal government took the extraordinary step of exempting the oil and gas industry from the antitrust laws, so they could be molded into one functional unit under control of the PAW.[35]  The PAW made clear that oil and gas companies had no choice but to comply with the federal government's production and specifications mandates.  *Exxon Mobil*, 2020 WL 5573048, at *12 (The PAW would "quit allocating crude oil to those that didn't devote themselves to what we called the war effort," in effect shuttering oil and gas companies that did not comply).

The significant and comprehensive control the federal government exerted over ExxonMobil's production of avgas during World War II is precisely what the Federal Officer Removal Statute contemplates.  *See Betzner* v. *Boeing Co.*, 910 F.3d 1010, 1015 (7th Cir. 2018) (removal proper when defendant "acted under the military's detailed and ongoing control" by "contract[ing] to manufacture heavy bomber aircraft"); *see*

---

[35] *See* Petroleum Administration for War, *A History of the Petroleum Administration for War, 1941-1945*, 383 (John W. Frey & H. Chandler Ide eds. 2005) (letter of assurance from United States Attorney General that "in the present emergency acts performed by industry under the direction of public authority, and designed to promote public interest and not to achieve private ends, do not constitute violations of the antitrust laws").

48

*also Camacho* v. *Autoridad de Telefonos de Puerto Rico*, 868 F.2d 482, 486 (1st Cir. 1989). The relaxation of the antitrust laws, the rationing of materials, and production quotas cannot be compared to traditional regulation—they create the kind of "special relationship" between the government and private industry described in *Watson*. *See Watson*, 551 U.S. at 151-52.

*Second*, the federal government has continued to control ExxonMobil's and FHR's contributions to military efforts. At the advent of the Korean War in 1950, President Truman established the Petroleum Administration for Defense ("PAD"), under authority of the Defense Production Act of 1950, Pub. L. 81-774, which issued production orders to Defendants and other oil and gas companies, including to ensure adequate quantities of avgas for military use.[36] *See Exxon Mobil*, 2020 WL 5573048, at *15. Defendants continue to supply fossil fuel products, including the dominant military jet fuel for NATO air force, to the U.S. military pursuant to the exacting specifications set forth by the federal government. Historically and today, certain Defendants have been among the top suppliers of fossil fuel products to the U.S. military, whose energy needs are coordinated through the Defense Energy Support Center ("DESC").[37]

---

[36] *See* Fourth Annual Report on the Activities of the Joint Committee on Defense Production, 84th Cong., 1st Sess., H. Rep. No. 1, at 122 (Jan. 5, 1955).

[37] *See* Anthony Andrews, Cong. Rsch. Serv., R40459, Department of Defense Fuel Spending, Supply, Acquisition, and Policy 10 (2009).

### 2. Defendants Have Engaged in the Exploration and Production of Fossil Fuels under Agreements with Federal Agencies Exercising Supervision and Control

In addition to supporting national defense, Defendants have also worked at federal direction to extract and produce critical energy resources for the nation.

*First*, over the past 70 years, the U.S. government has directed Defendants to explore for, develop, and produce oil and gas on the OCS pursuant to leases issued by the federal government, and governed by OCSLA, 43 U.S.C. § 1331 *et seq.* The aim is to promote energy security and reduce reliance on oil imported from hostile powers. Under OCSLA, the Department of Interior maintains and administers the OCS leasing program, under which lessees are obligated to "develop[] . . . the leased area" diligently, including carrying out exploration, development, and production activities for the express purpose of "maximiz[ing] the ultimate recovery of hydrocarbons from the leased area." Ex. 7 § 10.

In the wake of the energy shortages of the 1970s, Congress considered a proposal to create a national company to facilitate OCS development.[38] The proposal was ultimately rejected; instead, the government contracted with private energy companies, including Defendants, to perform these essential tasks on its behalf with expanded federal supervision and control. In 1978, Congress adopted amendments to OCSLA that greatly increased the Secretary of the Interior's control over the OCS leasing

---

[38] *See* Ex. 8 at S903-04.

50

program and instructed the Secretary to create oil and gas leasing programs on a five-year review cycle "which he [or she] determines will best meet national energy needs for the five-year period following its approval or reapproval."[39]  43 U.S.C. § 1344(a)-(e).

Following the 1978 amendments, Defendants' activities on the OCS increased significantly, consistent with federal oil and gas leasing programs that were designed to meet national energy needs.  For instance, more than three times as many barrels of oil were produced from the OCS in the 25 years following the Arab Oil Embargo of 1973 than in the 25 years before the embargo.[40]  In the years since 1973, certain Defendants (or their subsidiaries or affiliates) have ranked among the top operators on the OCS, as ranked by volume of oil produced.[41]

The Notice detailed specific lease and statutory provisions through which the federal government supervises and controls Defendants as federal mineral lessees on federal lands, including the OCS.  *See* Notice ¶¶ 81-92; Ex. 7; Ex. 9; Ex. 10.  For

---

[39]  In the lead-up to the 1978 amendments, the Ad Hoc Select Committee on the OCS published a report stating that "alternative sources of energy will not be commercially practical for years to come," and thus, "a healthy economy remains dependent on supplies of oil and gas."  H.R. Rep. No. 94-1084, at 254 (1976).

[40]  U.S. Dep't of Interior, Bureau of Safety & Env't Enf't, *Gulf of Mexico Region: Annual Summary of Production for Entire Region*, https://www.data.bsee.gov/Main/HtmlPage.aspx?page=annualRegion (last visited Oct. 16, 2020).

[41]  U.S. Dep't of Interior, Mins. Mgmt. Serv., *Gulf of Mexico Region: Production by Operated Ranked by Volume* (Dec. 22, 2000), https://www.data.bsee.gov/Production/Files/Rank%20File%20Oil%201947-1995.pdf.

example, "the federal government retains the right to control a lessee's rate of production from its lease," including by setting the "Maximum Efficient Rate for production from a reservoir—that is, a cap on the production rate from all of the wells producing from a reservoir." Notice ¶ 83. Federal regulations also control the means of oil and gas production on the OCS, including the use of enhanced oil and gas recovery operations (30 C.F.R. § 250.1165), well tests (*id.* §§ 250.1151, 250.1152), and flaring and venting gas (*id.* § 250.1160-64). Through these leases, Defendants have fulfilled a government need to produce oil and gas from federal lands to further energy security. *See Sawyer* v. *Foster Wheeler LLC*, 860 F.3d 249, 255 (4th Cir. 2017).

*Second*, ExxonMobil acted under federal officers as an operator and lessee of the Strategic Petroleum Reserve infrastructure. Under 43 U.S.C. § 1353(a)(1), "all royalties . . . accruing to the United States under any oil and gas lease [under OCSLA] . . . shall, on demand of the Secretary [of the Interior], be paid in oil and gas." From 1999 to December 2009, the federal government's "primary means of acquiring oil for the [Strategic Petroleum Reserve]" was by taking its royalties from oil produced from federal offshore leases as royalties "in kind" as part of the so-called "RIK" program.[42] The federal government required ExxonMobil (and/or its predecessors, subsidiaries, or affiliates), as a lessee of federal offshore leases on the OCS, to pay royalties "in kind,"

---

[42] U.S. Dep't of Energy, Filling the Strategic Petroleum Reserve, https://www.energy.gov/fe/services/petroleum-reserves/strategic-petroleum-reserve/filling-strategic-petroleum-reserve (last visited Nov. 8, 2020).

52

which the government used for its strategic stockpile, a crucial element of U.S. energy security and treaty obligations.[43]   ExxonMobil thus "help[ed] the Government to produce an item that it needs." *Watson*, 551 U.S. at 153.

In addition, the Department of Energy has leased to an ExxonMobil affiliate the St. James Terminal in Louisiana and two government-owned pipelines that are also part of the Strategic Petroleum Reserve near Freeport, Texas.[44]   The Department of Energy's leases enable the affiliate to use the facilities for its commercial purposes, subject to the federal government's supervision and control in the event of the President's call for an emergency drawdown.   *See* 42 U.S.C. § 6241(d)(1).   The United States has exercised this control to draw down the reserve, including in response to Hurricane Katrina in 2005 and disruptions to the oil supply in Libya in 2011.[45]

---

[43]   *See*, *e.g.*, U.S. Dep't of Interior, Mins. Mgmt. Serv., Sample Dear Operator Letter (Dec. 14, 1999), https://onrr.gov/ReportPay/PDFDocs/991214.pdf (invoking OCSLA and royalty provisions in federal leases operated by certain Defendants, and/or their predecessors, subsidiaries, or affiliates, "to use royalties in kind (RIK) to replenish the Strategic Petroleum Reserve (SPR)").

[44]   *See* U.S. Dep't of Energy, Department of Energy Awards Strategic Petroleum Reserve Lease to ExxonMobil (Oct. 28, 2019), https://www.energy.gov/articles/department-energy-awards-strategic-petroleum-reserve-lease-exxonmobil; U.S. Dep't of Energy, Strategic Petroleum Reserve Annual Report to Congress for Calendar Year 2010, at 34 (2011); U.S. Dep't of Energy, DOE Signs Major Agreement with Exxon Pipeline to Lease Idle Pipelines at Strategic Reserve (Jan. 14, 1999), https://fossil.energy.gov/techline/techlines/1999/tl_bmlse.html.

[45]   *See* U.S. Dep't of Energy, History of SPR Releases, https://www.energy.gov/fe/services/petroleum-reserves/strategic-petroleum-reserve/releasing-oil-spr (last visited Nov. 8, 2020).

Despite this overwhelming evidence of federal officer direction and control, the Attorney General contends that Defendants were not "acting under" federal officers because they were "private entit[ies]" pursuing "commercial purposes." Br. 25. But even if true, that would not be dispositive nor is it the test for removal. Courts routinely find that private entities pursuing commercial purposes were nonetheless acting under federal officers. *See, e.g.*, *Jacks*, 701 F.3d at 1230-35 (Blue Cross Blue Shield); *Isaacson* v. *Dow Chem. Co.*, 517 F.3d 129, 133 (2d Cir. 2008) (Dow Chemical). Here, Defendants' relationship with the federal government was—and remains—far more than arm's length commercial transactions. As demonstrated above, the federal government engaged in extensive supervision and control of ExxonMobil's and FHR's production of fossil fuels spanning back nearly a century and continuing to today through those Defendants' supply of fossil fuels to the U.S. military and exploration of the OCS on behalf of the government—activities that the government would have had to perform in the absence of its contracts with Defendants.

### B.    Defendants' Activities, Undertaken at Federal Direction, Are "Connected or Associated" with the Attorney General's Claims

The Attorney General's claims "relat[e] to" Defendants' activities taken at federal direction. 28 U.S.C. § 1442(a)(1). To satisfy the nexus requirement, defendants must show only that the alleged conduct "relat[es] to any act under color" of a federal office. *Id*. The Eighth Circuit has recognized that this connection requirement is "quite low." *Jacks*, 701 F.3d at 1230 n.3 (quoting *Isaacson*, 517 F.3d at 137); *see also Graves*,

447 F. Supp. 3d at 913.  Under this standard, a defendant need only demonstrate that the relevant conduct "ha[s] some connection to, or association with, governmental actions."  *Id*.  In addition, "[t]he Supreme Court has made clear that the courts should credit Defendant's theory of the case when determining whether a causal connection exists."  *Id.* (citing *Acker*, 527 U.S. at 432 (1999)); *see also K&D LLC* v. *Trump Old Post Office LLC*, 951 F.3d 503, 506 (D.C. Cir. 2020); *Baker*, 962 F.3d 937, 945 (7th Cir. 2020).

Here, crediting the defense theory of the case, Defendants' fossil fuel activities easily satisfy the low threshold of having "some connection to, or association with" actions directed by the federal government.  Indeed, a substantial amount of the fossil fuel activities upon which the Complaint is based were performed under the direction of the federal government.  While the federal government required increased production for the war effort, the Attorney General complains about the levels of past production.  The federal interests implicated by that conflict—including the federal government's ability to recruit private assistance in the future—should be litigated in federal court.

Straining to resist this conclusion, the Attorney General makes several factually and legally deficient arguments.  *First*, the Attorney General argues that its claims are not connected to federally-directed activities because the Complaint purports to disclaim injuries arising from Defendants' provision of fossil fuel products to the federal government.  Br. 22.  As an initial matter, the Complaint concedes that the alleged injuries "arose from Defendants' provision of fossil fuel products to the federal

government for military and national defense purposes."  Compl. ¶ 9 n.4.  That the

Attorney General offers this concession in the context of disclaiming such injuries is of

no significance.  The disclaimer is completely ineffective as the Attorney General offers

no method to isolate injuries from federally-directed conduct, nor is one possible in

light of the undifferentiated nature of the climate change-based harm alleged in the

Complaint.  *See Kivalina*, 663 F. Supp. 2d at 880 ("[T]here is no realistic possibility of

tracing any particular alleged effect of global warming to any particular emissions by

any specific person, entity, [or] group at any particular point in time.").  The Attorney

General cannot circumvent the Federal Officer Removal Statute—a statute intended to

protect defendants—simply by adding a footnote attempting to disclaim the federally-

directed contribution to undifferentiated injuries.

*Second*, the Attorney General argues that "Defendants rewrite the complaint as

seeking to end all fossil-fuel production and then posit that their leasing of federal lands

for exploration, drilling and production of fossil fuels . . . renders them federal officers

entitled to this Court's jurisdiction."  Br. 22.  But, as noted above, the true purpose of

the Attorney General's claims, and indeed the entire lawsuit, is to discontinue or reduce

Defendants' fossil fuel activities.  The Attorney General cannot avoid that its claims

take issue with federally-directed activities—including ExxonMobil's and FHR's

"extraction," "production," and "sale" of fossil fuel products—and that its alleged

harms purportedly arise from "use of Defendants' products," including by the federal

government.  Compl. ¶¶ 4, 181.

56

*Third,* the Attorney General argues that courts "routinely reject federal jurisdiction in cases involving failures to warn or deceptive marketing." Br. 24. But, the only in-circuit case it cites, *In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*, 428 F. Supp. 2d 1014, 1016-18 (D. Minn. 2006), is inapposite and pre-dates the Removal Clarification Act of 2011, which broadened the scope of removal to any acts "relating to any act under color" of federal office. There, the court found that there was "no link" between "the FDA's broad regulation of medical devices" and the acts challenged in the plaintiffs' complaints. *Id.* at 1018. The court nonetheless explicitly distinguished situations where, as here, the federal government directed activities at issue in a plaintiff's complaint. *Id.*; *see also Graves*, 447 F. Supp. 3d at 913 (holding that 3M met the "low hurdle" of federal officer removal because "the warnings and instructions for its earplugs plausibly have some connection to, or association with, governmental actions"). The Attorney General's out-of-circuit cases simply apply the familiar rule that compliance with federal regulations does not constitute acting under federal direction. These precedents are inapplicable to Defendants' conduct here, which goes far beyond mere compliance with federal regulations.

*Finally*, the Attorney General falls back on out-of-circuit decisions applying different precedents to different claims supported by different facts. *See, e.g.*, Br. 22-23 (citing *Baltimore*, 952 F.3d at 467; *San Mateo*, 960 F.3d at 600-03; *Boulder*, 965 F.3d at 819-27; *Rhode Island*, 393 F. Supp. 3d at 152; *Massachusetts*, 2020 WL 2769681, at \*12). In none of those cases, for example, did the court consider

ExxonMobil's provision of avgas to the United States military.  Nor did the courts consider Defendants' ongoing and extensive production of other special fuels under the direction of the DESC, or the Defendants' production of oil and operation of infrastructure for the Strategic Petroleum Reserve.  Based on the facts alleged in *this action* and under *Eighth Circuit* precedents, the Attorney General's claims clearly satisfy the requirements of the Federal Officer Removal Statute.

## IV.    This Action Is Removable under the Outer Continental Shelf Lands Act

Removal is also warranted under OCSLA, which vests federal courts with original jurisdiction over all actions "arising out of, or in connection with . . . any operation conducted on the [OCS] which involves exploration, development, or production of the minerals, of the subsoil and seabed of the [OCS], or which involves rights to such minerals."  43 U.S.C. § 1349(b); *see Tenn. Gas Pipeline* v. *Houston Cas. Ins. Co.*, 87 F.3d 150, 155 (5th Cir. 1996).  There is no dispute that Defendants have engaged in significant "exploration, development, or production" of minerals on the OCS.  43 U.S.C. § 1349(b).  Defendants and their affiliates operate a large share of the more than 5,000 active oil and gas leases on the nearly 27 million OCS acres that the Department of the Interior administers under OCSLA, which were collectively responsible for producing 690 million barrels of oil and 1.034 trillion cubic feet of natural gas in 2019 alone.  Notice ¶ 102.  These substantial activities on the OCS necessarily account for a significant portion of the conduct that the Attorney General alleges caused climate change in Minnesota.  *See, e.g.*, Compl. ¶ 4 (criticizing

Defendants' "largely unabated and expanded **extraction**, **production**, promotion, marketing, and sale" of their fossil-fuel products) (emphasis added).

Further, the Attorney General's claims "arise out of, or in connection with" those operations.  43 U.S.C. § 1349(b).  Contrary to the Attorney General's representation, Br. 20-21, OCSLA's jurisdictional sweep is "broad," *Baker* v. *Hercules Offshore, Inc.*, 713 F.3d 208, 213 (5th Cir. 2013), as it was intended to "extend[] to the entire range of legal disputes" that Congress "knew would arise relating to resource development" on the OCS, *Laredo Offshore Constructors, Inc.* v. *Hunt Oil Co.*, 754 F.2d 1223, 1228 (5th Cir. 1985).  Courts have thus adopted a "broad reading of the jurisdictional grant of section 1349."  *EP Operating Ltd.* v. *Placid Oil Co.*, 26 F.3d 563, 569 (5th Cir. 1994)*.* Accordingly, a plaintiff's claims "arise out of, or in connection with" operations on the OCS so long as those operations *contribute* to the injuries alleged.  *See Tenn. Gas*, 87 F.3d at 155.  That is, jurisdiction under OCSLA is present where "at least part of the work" that the plaintiff alleges caused its injuries "arose out of or in connection with" the defendant's OCS operations.  *Ronquille* v. *Aminoil Inc.*, Civ. No. 14-164, 2014 WL 4387337, at *2 (E.D. La. Sept. 4, 2014).

The Attorney General responds that none "of Defendants' misrepresentations, omissions, or failures to warn occurred on the OCS."  Br. 20.  That will not work.  The Attorney General's theory of injury and requested relief are not limited to any incremental increase in fossil fuel use purportedly caused by the alleged misrepresentations.  Instead, the Attorney General seeks to recover for *all* alleged

59

climate change injuries suffered by the State of Minnesota. *See, e.g.*, Compl. ¶¶ 139-171 (listing myriad harms allegedly suffered by the State of Minnesota "as a result of climate change"); ¶ 230 (alleging a "causal nexus" between Defendants' purported misconduct and the climate change-based harm allegedly incurred by Plaintiff); ¶ 248 (seeking restitution to remedy these general climate-related injuries). That includes emissions resulting from Defendants' OCS activities. Even if the Attorney General sought to recover only for injuries directly attributable to Defendants' alleged misrepresentations, there is no method to isolate such injuries in light of the undifferentiated nature of harm alleged in the Complaint. *See Kivalina*, 663 F. Supp. 2d at 880.

More importantly, OCSLA jurisdiction exists even if the Complaint pleads no substantive claims for specific conduct on the OCS. *See, e.g.*, *In re Deepwater Horizon*, 745 F.3d 157, 163 (5th Cir. 2014). Congress "intended" that "any dispute that alters the progress of production activities on the OCS," and thus "threatens to impair the total recovery of the federally-owned minerals from the reservoir or reservoirs underlying the OCS," falls within OCSLA's "grant of federal jurisdiction." *Amoco Prod. Co.* v. *Sea Robin Pipeline Co.*, 844 F.2d 1202, 1210 (5th Cir. 1988). Consistent with Congress's intent, courts have repeatedly found OCSLA jurisdiction not only where the claims involved conduct that occurred on the OCS, but also where resolution of the dispute foreseeably could affect the efficient exploitation of minerals from the OCS. *See, e.g.*, *EP Operating Ltd.*, 26 F.3d at 569-70; *United Offshore* v. *S. Deepwater*

*Pipeline Co.*, 899 F.2d 405, 407 (5th Cir. 1990).   The Attorney General's claims threaten the very purpose of OCSLA and the continued viability of the federal leasing program.   *Laredo Offshore Constructors, Inc.* v. *Hunt Oil Co.*, 754 F.2d 1223, 1228 (5th Cir. 1985).   Indeed, the Attorney General's entire complaint, and the campaign behind it, are designed to reduce exploration and production of fossil fuels by replacing them with alternative technologies.   That rationale applies to the OCS as well as to any other oil-producing region.

The Attorney General seeks billions of dollars in damages and restitution, in addition to costly equitable relief, from Defendants.   *See* Notice ¶¶ 120-22; Compl. ¶¶ 243-51.   An award of that magnitude would substantially discourage production on the OCS, thereby threatening the viability of the federal government's leasing program. *Cf. Brooklyn Union Expl. Co.* v. *Tejas Power Corp.*, 930 F. Supp. 289, 292 (S.D. Tex. 1996) ("[C]hanges in price can affect production," justifying OCSLA jurisdiction, "to the extent that the current or future price is altered.").   All of this is in keeping with the Attorney General's goal to curtail fossil fuel use in general through this and similar lawsuits, *see supra* at 4-7, which would significantly impact, if not eliminate, production on the OCS.

## V.   This Action Arises Out of Federal Enclaves

The Constitution's "Enclave Clause," which authorizes Congress to "exercise exclusive Legislation in all Cases whatsoever" over all places purchased with the consent of a state "for the Erection of Forts, Magazines, Arsenals, dock-Yards, and

other needful Buildings," U.S. Const. art. I, § 8, cl. 17, has "generally [been] read" to "establish federal subject matter jurisdiction over tort claims occurring on federal enclaves." *Jograj* v. *Enter. Servs., LLC*, 270 F. Supp. 3d 10, 16 (D.D.C. 2017). The "key factor" in evaluating federal enclave jurisdiction "is the location of the plaintiff's injury or where the specific cause of action arose." *Sparling* v. *Doyle*, No. EP-13-CV-00323-DCG, 2014 WL 2448926, at *3 (W.D. Tex. May 30, 2014). This action arises out of federal enclaves in four distinct ways, each sufficient to justify federal enclave jurisdiction.

*First*, in targeting Defendants' oil and gas operations and their alleged impacts, this action necessarily sweeps in those operations that occur on military bases and other federal enclaves. *See, e.g.*, *Humble Pipe Line Co.* v. *Waggoner*, 376 U.S. 369, 372-74 (1964). As of 2000, approximately 14% of the National Wildlife Refuge System "had oil or gas activities on their land," and these activities were spread across 22 different states, including Minnesota.[46] The Attorney General dismisses these activities as irrelevant. This action, it says, is limited to "seeking recovery for the harms it has suffered due to Defendants' deliberate misinformation campaign," which "is not alleged to have been conducted on the property of . . . the federal government." Br. 17. Such an opportunistic characterization counts for little. *See Wecker* v. *Nat'l Enameling*

---

[46] U.S. Gov't Accountability Off., GAO-02-64F, U.S. Fish & Wildlife Service Information on Oil and Gas Activities in the National Wildlife Refuge System 1, 12 (Oct. 31, 2001), http://www.gao.gov/new.items/d0264r.pdf.

*& Stamping Co.*, 204 U.S. 176, 186 (1907).  This action is a self-proclaimed effort to deal with "a climate change-crisis."  Compl. ¶ 1.  It is a "tool by which to seek the environmental policy changes" the Attorney General desires by "enlisting the judiciary to do the work that the other two branches of government cannot or will not do."  *City of San Francisco*, 2020 WL 3969558, at *20.

*Second*, the Complaint alleges a variety of climate change injuries suffered—and expected to be suffered—within Minnesota: "extreme heat," "crop damage," simultaneous increases in drought and flooding, infrastructural damage, higher rates of disease, and others.  Compl. ¶¶ 140-71.  Necessarily impacted, then, are the following federal enclaves within Minnesota, among others:  Fort Snelling Military Reservation, Federal Correctional Institution Sandstone, and Cass Lake Indian Hospital.

The Attorney General does not dispute that these locations are federal enclaves, or that its Complaint necessarily alleges injuries suffered to those federal enclaves when it refers to alleged state-wide impacts of climate change.  *See, e.g.*, *Compl.*  ¶¶ 139, 143, 157.  Instead, the Attorney General argues that those injuries cannot support federal enclave jurisdiction because it "expressly disclaims injuries to any federal property in Minnesota."  Br. 17-18.  Such a disclaimer is completely ineffective as it offers no method to isolate such injuries, nor is one possible in light of the undifferentiated nature of harm alleged in the Complaint.  In fact, the Attorney General seeks to recover for *all* alleged climate change injuries suffered by the State of Minnesota, not any limited incremental increase in fossil fuel use purportedly caused by Defendants' conduct.  The

Attorney General cannot sidestep federal jurisdiction by disclaiming damages for what were clearly events taking place in federal enclaves. *See Fung* v. *Abex Corp.*, 816 F. Supp. 569, 571 (N.D. Cal. 1992); *Richards* v. *Lockheed Martin Corp.*, 2012 WL 13081667, at *2 (D.N.M. Feb. 24, 2012) (stating that dismissal, not remand, is appropriate where injuries arose from a federal enclave and "plaintiff does not base [its] claim upon federal (or federalized) law"). Federal enclave jurisdiction exists precisely because cases involving those enclaves *belong in federal court*. The Attorney General cannot subvert this rule simply by reciting a bare disclaimer, unsupported by the substance of its allegations, of any relationship between its claims and federal lands.

*Third*, under the Attorney General's theory, the claims here arise out of sales of ExxonMobil's and FHR's products within Minnesota, which include sales on federal enclaves. Again, the Attorney General does not dispute that locations within Minnesota are federal enclaves. Instead, it claims that removal cannot be premised on these sales because injury, rather than conduct, is the relevant basis for federal enclave jurisdiction and that, even if conduct could form the basis of federal enclave jurisdiction, the "only conduct Defendants even attempt to relate to a specific federal enclave is activity in the District of Columbia." Br. 18-19. The Attorney General is wrong on the law. Courts have squarely held that pertinent events occurring on federal land are sufficient to establish federal jurisdiction. *See, e.g.*, *Jones* v. *John Crane-Houdaille, Inc.*, Civil No. CCB-11-2374, 2012 WL 1197391, at *1 (D. Md. Apr. 6, 2012); *Rosseter* v. *Indus. Light & Magic*, No. C 08-04545 WHA, 2009 WL 210452, at *2 (N.D. Cal. Jan. 27, 2009);

64

*Corley* v. *Long-Lewis, Inc.*, 688 F. Supp. 2d 1315, 1336 (N.D. Ala. 2010); *Stiefel* v. *Bechtel Corp.*, 497 F. Supp. 2d 1138, 1148 (S.D. Cal. 2007); *Klausner* v. *Lucas Film Ent. Co.*, No. 09-03502 CW, 2010 WL 1038228, at *1, *4 (N.D. Cal. Mar. 19, 2010). These holdings make sense; an injury-based rule for federal enclave jurisdiction would lead to the absurd result that federal jurisdiction does not exist over claims where all of the relevant conduct occurred on a federal enclave, but the plaintiff happened to be outside the enclave at the time of injury. Courts reject this interpretation, holding that the "fortuity" of the location of the plaintiff at the time of the alleged injury "does not mean" that the claim arose there for purposes of the doctrine. *Taylor* v. *Lockheed Martin Corp.*, 78 Cal. App. 4th 472, 481 (2000).

In addition, the sales at issue here set this case apart from the cases that the Attorney General points to in which federal enclave jurisdiction has not been found. *See* Br. 18-19. In each of those cases, federal enclave jurisdiction was asserted based on (i) defendants' activities on federal enclaves outside the forum, and/or (ii) injuries suffered on federal enclaves inside the forum. Here, under the Attorney General's theory, the claims arise out of Defendants' activities, for which it seeks to hold Defendants liable, occurring on federal enclaves within the forum.

*Fourth*, to the extent the Attorney General asserts that federal policymakers would have adopted different energy and climate policies absent alleged misrepresentations, the Complaint necessarily touches conduct occurring in the District of Columbia, where API is headquartered and all Defendants engage in protected

65

speech directed toward the Executive and Legislative branches of the federal government.  The Attorney General alleges that Defendants lobbied regulators, Congress, and the Executive Branch in order to influence public policy. *See, e.g.*, Compl. ¶ 13 (alleging API speaks for the oil and gas industry to Congress and the Executive); ¶ 16 (alleging API engages in public relations targeting "policy makers"); ¶ 100 (alleging Defendants orchestrated lobbying and public relations efforts directed at "the White House"); ¶ 206 (alleging Defendants engaged in a campaign "to mislead the public and decision makers about the consequences of using their products"); ¶ 216 (alleging regulators and policymakers relied on Defendants' "misrepresentations").  Again, Defendants reject any suggestion that one or more Defendants misled decision makers.  Nevertheless, the Attorney General bases its claims on political speech at the core of the First Amendment that occurred in the District of Columbia, a federal enclave, U.S. Const. art. I, § 8, cl. 17, which provides yet another basis for federal enclave jurisdiction here.

## VI.    This Action Satisfies the Class Action Fairness Act's Requirements

The Class Action Fairness Act ("CAFA") permits removal of (1) any "class action," for which (2) minimal diversity exists, (3) at least 100 class members are represented, and (4) "the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs."  28 U.S.C. § 1332(d)(1), (2), (5); see also 28 U.S.C. § 1453(b).

The only element the Attorney General disputes is the first—whether its suit on behalf of Minnesota consumers is a "class action" within the meaning of CAFA. 28 U.S.C. § 1332(d)(1)(B). CAFA defines a "class action" as "any civil action filed under Rule 23 of the Federal Rules of Civil Procedure or *similar state statute or rule* of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action." *Id.* § 1332(d)(1)(B) (emphasis added). Congress intended the definition of a "class action" under CAFA "to be interpreted liberally." S. Rep. No. 109-14, at 35 (2005), *as reprinted in* 2005 U.S.C.C.A.N. 3, 34 (formatting altered). CAFA's "application should not be confined solely to lawsuits that are labeled 'class actions.' Generally speaking, lawsuits that resemble a purported class action should be considered class actions for purposes of applying these provisions." *Id.* Put differently, CAFA permits removal of a suit that is "in substance a class action," notwithstanding a plaintiff's "attempt to disguise the true nature of the suit." *Addison Automatics, Inc.* v. *Hartford Cas. Ins. Co.*, 731 F.3d 740, 742 (7th Cir. 2013); *see, e.g.*, *Song* v. *Charter Commc'ns Inc.*, 2017 WL 1149286, at *1 n.1 (S.D. Cal. Mar. 28, 2017). The Eighth Circuit has made clear that it will not "prioritize a complaint's use of magic words over its factual allegations" to determine whether an action constitutes a "class action" under CAFA. *Williams* v. *Emps. Mut. Cas. Co.*, 845 F.3d 891, 901 (8th Cir. 2017); *accord Song*, 2017 WL 1149286, at *1 n.1.

*Song* is instructive. There, the plaintiff sued various cable companies, alleging that "defendants unlawfully charge California consumers a surcharge of $8.75 per

customer per month." 2017 WL 1149286, at *1. "Though he did not style his complaint as a class action," Song asserted that he "brought the lawsuit to end Charter's unlawful actions, not only for his benefit but for the benefit of the millions of California consumers whom Charter continues to target with this illegal and fraudulent scheme." *Id.* On these facts, the court found CAFA jurisdiction satisfied. Lawsuits like Song's "that *resemble* a purported class action," the court held, "should be considered class actions" for purposes of CAFA. *Id.* at *1 n.1 (emphasis added).

So, too, here. The Attorney General concedes that this action contains the "fundamental attributes of a consumer class action" in "key respects." Br. 27-28 (acknowledging that the Attorney General brought this case in a representative capacity and that it seeks restitution and damages typically sought in class actions, but positing that "this case lacks" other aspects of a "consumer class action"). The Complaint asserts claims on behalf of all Minnesota residents and "[f]ossil-fuel consumers." *See, e.g.*, Compl. ¶¶ 191, 194, 215, 230. The Attorney General's central theory is that Defendants "conspire[ed] to deceive consumers" about the alleged certainty of climate change and failed to "warn[] consumers" of alleged harms associated with certain Defendants' products. *Id.* ¶¶ 204-05. Additionally, the explicit purpose of this action is to transfer the costs of alleged climate change injuries from Minnesota's consumers and residents to six out-of-state defendants, *id.* ¶ 7, including by seeking restitution on behalf of Minnesota's consumers, *id.* ¶ 248. By suing in a representative capacity on behalf of Minnesota's residents and consumers, the Attorney General has chosen to bring what

is in substance a putative class action: a "representative suit[] on behalf of [a] group of persons similarly situated."  1 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 1.1 (4th ed. 2002).

Jurisdiction is not only appropriate under CAFA, it would further CAFA's legislative purposes.   CAFA's "primary objective" is to "ensure Federal court consideration of issues of national importance." *Dart Cherokee Basin Operating Co.* v. *Owens*, 574 U.S. 81, 89 (2014); *accord* Pub. L. No. 109-02, § 2(b)(2), 119 Stat. 4, 5 (2005).  The "Framers were concerned that state courts might discriminate against interstate businesses and commercial activities, and thus viewed diversity jurisdiction as a means of ensuring the protection of interstate commerce." S. Rep. No. 109-14, at 8; *see generally* John P. Frank, *Historical Bases of the Federal Judicial System*, 13 Law & Contemp. Probs. 3, 22-28 (1948).

Prior to CAFA's enactment, however, plaintiffs were able to "'game' the procedural rules and keep nationwide or multi-state class actions in state courts." S. Rep. No. 109-14, at 4.  The state courts in which these nationwide cases were brought were effectively "invite[d]" to "dictate to 49 others what their laws should be on a particular issue, thereby undermining basic federalism principles." *Id.* at 24.  To Congress, that was untenable: "A system that allows state court judges to dictate national policy" from the "local courthouse steps is contrary to the intent of the Framers when they crafted our system of federalism." *Id.*  As Congress "firmly believe[d]" that such "interstate class actions . . . properly belong in federal court," it enacted CAFA "to

ensure that qualifying interstate class actions initially brought in state courts may be heard by federal courts if any of the defendants so desire." *Id.* at 5.

This is exactly the type of case where Congress did not want state court judges to dictate national policy, resulting in an outsized impact on all other states based on the dictates of a single state court judge. This suit is a thinly veiled assault on the national (and international) fossil fuel energy industry, and directly implicates the entire patchwork of relevant federal legislation and regulation. It is merely one of many coordinated suits brought by attorneys general, municipalities, and climate activists, who have stated clearly that they intend to use targeted litigation, such as this suit, in a concerted effort to stymie the operation of the fossil fuel energy industry. Such a backdoor attempt to affect and supplant federal regulation of fossil fuel energy must be heard in a federal forum.

The Attorney General's efforts to remove this action from CAFA's ambit are unavailing. To start, it attempts to constrict CAFA's coverage by arguing without support that "[f]ederal jurisdiction pursuant to CAFA is narrow." Br. 26. That is not the law of the Eighth Circuit or the view of the Congress that enacted CAFA. It next asserts that "[t]his action was not brought under Rule 23 or a 'similar State statute or rule of judicial procedure,'" Br. 27, but as already discussed, that assertion is not conclusive in determining whether this suit is in substance a class action. *See Addison Automatics*, 731 F.3d at 742. Finally, the Attorney General relies on out-of-circuit cases to argue that this action cannot be a class action because it was brought, in part, pursuant

to its *parens patriae* authority.  Br. 25-28.  But whether *parens patriae* claims are "class actions" for purposes of CAFA is an open question in the Eighth Circuit, *see Missouri ex rel. Koster* v. *Portfolio Recovery Assocs., Inc.*, 686 F. Supp. 2d 942, 944 (E.D. Mo. 2010).

## VII.   This Court Has Diversity Jurisdiction Because the Real Parties in Interest Are Completely Diverse from All Defendants

Federal courts are vested with diversity jurisdiction over civil actions for which (1) the amount in controversy "exceeds the sum or value of $75,000," and (2) there is "complete diversity," meaning that no plaintiff is a citizen of the same State as any defendant.  28 U.S.C. § 1332(a); *Lincoln Prop. Co.* v. *Roche*, 546 U.S. 81, 89 (2005). Both criteria are satisfied here.

*First*, it is undisputed that the amount-in-controversy exceeds $75,000.[47] *Second*, the parties are "completely diverse."  All plaintiffs—the Minnesota consumers on whose behalf the Attorney General sues, who are the real parties in interest in this action—and no Defendants are citizens of Minnesota.[48]  *See* 28 U.S.C. § 1332.

The Attorney General's only argument in opposition to diversity jurisdiction is that the State of Minnesota, rather than the consumers on whose behalf it sues, is the real party in interest.  *See* Br. 28-30.  But the Attorney General fails to plausibly allege

---

[47]  The Complaint alleges that Defendants are liable for their conduct promoting and selling oil and gas over the last 50 years, and seeks restitution and damages, as well as civil penalties and costly injunctive relief.  *See* Compl. ¶¶ 243-51.

[48]  No Defendant is either incorporated or has its principal place of business in Minnesota.  *See* Compl. ¶¶ 13, 17, 19, 28, 31; Notice ¶ 116.

that Defendants caused widespread harm to Minnesota as a whole, and seeks relief that would accrue to the personal benefit of individual consumers.  As a result, this argument must be rejected.

To establish more than a nominal interest in the litigation, the Attorney General must demonstrate a "quasi-sovereign interest" distinct "from the interests of particular private parties."  *Alfred L. Snapp & Son, Inc.* v. *Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982); *see also Pennsylvania* v. *New Jersey*, 426 U.S. 660, 665 (1976).  A general interest in protecting Minnesota residents from deceptive consumer practices is not enough.  *Missouri, K. & T. Ry. Co.* v. *Hickman*, 183 U.S. 53, 60 (1901) (observing that a state's general interest in protecting the welfare of its citizens "is not that which makes the state, as an organized political community, a party in interest in the litigation"); *see also Pub Sch. Ret. Sys. of Missouri* v. *State St. Bank & Trust Co.*, 640 F.3d 821, 827 (8th Cir. 2011) (quoting *Hickman*, 183 U.S. at 59)); *Dep't of Fair Empl. & Hous.* v. *Lucent Techs., Inc.*, 642 F.3d 728, 738 (9th Cir. 2011).  The Attorney General must instead advance an "injury to a sufficiently substantial segment of its population."  *Snapp*, 458 U.S. at 607.  Although there is no well-defined limit "on the proportion of the population of [Minnesota] that must be adversely affected by the challenged behavior," the Attorney General must allege more than a discrete injury to a "group of individual residents."  *Id.*

The Attorney General has failed to do so.  At the outset, the statutory regime under which the Attorney General seeks compensation for the alleged injuries to

consumers makes clear that those consumers, not the State, are the real parties in interest. Minnesota Statute § 8.31 empowers both the Attorney General and private parties to enforce the statutory provisions pleaded in Counts I, IV, and V. But, in cases where the Attorney General enforces those rights, any funds obtained as a result of the lawsuit cannot be deposited in the state treasury without first attempting to distribute the funds to the injured person. *Id.* § 8.31 (2c). This makes clear that such cases are brought to enforce the rights of the individual Minnesota consumers who are the real parties in interest to the litigation. Confronted with this clear reality, the Attorney General argues that only it, and not individual consumers, can recover the civil penalties sought in this case. Br. 28. But this is precisely the general interest in protecting residents from deceptive trade practices that should not suffice under real party in interest analysis. *See Hickman*, 183 U.S. at 60 (1901) (observing that a state's general interest in protecting the welfare of its citizens "is not that which makes the state, as an organized political community, a party in interest in the litigation").

The Attorney General's invocation of its *parens patriae* authority, *see* Compl. ¶ 12, only confirms that Minnesota consumers and residents are the real parties in interest. *See State* v. *Minnesota Sch. of Bus., Inc.*, 935 N.W.2d 124, 133 (Minn. 2019) ("The Attorney General's *parens patriae* power authorizes him to act on behalf of all Minnesotans harmed by a pattern and practice of fraudulent conduct (citation omitted)); *New York* v. *Gutierrez*, 2008 WL 5000493, at *13 (E.D.N.Y. Nov. 20, 2008) (holding

that where the attorney general brings an action *parens patriae* on behalf of allegedly injured consumers, those consumers are the real parties in interest).

While it is true that states can be the real parties in interest in litigation where there is substantial injury to a "great many citizens," *Maryland* v. *Louisiana*, 451 U.S. 725, 739 (1981), that is patently not the case under the Attorney General's theory.  If this case is actually about deceptive marketing and not about climate change, as the Attorney General insists in its brief, but not in its public statements,[49] then the harm is to consumers who were influenced in their subjective preferences in energy and transportation and therefore purchased fossil fuel energy at a rate that they would not have absent Defendants' alleged marketing.  Thus, under this theory, the harm alleged is plainly only to a subset of identifiable Minnesotans.

This is a far cry from the sort of quantifiable, widespread harm tantamount to injuring Minnesota as a whole that is required to show that Minnesota is the real party in interest.  *See, e.g.*, *Nevada* v. *Bank of Am. Corp.*, 672 F.3d 661, 670 (9th Cir. 2012) (state was real party in interest where foreclosures caused by defendant's deceptive mortgage practices affected "nearly one million homes across Nevada").  Accordingly,

---

[49] The Attorney General's press release makes clear that this suit is an attempt to "stop[]" "fossil fuel-companies like Exxon" from "deal[ing] in carbon across the world" and to make them "pay for the devastating consequences of climate change." Office of Minnesota Attorney General Keith Ellison, *AG Ellison Sues ExxonMobil, Koch Industries & American Petroleum Institute for Deceiving, Defrauding Minnesotans about Climate Change*, https://www.ag.state.mn.us/Office/ Communications/2020/06/24_ExxonKochAPI.asp (last visited Nov. 3, 2020).

the real parties in interest in this action are the Minnesota residents and consumers on whose behalf the Attorney General sues.

## CONCLUSION

For the foregoing reasons, this Court has subject matter jurisdiction over this action and the Motion to Remand should be denied.[50]

---

[50] In the final sentence of the conclusion of its brief, the Attorney General requests attorneys' fees. A plaintiff opposing removal is entitled to attorneys' fees or costs only if it can show that "the removing party lacked an objectively reasonable basis for seeking removal." *Martin* v. *Franklin Cap. Corp.*, 546 U.S. 132, 141 (2005). This is a high burden. A defendant's basis for removal is "objectively reasonable" when "there was uncertainty as to whether removal was appropriate." *Cont'l Prop. Grp., Inc.* v. *City of Minneapolis*, 2009 WL 282096, at *4 (D. Minn. Feb. 5, 2009) (granting remand but denying award of fees). Here, Defendants' arguments are supported by extensive evidence and precedent, and some raise novel questions the Eighth Circuit has yet to address. Not only are Defendants' arguments objectively reasonable, they are correct.

DATE:  November 9, 2020

Respectfully submitted,

/s/ _____
Jerry W. Blackwell (MN #186867)
G. Tony Atwal (MN #331636)
BLACKWELL BURKE P.A.
431 South Seventh Street, Suite 2500
Minneapolis, MN 55415
Tel: (612) 343-3232
E-mail: blackwell@blackwellburke.com
E-mail: tatwal@blackwellburke.com

Patrick J. Conlon (*pro hac vice*)
EXXON MOBIL CORPORATION
22777 Springwoods Village Parkway
Spring, TX 77389
Tel:  (832) 624-6336
E-mail:
patrick.j.conlon@exxonmobil.com

Theodore V. Wells Jr. (*pro hac vice*)
Daniel J. Toal (*pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON, LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Tel:  (212) 373-3000
E-mail: twells@paulweiss.com
E-mail: dtoal@paulweiss.com

Justin Anderson (*pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON, LLP
2001 K Street, NW
Washington, DC 20006-1047
Tel:  (202) 223-7321
E-mail: janderson@paulweiss.com

*Attorneys for Defendants*

Todd Noteboom (MN #240047)
Andrew W. Davis (MN #386634)
Peter J. Schwingler (MN #388909)
STINSON LLP
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Tel: (612) 335-1500
E-mail: todd.noteboom@stinson.com

Andrew M. Luger (MN #0189261)
JONES DAY
90 South Seventh Street, Suite 4950
Minneapolis, MN 55402
Tel: (612) 217-8862
E-mail: aluger@jonesday.com

Debra R. Belott (*pro hac vice*)
JONES DAY
51 Louisiana Avenue, NW
Washington, D.C. 20001-2113
Tel: (202) 879-3689
E-mail: dbelott@jonesday.com

William A. Burck (*pro hac vice*)
QUINN EMANUEL LLP
1300 I Street, NW, Suite 900
Washington, D.C. 20005-4107
Tel: (202) 538-8120
E-mail:
williamburck@quinnemanuel.com

Stephen A. Swedlow (*pro hac vice*)
QUINN EMANUEL LLP
191 North Wacker Drive, Suite 2700
Chicago, IL 60606
Tel: (312) 705-7488
E-mail:

*EXXON MOBIL CORPORATION And*
*EXXONMOBIL OIL CORPORATION*


Thomas H. Boyd (MN #200517)
Eric F. Swanson (MN #188128)
WINTHROP & WEINSTINE, P.A.
225 South Sixth Street
Suite 3500 Cappella Tower
Minneapolis, MN 55402
Tel: (612) 604-6400
E-mail: tboyd@winthrop.com
E-mail: eswanson@winthrop.com


Andrew G. McBride (*pro hac vice*)
MCGUIREWOODS LLP
2001 K Street NW, Suite 400
Washington, D.C. 20006-1040
Tel: (202) 857-2487
E-mail: amcbride@mcguirewoods.com


Brian D. Schmalzbach (*pro hac vice*)
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219-3916
Tel: (804) 775-4746
E-mail:
bschmalzbach@mcguirewoods.com


*Attorneys for Defendant*
*AMERICAN PETROLEUM INSTITUTE*

stephenswedlow@quinnemanuel.com

*Attorneys for Defendants*
*KOCH INDUSTRIES, INC.,*
*FLINT HILLS RESOURCES LP, and*
*FLINT HILLS RESOURCES PINE BEND*

77