## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

STATE OF MINNESOTA, *by its Attorney
General Keith Ellison*

Plaintiff,

v.

AMERICAN PETROLEUM INSTITUTE,
EXXON MOBIL CORPORATION,
EXXONMOBIL OIL CORPORATION, KOCH
INDUSTRIES, INC., FLINT HILLS
RESOURCES, LP, and FLINT HILLS
RESOURCES PINE BEND

Defendants.

Civil No. 20-1636 (JRT/HB)

**MEMORANDUM OPINION
AND ORDER GRANTING MOTION TO
REMAND AND DENYING MOTION TO
STAY**

Elizabeth C. Kramer, Leigh K. Currie, Oliver J. Larson, and Peter N. Surdo, **OFFICE OF THE MINNESOTA ATTORNEY GENERAL**, 445 Minnesota Street, Suite 1100, St. Paul, MN 55101; Matthew Kendall Edling and Victor Marc Sher, **SHER EDLING LLP**, 100 Montgomery Street, Suite 1410, San Francisco, CA 94104, for plaintiff.

Eric F. Swanson and Thomas H. Boyd, **WINTHROP & WEINSTINE PA**, 225 South Sixth Street, Suite 3500, Minneapolis, MN 55402; Andrew Gerald McBride, **MCGUIRE WOODS LLP**, 2001 K Street Northwest, Suite 400, Washington, DC 20006; and Brian David Schmalzbach, **MCGUIRE WOODS LLP**, 800 East Canal Street, Richmond, VA 23219, for defendant American Petroleum Institute.

Jerry W. Blackwell and Gurdip S. Atwal, **BLACKWELL BURKE PA**, 431 South Seventh Street, Suite 2500, Minneapolis, MN 55415; Daniel J. Toal and Theodore V. Wells, Jr., **PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**, 1285 Avenue of the Americas, New York, NY 10019; Justin Anderson, **PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**, 2001 K Street Northwest, Washington, DC 20006; and Patrick J. Conlon, **EXXON MOBIL**

**CORPORATION**, 22777 Springwoods Village Parkway, Suite N1.4B.388, Spring, TX 77389, for defendants Exxon Mobil Corporation and ExxonMobil Oil Corporation.

Michelle Schmit and Stephen Andrew Swedlow, **QUINN EMANUEL URQUHART & SULLIVAN LLP**, 191 North Wacker Drive, Suite 2700, Chicago, IL 60606; William Anthony Burck, **QUINN EMANUEL URQUHART & SULLIVAN LLP**, 1300 I Street Northwest, Suite 900, Washington, DC 20005; Andrew M. Luger, **JONES DAY**, 90 South Seventh Street, Suite 4950, Minneapolis, MN 55402; Debra Rose Belott, **JONES DAY**, 51 Louisiana Avenue Northwest, Washington, DC 20001; and Andrew W. Davis, Peter J. Schwingler, and Todd A. Noteboom, **STINSON LLP**, 50 South Sixth Street, Suite 2600, Minneapolis, MN 55402, for defendants Koch Industries, Inc., Flint Hills Resources, LP, and Flint Hills Resources Pine Bend.

Plaintiff State of Minnesota ("the State") commenced this action in Minnesota state court against Defendants American Petroleum Institute ("API"), Exxon Mobil Corporation, ExxonMobil Oil Corporation, Koch Industries, Inc., Flint Hills Resources LP, and Flint Hills Resources Pine Bend asserting five causes of action for violations of Minnesota common law and consumer protection statutes. The State alleges that Defendants developed a widespread campaign to deceive the public about the dangers of fossil fuels and to undermine the scientific consensus linking fossil fuel emissions to climate change.

Defendants removed the action to federal court on seven independent grounds: federal common law; disputed and substantial federal issues (the *Grable* doctrine); the federal officer removal statute; the Outer Continental Shelf Lands Act; federal enclaves; the Class Action Fairness Act; and diversity. Plaintiff filed a Motion to Remand to state

court. Because Defendants have not met their burden of establishing that federal jurisdiction is warranted on any of the grounds presented, the Court will grant the State's Motion.

Defendants Koch Industries, Inc., Flint Hills Resources LP, and Flint Hills Resources Pine Bend (collectively, "FHR Defendants") have also filed a Motion to Stay to await the Supreme Court's decision in *BP p.l.c. v. Mayor & City Council of Baltimore*, No. 19-1189 (U.S.) and the Court's determination on a Petition for Certiorari in *Chevron Corporation et al. v. City of Oakland, et al.* (U.S., Jan. 8, 2021). Plaintiff opposes this motion. Because the Court finds that the *Baltimore* case is before the Supreme Court on a narrow procedural question not at issue here and the dispensation of the petition in *City of Oakland* is too speculative to warrant a stay in the instant proceedings, the Court will deny FHR Defendants' Motion to Stay.

## BACKGROUND

## I.      FACTUAL BACKGROUND

The Attorney General brings this action pursuant to his authority under Minnesota Statutes Chapter 8 and his *parens patriae* authority under state common law. (Notice of Removal, Ex. A ("Compl.") ¶ 12, July 27, 2020, Docket No. 1-1.)

Defendant American Petroleum Institute (API) is a nonprofit corporation registered to do business in Minnesota. (*Id.* ¶ 13.) API was established in 1919 and is the country's largest oil trade association, with over 600 members. (*Id.*) Defendant Exxon

Mobil Corporation is a multinational, vertically integrated energy and chemicals company incorporated in New Jersey with a principal place of business in Irving, Texas.  (*Id.* ¶ 17.)  Exxon Mobil Corporation is the parent company for numerous subsidiaries and has done business as or is the successor in liability to numerous entities.  (*Id.*)  Defendant ExxonMobil Oil Corporation is a wholly owned subsidiary of Exxon Mobil Corporation, incorporated in New York with a principal place of business in Irving, Texas.  (*Id.* ¶ 19.)  Defendant Koch Industries, Inc. ("Koch") is an American multinational corporation based in Wichita, Kansas.  (*Id.* ¶ 28.)  Koch is the parent company for numerous subsidiaries involved in the manufacturing, refining, and distribution of petroleum products.  (*Id.* ¶ 29.)  Koch, as well as many of its subsidiaries and affiliates, is registered to do business in Minnesota.  (*Id.* ¶ 31.)

Defendants Flint Hills Resources LP and Flint Hills Resources Pine Bend, LLC, subsidiaries of Koch, are licensed distributors of petroleum products in Minnesota.  (*Id.*)  Koch subsidiaries import crude oil from Canada to a terminal in Clearbrook, Minnesota, which is owned and operated by Koch.  (*Id.* ¶ 32.)  Oil is piped from the Clearbrook terminal to the Flint Hills Resources Pine Bend Refinery via other Koch-owned pipelines.  (*Id.*)  Flint Hills Resources' Pine Bend Refinery refines the majority of the motor gasoline consumed in Minnesota.  (*Id.* ¶ 37.)

### A.  Climate Change & Fossil Fuels

Beginning in the 1950s, scientists—including many employed by the fossil fuel industry—began to understand that burning fossil fuels released additional greenhouse gasses, drove up atmospheric concentration, changed the carbon ratio in the atmosphere, and impacted global temperature and climate.  (*Id.* ¶¶ 55–59.)  The State alleges that by 1965, Defendants and their predecessors-in-interest were aware that widely used fossil-fuel products would cause global warming by the end of the century and would have wide-ranging and costly consequences.  (*Id.* ¶ 60.)

The State alleges that Defendants were at the forefront of scientific discourse about climate change and its relationship to fossil fuels, and were privy to research developed by industry-employed scientists as well as independent analyses, including research commissioned by Defendants and their colleagues.  (*Id.* ¶¶ 60–72.)  By the 1980s, there was an established consensus among scientists and within the fossil fuel industry that atmospheric $CO_2$ concentrations were reaching dangerous levels and would significantly impact the earth's climate, and international coalitions had begun to emerge to address the issue.  (*Id.* ¶ 73.)

### B.  Defendants' Alleged Misinformation Campaign

The State alleges that, as the international and scientific consensus coalesced around the relationship between fossil fuels emissions and climate change, Defendants mounted an aggressive campaign to undermine the public's perception of climate

science. (*Id.* ¶¶ 82–87.) Defendants allegedly spent millions of dollars on advertising and public relations campaigns, in Minnesota and elsewhere, to mislead consumers and the general public about the scientific consensus around climate change, the relationship between climate change and their fossil-fuel products, and the urgency of the dangers of climate change. (*Id.* ¶¶ 88–90). The State further alleges that Defendants funneled hundreds of millions more dollars to organizations that publicly promoted false statements about and denied the existence of climate change, and paid scientists to produce misleading reports and materials, which Defendants' then cited and promoted to support their own fraudulent statements. (*Id.* ¶¶ 92–131.)

The State identifies two broad categories of alleged injuries caused by Defendants' misinformation campaign: (1) harms to consumers who relied on Defendants' false information, (*id.* ¶¶ 172–83); and (2) environmental and social harms from increased consumption of fossil fuels, including changes in climate, damage to infrastructure, and worsening public health, (*id.* ¶¶ 139–71), all of which, the State avers, could have been mitigated, but for Defendants' campaign, (*id.* ¶¶ 172, 213–14).

## II.   PROCEDURAL HISTORY

Plaintiff commenced this action in Minnesota state court asserting five counts related to Defendants' alleged misinformation campaign: (1) violations of the Minnesota Consumer Fraud Act ("CFA"), Minnesota Statutes § 325F.69; (2) failure to warn under common law theories of strict liability and negligence, against all Defendants except API;

(3) common law fraud and misrepresentation; (4) violations of the Minnesota Deceptive Trade Practices Act ("DTPA"),Minnesota Statutes § 325D.44; and (5) violations of the Minnesota False Statement in Advertising Act ("FSAA"),Minnesota Statutes § 325F.67. (*Id.* ¶¶ 184–242.)  The State seeks damages, civil penalties, disgorgement of profits made as a result of unlawful conduct, and an order enjoining Defendants from continued violations of the CFA, DTPA, and FSAA.  (*Id.* ¶¶ 244, 247–249.).  The State also requests that Defendants be compelled to disclose, disseminate, and publish all research that they conducted directly or indirectly relating to climate change, and fund a corrective climate change public education campaign in Minnesota, administered and controlled by an independent third party.  (*Id.* ¶¶ 245–246).

On July 27, 2020, Defendants removed the action to federal court.  (Notice of Removal, July 27, 2020, Docket No. 1.)  Defendants raise seven grounds for asserting federal jurisdiction over this matter: (1) the claims arise under federal, not state, common law; (2) the action raises disputed and substantial federal issues that must be adjudicated in a federal forum (the "*Grable* doctrine"); (3) removal is authorized by the federal officer removal statute, 28 U.S.C. § 1442(a)(1); (4) federal jurisdiction arises under the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1349(b); (5) the claims are based on conduct arising out of federal enclaves; (6) the action is actually a class action governed by the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), 28 U.S.C. § 1453(b); and (7)

the court has diversity jurisdiction under 28 U.S.C. § 1332(a), on the theory that the real parties in interest are not the State, but the citizens of Minnesota.

On August 26, 2020, Minnesota moved to remand the case to state court, arguing that the Court lacks subject matter jurisdiction because (a) neither federal common law nor the *Grable* doctrine apply; (b) no federal enclaves are implicated; (c) the Outer Continental Shelf Lands Act is not implicated; (d) the federal officer removal statute does not apply; (e) the suit is not a "class action" and therefore not subject to the Class Action Fairness Act; and (f) the suit was brought by the State, which is not a citizen for purposes of diversity jurisdiction.  (Mot. Remand, Aug. 26, 2020, Docket No. 32.)  Defendants oppose this Motion.

The FHR Defendants filed a Motion to Stay, on January 15, 2021, arguing that staying proceedings until the Supreme Court issues a decision in *BP p.l.c. v. Mayor & City Council of Baltimore*, and makes a determination on the Petition for Certiorari in *Chevron Corporation v. City of Oakland, et al.*, would conserve judicial resources and would not prejudice the State.  (Mot. Stay, Jan. 15, 2021, Docket No. 56.)  The State opposes staying the Motion to Remand.

## DISCUSSION

### I.     MOTION TO REMAND

#### A.     Standard of Review

"Federal courts are courts of limited jurisdiction, possessing only that power authorized by Constitution and statute."  *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (quotation omitted).  A defendant may remove a civil action to federal court only if the action could have been filed originally in federal court.  *See* 28 U.S.C. § 1441(a)–(b); *Gore v. Trans World Airlines*, 210 F.3d 944, 948 (8th Cir. 2000).  The party seeking removal bears the burden of demonstrating that removal was proper, and "all doubts about federal jurisdiction must be resolved in favor of remand."  *Cent. Iowa Power Co-op. v. Midwest Indep. Transmission Sys. Operator, Inc.*, 561 F.3d 904, 912 (8th Cir. 2009).  Remand is mandatory "at any time before final judgment [if] it appears that the district court lacks subject matter jurisdiction."  28 U.S.C. § 1447(c).

#### C.    The Well-Pleaded Complaint Rule

"[F]ederal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint.  The rule makes the plaintiff the master of the claim; he or she may avoid federal jurisdiction by exclusive reliance on state law."  *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987) (citation omitted).  Where a complaint pleads only state law claims, a federal court does not have jurisdiction based on a federal defense.  *See, e.g.*, *Aetna Health Inc. v. Davila,* 542 U.S. 200, 207 (2004).

There are two relevant exceptions to the well-pleaded complaint rule. First, "[w]hen a plaintiff has artfully pleaded in a manner that avoids an element of the tort that rests on federal law, the court 'may uphold removal even though no federal question appears on the face of plaintiff's complaint.'" *Gore*, 210 F.3d at 950 (quoting *Rivet v. Regions Bank of La.*, 522 U.S. 470, 475 (1998)). The artful pleading doctrine allows removal where Congress either expressly provides for removal of a particular state law action or where federal law completely preempts a plaintiff's state-law claim. *Rivet*, 522 U.S. at 475.

Second, even where "federal law does not create the cause of action, federal question jurisdiction may exist if [Plaintiff's] 'state-law claim necessarily raise[s] a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities.'" *Great Lakes Gas Trans. Ltd. P'ship v. Essar Steel Minnesota LLC*, 843 F.3d 325, 331 (8th Cir. 2016) (quoting *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314 (2005)). The Supreme Court has recognized a "special and small category" of cases that fit into this framework, *Empire Healthchoice Assur., Inc. v. McVeigh*, 547 U.S. 677, 699 (2006), "where vindication of a right under state law necessarily turned on some construction of federal law," *Merrell Dow Pharmaceuticals, Inc. v. Thompson*, 478 U.S. 804, 808–09 (1986) (quotation omitted).

**B.     Analysis**

**1.     Federal Common Law**

Defendants' first asserted ground for removal is that the Court has original jurisdiction because the State's claims arise under federal common law and cannot be resolved under state law.  Only a few limited areas of federal common law survived *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).  In particular, courts have determined that federal common law applies where a federal decision is required "to protect uniquely federal interests," *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 427 (1964), or where "our federal system does not permit the controversy to be resolved under state law, either because the authority and duties of the United States as sovereign are intimately involved or because the interstate or international nature of the controversy makes it inappropriate for state law to control."  *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 641 (1981).  Defendants argue that the State's Complaint necessarily arises under three areas controlled by federal common law: interstate pollution, navigable waters, and foreign affairs.  Defendants further argue that federal jurisdiction is proper because state law cannot apply to the claims alleged.

**i.   Interstate Pollution**

First, Defendants argue that the State's claims are premised upon interstate pollution because the State's alleged injuries stem from climate change impacts, which are caused by global emissions and are inherently transboundary in nature.  The Supreme

Court has specifically recognized federal common law in the arena of transboundary pollution and environmental protection, *see Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 421 (2011) ("When we deal with air and water in their ambient or interstate aspects, there is federal common law."), but has also held that this area of federal common law has largely (though not entirely) been displaced by environmental statutes, including the Clean Air Act and Clean Water Act, *see e.g.*, *id.* at 424 (finding that the "Clean Air Act and the EPA actions it authorizes displace any federal common-law right to seek abatement of carbon-dioxide emissions from fossil-fuel fired powerplants"); *Int'l Paper v. Ouellette*, 479 U.S. 481, 497 (1987) ("The CWA precludes only those suits that may require standards of effluent control that are incompatible with those established by the procedures set forth in the Act.").

Defendants cite a number of cases to support their argument that federal common law should govern; however, in each of these precedential cases, a cause of action for interstate pollution was alleged on the face of the complaint, which is not the case here.[1] Despite the fact that the State alleges no causes of action related to pollution regulations

---

[1] *See, AEP*, 564 U.S. at 415 (federal common law public nuisance claims against carbon-dioxide emitters seeking cap on emissions); *Illinois v. Milwaukee*, 406 U.S. 91, 93 (1972), *superseded by statute* (cause of action for pollution of Lake Michigan); *Ouellette*, 479 U.S. at 483–84 (1987) (common law nuisance for discharges into interstate lake); *Native Village of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849, 853 (2012) (federal common law public nuisance claims against for greenhouse gas emissions and climate change injuries); *City of New York v. BP p.l.c.*, 325 F. Supp. 3d 466, 470 (S.D.N.Y. 2018) (public nuisance, private nuisance, and trespass claims related to sea level rise, increased flooding, and temperature increases). However, *City of New York* does not provide a framework for removal based upon federal common law because the action was originally filed in federal court.

or disputes between states over emissions standards, Defendants argue that the State has not pleaded sufficient facts to support its consumer protection claims, and therefore the complaint must actually establish a cause of action for interstate pollution under the federal common law.

To adopt Defendants' theory, the Court would have to weave a new claim for interstate pollution out of the threads of the Complaint's statement of injuries. This is a bridge too far. Because Defendants do not plausibly identify any actual disputes related to interstate pollution that must be resolved to reach the merits of the State's pleaded claims, federal common law does not establish a basis for jurisdiction on this ground.

### ii. Navigable Waters

Similarly, Defendants argue that federal common law must govern because the State seeks remedies for injuries related to flooding, damage, and contamination of navigable waters. Again, the cases that Defendants rely on establish that federal common law is required to resolve issues not present here; in particular, to mediate conflict between the states or between states and the federal government related to interstate water bodies.[2] Although flooding is an alleged injury related to the consumer protection claims, the State's action does not purport to regulate, apportion, or mediate other

---

[2] *See Hinderlider v. La Plata River & Cherry Creek Ditch Co.*, 304 U.S. 92, 110 (1938) (apportionment of water of an interstate stream between two states is a question of federal common law); *Milwaukee I*, 406 U.S. at 105 n.6 (conflict over pollution discharged by one state into water body that bordered four states); *Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765, 767–68 (7th Cir. 2011) (action related to federal management of interstate waterway).

states' or agencies' relationships to navigable waters, and the federal common law of navigable waters is not necessarily raised here.

### iii. Foreign Affairs

Third, Defendants argue that the State's claims are of an inherently international nature because the regulation of energy production and trade has important foreign policy implications and is accordingly within the exclusive purview of the federal courts. Defendants claim that, because fossil fuels are strategically important domestic and international resources, the State's case is intended to have significant impacts on United States foreign policy. The Court declines Defendants' invitation to interpret this well-pleaded consumer protection action as a wholesale attack on all features of global fossil fuel extraction, production, and policy.

### iv. State Law

Finally, Defendants contend that federal jurisdiction is proper because state law cannot control claims that seek to regulate the interstate and international production and sale of fossil fuels. The State does, however, have a clear interest in preventing fraud and deception and ensuring that citizens have access to accurate information in the consumer marketplace. *See e.g.*, *Edenfield v. Fane*, 507 U.S. 761, 768–69 (1993). Because the State's claims fall squarely within that area of state interest, the claims do not open the door for substantive challenges to Minnesota's (or any other state's) emissions or water quality standards. Neither do the claims alleged require the Court to assess federal

management of navigable waters or weigh any issues of foreign policy.  Accordingly, federal common law is not applicable.

### v.  Federal Common Law as a Basis for Removal

Even if the Court could conjure a separate claim arising from the State's alleged environmental injuries that would fall within an area of federal common law, it still may not confer jurisdiction.  Defendants argue that federal common law provides a basis for federal jurisdiction because (1) courts have recognized an exception to the well-pleaded complaint rule where plaintiff's putative state law claims arise under federal common law, and (2) federal common law presents a substantial federal question for the purposes of asserting jurisdiction under the *Grable* doctrine.  The Court will address the *Grable* doctrine in Section 2.

As noted above, the Supreme Court has established two exceptions to the well-pleaded complaint rule: express provision of Congress and complete preemption.  *Rivet*, 522 U.S. at 475.  A federal statute completely preempts artfully pleaded state law claims if it "provide[s] the exclusive cause of action for the claim asserted and also set[s] forth procedures and remedies governing that cause of action[,]" *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 8 (2003), and the statute's pre-emptive force is "so extraordinary that it converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule." *Caterpillar, Inc.*, 482 U.S. at 393 (quotation omitted).  Complete preemption is distinct from ordinary preemption, which

provides a defense against state law claims, but does not establish a pathway for federal jurisdiction. *See Johnson v. MFA Petroleum Co.*, 701 F.3d 243, 247 (8th Cir. 2012).

Defendants suggest that complete preemption is not required for removal because the State's claims inherently arise under federal common law, and artful pleading that disguises a federal cause of action is a separate and distinct basis for removal than complete preemption. However, neither the Eighth Circuit nor the Supreme Court has found that implied federal common law claims establish a separate and independent exception to the well-pleaded complaint rule. To the extent that the cases Defendants cite carve out a third exception, this approach lacks support in this circuit and is contrary to Supreme Court precedent establishing the specific and defined parameters for federal jurisdiction over exclusively state law claims. *See Caterpillar*, 482 U.S. at 392–94; *Rivet*, 522 U.S. at 474–75.

Further, in each of the cases Defendants cite to support this argument, plaintiffs' precise claims were explicitly connected to or relied upon interpretations of a discrete area of federal law.[3] Here, Defendants proffer multiple theories for how Plaintiff's claims

---

[3] *See In re Otter Tail Power Co.*, 116 F.3d 1207, 1215 (8th Cir. 1997) (state law claims involved tribal regulatory authority and raised important questions of federal law requiring interpretation of treaties, federal statutes, and the federal common law of inherent tribal sovereignty); *Sam L. Majors Jewelers v. ABX, Inc.*, 117 F.3d 922, 928. (5th Cir. 1997) (claims arising out of "clearly established federal common law cause of action against air carriers for lost shipments."); *Treiber & Straub, Inc. v. UPS, Inc.*, 474 F.3d 379, 384 (7th Cir. 2007) (same); *Caudill v. Blue Cross and Blue Shield of N.C.*, 999 F.2d 74, 76–77 (4th Cir. 1993) (applying federal jurisdiction to state-law claims pursuant to Federal Employees Health Benefits Act), *abrogated by Empire HealthChoice Assur. Inc. v. McVeigh*, 547 U.S. 677, 693 (2006); *Battle v. Seibels Bruce Ins. Co.*, 288 F.3d 596, 607 (claims requiring interpretation of insurance policies issued pursuant to the National Flood Insurance

might be related to federal common law but as noted above, each of these theories lacks a substantial relationship to the actual claims alleged and would require the Court to invent a separate cause of action.  That is beyond the Court's discretion and is not a sound foundation for asserting federal jurisdiction.

Because the Court finds that the claims alleged by the State do not arise under federal common law and Defendants do not plausibly allege that the claims are completely preempted, federal common law is not a sufficient independent basis for removal in this manner.

2.      <em>Grable</em> Jurisdiction

Defendants' second argument for removal is that this action necessarily raises and requires the resolution of substantial questions of federal law.  Federal jurisdiction may be asserted over a state-law claim if a federal issue is: "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress."  *Gunn*, 568 U.S. at 258 (citing *Grable & Sons Metal Products, Inc. v. Darue Eng. & Mf'g*, 545 U.S. 308, 313–14 (2005)).  All four criteria, often referred to as the "*Grable* doctrine," must be met to exercise federal jurisdiction.  *Id.*

---

Program governed exclusively by federal common law); *Newton v. Captial Assur. Co., Inc.*, 245 F.3d 1306, 1308–09 (11th Cir. 2001) (same).

### i. Necessarily Raised

Defendants offer various avenues for the Court to find that the claims necessarily raise disputed federal issues, including foreign policy considerations, injuries to and management of the navigable waters of the United States, and transboundary pollution. Defendants also assert that the claims implicate Congress's careful policymaking balance between energy production and environmental protection, Defendants' alleged influence over policymakers' decisions, and constitutional questions of federalism.

The Court has already rejected Defendants' arguments that the Complaint necessarily raises issues related to management of navigable waters, transboundary pollution, or foreign policy. Contrary to Defendants' assertions, the Complaint does not require interpretation of any federal environmental regulations or climate treaties, nor does it ask a court to review federal agencies' management of interstate waters. The Complaint only requires a court to determine whether Defendants engaged in a misinformation campaign that ran afoul of Minnesota's consumer protection statutes and common law, and whether the State can demonstrate that those alleged violations of discrete state laws caused harm to Minnesota and Minnesota consumers.

With regard to Congress's careful balance between energy and environmental priorities, Defendants do not appear to argue that Congress sanctioned, directed, or participated in the alleged scheme to defraud the public. Accordingly, determining whether Defendants engaged in a misinformation campaign in violation of Minnesota law

does not require a court to second-guess Congress's priorities regarding energy production and environmental protection.

Defendants further argue that the Complaint necessarily asserts federal claims to the extent that it alleges that federal policymakers would have adopted different energy and climate policies but-for Defendants' alleged misrepresentations.  However, the Complaint includes policymakers as a category of individuals who relied on Defendants' allegedly fraudulent misrepresentations in deciding to continue to purchase and use Defendants' fossil-fuel products.  It does not argue that any particular policies or regulatory decisions would be different but-for Defendants' actions, and therefore does not implicate Congress' careful regulatory framework.

As to questions of federalism, Defendants allege that the State seeks to supplant the federal government's authority over federal questions and requires the Court to consider the constitutional division of authority between the federal government and the states.  This gravely overstates the State's case, and it is unclear to the Court how a state court adjudicating a set of claims that fall well within a state's consumer protection interest will necessarily challenge the foundations of our system of government.

Defendants also claim that proving the specific elements of the causes of action will require a court to wade into disputed and substantial federal questions, including whether fossil fuels are unreasonably dangerous, and whether Defendants actually misrepresented the dangers of climate change and the urgency required to mitigate

climate change.  Again, Defendants overstate both the State's claims and what is required to prove them under Minnesota law.[4]

Although Defendants have identified ways in which the State's claims may be tangentially related to federal law, "it takes more than a federal element to open the 'arising under' door" to federal jurisdiction.  *Empire Healthchoice*, 547 U.S. at 701 (quoting *Grable*, 545 U.S. at 313).  The federal issues that Defendants offer are not necessarily raised by the Complaint's state-law claims, and vindication of the State's rights under state consumer protection law does not "necessarily turn on some construction of federal law."  *Franchise Tax Board*, 463 U.S. at 9.

---

[4] It is not necessary for the Court to weigh Minnesota's ability to prove the elements of the state law claims here; it is Defendants' burden to demonstrate that these claims warrant federal jurisdiction.  Nevertheless, the Court notes that adjudicating the State's failure to warn claims do not require a court to supplant its judgment for Congress's regarding the safety and use of a product, as Defendants allege.  While the danger of a product is raised in a failure to warn action, it is in the context of whether a warning was adequate under state law, and does not require a court to determine whether the product should have been manufactured, sold, and consumed generally.  *See, e.g., Glorvigen v. Cirrus Design Corp.*, 816 N.W.2d 572, 582 (Minn. 2012) (explaining that the duty to warn consists of two duties: (1) to give adequate instructions for safe use; and (2) to warn of dangers inherent in improper use); *Frey v. Montgomery Ward & Co.*, 258 N.W.2d 782, 788 (Minn. 1977) (stating the rule that, where a manufacturer has "actual or constructive knowledge of danger to users, the . . . the manufacturer has a duty to warn of such dangers."); *Gray v. Badger Mining Corp.*, 676 N.W.2d 268, 274 (Minn. 2004) (explaining conditions of legal adequacy for warnings).  As to the State's other statutory claims under Minnesota's various consumer protection and trade practices statutes, Defendants' own explanations of the law demonstrate that the State's claims only require proving that Defendants engaged in misinformation, deception, fraud, or otherwise unfair practices prohibited by state law; the claims alleged do not require the Court to make determinations about fossil fuels or federal energy policy in general.

## ii.  Actually Disputed and Substantial

Having found that the State's action does not necessarily raise the federal issues offered by Defendants, the Court need not proceed to address the other *Grable* factors. However, the Court notes that, while the complex features of global climate change certainly present many issues of great federal significance that are both disputed and substantial, the State here does not bring claims capable of addressing the panoply of social, environmental, and economic harms posed by climate change.  The State's Complaint, far more simply, seeks to address one particular feature of the broader problem—Defendants' alleged misinformation campaign.  The State's case is constrained by the causes of action asserted in its Complaint.  Accordingly, the State must prove that its purported injuries are related to Defendants' alleged violations of state laws, and any judicial remedies will likely be limited and responsive to those specific claims.  As a result, this action does not present the doomsday scenario that Defendants present, and neither does it necessarily raise the disputed and substantial issues of federal law that are required for the Court to assert jurisdiction pursuant to *Grable*.

## iii.  Federal/State Balance

Moreover, the Court finds that its efforts to exercise jurisdiction over this case may disrupt the balance between federal and state courts.  In this case, the state court will not need to reach any question of federal law to litigate these claims, nor will the state court's holding "stand as binding precedent for any future [consumer fraud or climate-change

injury] claim[.]"  *Gunn*, 568 U.S. 264.  The State asks the court to determine only whether Defendants are liable for misleading the public and engaging in consumer fraud under state law.  For the federal court to assert jurisdiction over these areas of traditional state jurisdiction may disrupt the balance between state and federal judicial authority.

Ultimately, Defendants question whether there can be a state law action for alleged climate change injuries at all.  The Court does not disagree that assessing this type of injury raises broad and complicated questions.  However, allegations of a complex injury do not create a pathway for federal jurisdiction when the actual causes of action arise only under state law.  Accepting Defendants' interpretation of *Grable* jurisdiction would require the Court to make an exceptional logical leap and interpret this Complaint as a full-scale assault on all aspects of fossil fuel extraction, production, distribution, and use.  That is not what the Complaint asserts on its face, and it is not within the Court's authority to rewrite the Complaint and make it so.

### 3.    Federal Officer Removal Statute

Defendants' next proffered removal ground is the federal officer removal statute, 28 U.S.C. § 1442(a)(1), which requires that the removing defendant plausibly allege that (1) the defendant is a "person" under the statute, which is undisputed here; (2) the defendant was "acting under" the direction of a federal officer when it engaged in the allegedly tortious conduct; (3) there is a causal connection between the defendant's actions and the official authority; and (4) the defendant raises a "colorable" federal

defense. *See*; *Jacks v. Meridian Res. Co.*, 701 F.3d 1224, 1230 (8th Cir. 2012). Relevant here is the federal government contractor defense, which provides that suits against defendants acting on behalf of federal officers "may be removed despite the nonfederal cast of the complaint; the federal-question element is met if the defense depends on federal law[.]" *Jefferson County v. Acker*, 527 U.S. 423, 431 (1999).

### i. "Acting Under"

Defendants first argue that they were "acting under" the direction of federal officers in the production of fossil fuels and the development of specialized military products in support of multiple war efforts since at least World War II. Second, Defendants argue that they have worked under federal direction to extract and produce critical energy resources for the nation, including exploration and development of resources in the Outer Continental Shelf and as operators and lessees of the Strategic Petroleum Reserve infrastructure. The Court finds that these are plausible ways in which Defendants may have acted under the direction of federal officers, and because the Court lacks information about whether Defendants' alleged tortious conduct occurred when Defendants were acting under federal officer control, the Court will proceed with the analysis.

### ii. Connection to Claims

Historically, courts have considered the causal connection requirement to be a low hurdle. *See*, *e.g.*, *Graves v. 3M Co.*, 447 F. Supp. 3d 908, 913 (D. Minn. 2020) (citing

*Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 137 (2d Cir. 2008). Indeed, in 2011, Congress amended the statute to encompass suits "for or **relating to** any act under color of [federal] office." 28 U.S.C. § 1442(a)(1) (2011) (emphasis added); *see also In re Commonwealth's Motion to Appoint Counsel Against or Directed to Def. Ass'n of Philadelphia*, 790 F.3d 457, 471 (3d Cir. 2015), *as amended* (June 16, 2015) (discussing the 2011 amendment). As a result of the amendment, all that is required is that the case relates to an official act. For example, the Third Circuit has found that the condition is met so long as Defendants' conduct has a "connection" or "association" with a governmental act. *In re Commonwealth's Motion*, 790 F.3d at 471. However, Defendants are still required to demonstrate that the act for which they are being sued occurred at least in part "**because of** what they were asked to do by the Government." *Graves*, 447 F. Supp. 3d at 913. (emphasis in original) (quoting *Isaacson v. Dow Chem Co.*, 517 F.3d 1129, 137 (2d Cir. 2008).

Defendants argue that their fossil fuel activities satisfy the low threshold of connection to or association with actions directed by the federal government. However, Defendants do not claim that any federal officer directed their respective marketing or sales activities, consumer-facing outreach, or even their climate-related data collection. Accordingly, despite the low bar, there does not appear to be any direction from or connection to the federal government related to the specific claims alleged here.

-24-

### iii. Colorable Defense

Although the lack of connection to a federal officer alone is fatal to federal officer jurisdiction, the Court notes that the fourth prong also fails. The federal officer removal statute requires that the defendant identify a federal defense to the claim brought against them in state court, but a defendant need only demonstrate that its defense is "colorable," not "clearly sustainable." *Jacks v. Meridian Res. Co., LLC*, 701 F.3d 1224, 1235 (8th Cir. 2012). "For a defense to be considered colorable, it need only be plausible; § 1442(a)(1) does not require a court to hold that a defense will be successful before removal is appropriate." *United States v. Todd*, 245 F.3d 691, 693 (8th Cir. 2001).

In a footnote, Defendants claim a number of defenses, including preemption under the Clean Air Act, the Commerce Clause, the First Amendment, and the foreign affairs doctrine, although they do not describe any particular defense or why it justifies application of the federal officer removal statute. As discussed with regard to the *Grable* doctrine and federal common law, the State does not raise claims related to environmental regulation or foreign policy, therefore the Clean Air Act and foreign affairs doctrine do not pose colorable defenses. As to the Commerce Clause and the First Amendment, Defendants do not explain exactly how these defenses relate either to the claims or actions taken at the direction of a foreign officer. Because it is the Defendants' burden to demonstrate a colorable defense now, and not "the mere possibility of some

future evidence as the basis for removal," *Graves*, 447 F. Supp. 3d at 916 n.8, Defendants have not met this hurdle to federal jurisdiction.

Defendants have failed to satisfy three of the four elements of the federal officer removal statute, and the Court cannot, therefore, exercise jurisdiction on this basis.

### 4.    Outer Continental Shelf Lands Act

The Outer Continental Shelf Lands Act ("OCSLA") establishes original jurisdiction in federal district courts over "cases and controversies arising out of, or in connection with (A) any operation conducted on the outer Continental Shelf, or which involves rights to such minerals, or (B) the cancellation, suspension, or termination of a lease or permit under this subchapter."   43 U.S.C. § 1349(b)(1).   The outer Continental Shelf ("OCS") includes all submerged lands lying seaward that are subject to the jurisdiction and control of the United States, but are outside of any particular State.   43 U.S.C. §§ 1301(a), (f), 1331(a).   The Fifth Circuit has interpreted the jurisdictional grant under OCSLA broadly, only requiring a "but-for connection" between the cause of the action and OCS operation. *In re Deepwater Horizon*, 745 F.3d 157, 163 (5th Cir. 2014).

Despite Defendants' argument that their various activities on the OCS necessarily account for a significant portion of the conduct attributable to alleged climate change injuries in Minnesota, the State's claims are rooted not in the Defendants' fossil fuel production, but in its alleged misinformation campaign.   Further, Defendants offer no basis for the Court to conclude that Minnesota's alleged injuries would not have occurred

but-for the Defendants' extraction activities on the OCS.  *Accord Mayor and City Council of Baltimore v. BP*, 388 F. Supp. 3d 538, 566–67 (D. Md. 2019) (rejecting federal jurisdiction under OCSLA based on lack of evidence of but-for causation).

Defendants also argue that, because the Complaint seeks potentially billions of dollars in damages, restitution, and equitable relief, this action could substantially discourage production on the OCS and undermine the viability of the federal government's leasing program.  This argument is highly speculative and quite unlikely and asks the Court to assume both the outcome of the suit in state court and the highest damages award possible.  This type of speculation, however, does not establish a stable ground for supporting removal, and the Court finds that it lacks jurisdiction under OCSLA.

### 5.    Federal Enclave

Defendants next argue that federal jurisdiction is appropriate because the action implicates federal enclaves in four distinct ways: (1) by targeting the alleged impacts of Defendants' oil and gas operations, the Complaint necessarily sweeps in operations that occur on military bases and other federal enclaves; (2) the Complaint's allegations of climate change injuries—including extreme heat, crop damage, drought, flooding, infrastructural damage, and disease—necessarily impact federal enclaves in Minnesota, including Fort Snelling Military Reservation, Federal Correctional Institute Sandstone, and

Cass Lake Indian Hospital[5]; (3) the claims arise out of sales of certain Defendants' products within Minnesota, which include sales on unspecified federal enclaves; and (4) to the extent the Complaint asserts that federal policymakers would have adopted different energy and climate policies absent Defendants' alleged misrepresentations, the Complaint touches on conduct occurring in the District of Columbia, a federal enclave.

"A federal enclave is created when a state cedes jurisdiction over land within its borders to the federal government and Congress accepts that cession. These enclaves include numerous military bases [and] federal facilities." *Allison v. Boeing Laser Tech. Servs.*, 689 F.3d 1234, 1235 (10th Cir. 2012). The constitutional grant of legislative power to Congress over federal enclaves "bars state regulation without specific congressional action." *W. River Elec. Ass'n, Inc. v. Black Hills Power & Light Co.*, 918 F.2d 713, 716 (8th Cir. 1990) (quoting *Paul v. United States,* 371 U.S. 245, 263 (1963)).

"[I]n enclave jurisdiction, the determinative fact is the precise location of the events giving rise to the claims for relief." *Akin v. Big Three Indus., Inc.*, 851 F. Supp. 819, 824 (E.D. Tex. 1994) (emphasis omitted). When an alleged injury has occurred both on and off the federal enclave, federal jurisdiction is proper if the federal enclave was the

---

[5] To establish a federal enclave, (1) the United States must acquire land in a state for one of the purposes mentioned in the Enclave Clause, (2) the state legislature must consent to the jurisdiction of the federal government, and (3) the federal government must accept the jurisdiction by filing a notice of acceptance with the state governor or in another manner prescribed by the laws of the state. *See* 40 U.S.C. § 3112(b); *Paul v. United States*, 371 U.S. 245, 264 (1963); *see also* U.S. Const. Art. I, § 8, cl. 17. Defendants state that these sites in Minnesota are federal enclaves, but do not provide documentation to satisfy the criteria.

locus in which the tort claim arose.  *See Sultan v. 3M Co.*, No. 20-1747, 2020 WL 7055576, at *8 (D. Minn. Dec. 2, 2020).  Even if some of the injuries occur inside while some occur outside of the federal enclave, the federal interest in exercising federal jurisdiction over the resultant claims decreases.  *See Akin*, 851 F. Supp. at 825 n.4.

The State specifically disclaims "injuries arising on federal property and those that arose from Defendants' provision of fossil fuel products to the federal government for military and national defense purposes."  (Compl. ¶ 9 n.4.)  Defendants contend that this disclaimer is ineffective because it offers no method to isolate injuries that arose on federal property.[6]  However, the burden is on Defendants to demonstrate that federal enclaves are the locus in which the claims arose, and they have not done so.  *See Sultan*, 2020 WL 7055576, at *4.  While the various injuries alleged in the complaint may be felt on federal enclaves as much as they are felt anywhere, the Court requires a more

---

[6] Further, Defendants counter that the Attorney General cannot sidestep federal jurisdiction by disclaiming damages for events that took place in federal enclaves.  However, both of the cases that Defendants cite for this proposition, *Fung v. Abex Corp.*, 816 F. Supp. 569, 571 (N.D. Cal. 1992) and *Richard v. Lockheed Martin Corp.*, 2012 WL 13081667, at *2 (D.N.M. Feb. 24, 2012), involve personal injury claims in which the injuries largely occurred on federal enclaves.  In *Fung*, the injuries involved asbestos exposure on submarines that were supervised by a contractor, but that were regularly docked at United States naval bases (there, the Court found the Federal Officer Removal Statute to be of greater significance than the enclaves); in *Richards*, the injuries largely occurred on White Sands Missile Range.  Here, Defendants do not claim that any particular injury occurred on a federal enclave; they merely allege that the State cannot effectively disclaim injuries on enclaves.  Because neither party has identified injuries that specifically occurred on a federal enclave, these cases do not support Defendants' argument that federal enclave jurisdiction is proper here.

-29-

substantive and explicit relationship between the actual claims alleged and a specific federal enclave to exercise jurisdiction.

### 6.  Class Action Fairness Act

Defendants also raise the possibility of jurisdiction under CAFA, 28 U.S.C. § 1453(b), on the theory that the case is actually a class action in which the Attorney General has brought a representative suit on behalf of a group of similarly situated persons.  CAFA expands federal diversity jurisdiction to allow for minimal diversity in class actions filed under Federal Rule of Civil Procedure 23 or similar state statute or rule of judicial procedure, 28 U.S.C. § 1332(d)(1)(B), in which more than $5 million is in controversy and there are greater than 100 members of proposed plaintiff classes.  *Id.* § 1332(d)(5), (6); *Pirozzi v. Massage Envy Franchising, Inc.*, 938 F.3d 981, 983 (8th Cir. 2019).  Defendants argue that, while this case is not styled as a class action, because it is brought in a representative capacity and seeks restitution and damages on behalf of many potential plaintiffs, it resembles a purported class action and should therefore be considered a class action under CAFA.

However liberally interpreted, federal jurisdiction under CAFA is limited to civil actions either filed under Rule 23 or brought under a similar state mechanism that authorizes class actions.  In the Eighth Circuit, an action can be interpreted as a class action subject to CAFA even where Plaintiff has omitted reference to the authorizing procedural rule or statute, but only where the state class action rule actually governs the

action.  *See Williams v. Emp'rs Mut. Cas. Co.*, 845 F.3d 891, 901 (8th Cir. 2017).  Defendants

have identified no state statute or procedural rule that would classify a suit of this nature

as a class action.[7]  Further, as the State points out, every court to have addressed the

application of CAFA to actions brought by a State in *parens patriae* under state common

law or consumer protection statutes has found that CAFA is not applicable.[8]  Because

---

[7] The cases Defendants cite do not support their argument that the present action should, or even could, be subject to CAFA.  Both *Addison Automatics, Inc. v. Hartford Cas. Ins. Co.*, 731 F.3d 740 (7th Cir. 2013) and *Williams*, 845 F.3d 891 are cases in which representatives of certified classes attempted to make separate claims against the same defendants as individuals.  In both of those cases, the Courts found that omitting reference to the existing class or applicable state statute did not allow the defendant to dodge CAFA jurisdiction.  Neither of these cases dealt with an action brought by an Attorney General on behalf of a state where no class action has been claimed or certified.  The case that Defendants characterize as most "instructive," *Song v. Charter Comm'ns. Inc.*, is an order on a Motion to Compel Arbitration and Stay Proceedings that does not substantively deal with the CAFA issue at all, except to include a short footnote noting that Plaintiff opposed CAFA jurisdiction, but the Court felt that the jurisdictional determination was within its discretion.  No. 17-325, 2017 WL 1149286, at *1 n.1 (S.D. Cal. Mar. 28, 2017).  *Dart Cherokee Basin Op. Co. LLC v. Owens* deals with a case filed as a class action in state court, where the dispute was about whether the amount in controversy met the $5 million CAFA threshold. 574 U.S. 81, 85 (2014).  Defendants also cite *Missouri ex rel. Koster v. Portfolio Recovery Assocs., Inc.*, for the proposition that the Eighth Circuit has not weighed in on the issue of CAFA application to *parens patriae* actions.  686 F. Supp. 2d 942, 944–47 (E.D. Mo. 2010).  However, the court in *Koster* found that a request for treble damages did not convert a *parens patriae* action into either a "mass action" or a "class action" under CAFA and declined to exercise federal jurisdiction.  *Id.*

[8] *See Mississippi ex rel. Hood v. AU Optronics Corp.*, 571 U.S. 161, 164 (2014) (*parens patriae* suit is not a "mass action" under CAFA);  *Hawaii ex rel. Louie v. HSBC Bank Nevada*, 761 F.3d 1027, 1040 (9th Cir. 2014) ("Failure to request class status or its equivalent is fatal to CAFA jurisdiction."); *Purdue Pharma L.P. v. Kentucky*, 704 F.3d 208, 212–20 (2d Cir. 2013) (determining *parens patriae* action was not "filed under" state statute or rule of judicial procedure "similar" to federal class action rule, and thus action did not qualify as a "class action" within the meaning of CAFA); *Mississippi ex rel. Hood v. AU Optronics Corp.*, 701 F.3d 796, 799 (5th Cir. 2012), *rev'd on other grounds*, 571 U.S. 161 (2014) (*parens patriae* action to enforce state law did not justify removal under CAFA); *LG Display Co. v. Madigan*, 665 F.3d 768, 770–72 (7th Cir. 2011) (case brought by Attorney General was brought under state anti-trust law that did not impose any of the familiar Rule 23 constraints); *Washington v. Chimei Innolux Corp.*, 659 F.3d 842, 847–49 (9th Cir. 2011) ("[P]arens patriae suits filed by state Attorneys General may not be removed to federal

neither the Eighth Circuit nor any other court has applied CAFA to a State Attorney General's representative action in this way, and because Defendants have not demonstrated that this action was brought under or would meet the standards of either Rule 23 or any state rule for class certification, CAFA is not applicable here.

### 7.    Diversity Jurisdiction

Finally, Defendants argue that the Court has diversity jurisdiction because the real parties in interest are the citizens of Minnesota, who are completely diverse from Defendants, and the amount in controversy undisputedly exceeds $75,000.  Defendants argue that the Attorney General seeks compensation for alleged injuries related only to Minnesota consumers, not the State in general, and that the harm alleged is only to consumers who were influenced by the purported misinformation campaign, and thus only applies to a subset of identifiable Minnesotans.

A state "may act as the representative of its citizens in original actions where the injury alleged affects the general population of a State in a substantial way."  *Maryland v. Louisiana*, 451 U.S. 725, 737 (1981).  "There is no question that a State is not a 'citizen' for purposes of the diversity jurisdiction."  *Moor v. Alameda Cty.*, 411 U.S. 693, 717 (1973).

---

court because the suits are not 'class actions' within the plain meaning of CAFA."); *W. Va. ex rel. McGraw v. CVS Pharmacy, Inc.*, 646 F.3d 169, 174–78 (4th Cir. 2011); *Massachusetts v. Exxon Mobil Corp.*, 462 F. Supp. 3d 31, 48–51 (D. Mass. 2020) (finding CAFA does not apply to *parens patriae* Attorney General actions); *Town of Randolph v. Purdue Pharma L.P.,* No. 19-10813, 2019 WL 2394253, at *4 (D. Mass. June 6, 2019) (finding no federal jurisdiction under CAFA in *parens patriae* opioid action); City of Galax, Virginia v. Purdue Pharma, L.P., No. 18-617, 2019 WL 653010, at *5–6 (W.D. Va. Feb. 14, 2019) (same).

The Complaint alleges injury to all Minnesotans and the Attorney General brings the action pursuant to state statutes and under *parens patriae authority* on behalf of Minnesota citizens and consumers.  Defendants have not offered any precedent or a cognizable argument for treating this as anything other than an action by the State of Minnesota, and therefore this action does not give rise to federal diversity jurisdiction.

## CONCLUSION ON MOTION TO REMAND

The Court recognizes that the vast threat of climate change requires a comprehensive federal, and indeed, global response.  The complex environmental impacts of climate change, and its far-reaching consequences for health, economy, and social wellbeing of all people cannot be understated.  Given the stakes, the Court has some reluctance in remanding such significant litigation to state court.  But the Court is also mindful of the limits of its jurisdiction.  If the State were—as Defendants suggest— seeking a referendum on the broad landscape of fossil fuel extraction, production, and emission, state court would most certainly be an inappropriate venue.  However, the State's action here is far more modest than the caricature Defendants present.  States have both the clear authority and primary competence to adjudicate alleged violations of state common law and consumer protection statutes, and a complex injury does not a federal action make.  The limits written into the Complaint likely will restrict the ultimate possible recovery in this case and thus, its possible impact on climate change, but that is the choice the State has made.  Because this Court does not have original jurisdiction over

this action, and because the claims alleged neither explicitly raise federal claims nor fall within one of the exceptions to the well-pleaded complaint rule, the Court must decline to exercise jurisdiction and remand the matter to state court.

## II.      MOTION TO STAY

The FHR Defendants move the Court to stay proceedings until the Supreme Court issues a decision in *BP p.l.c. et al. v. Baltimore* and makes a determination on the Petition for Certiorari in *Chevron et al. v. City of Oakland et al.* (U.S., Jan. 8, 2021).  The FHR Defendants argue that a stay is warranted because these cases are similar to the instant action and granting a stay would preserve judicial resources by alleviating the Court's need to decide issues now that may be ruled on by the Supreme Court within a few months.  In addition, the FHR Defendants argue that a stay is necessary to prevent serious hardship, particularly if the Court grants the Motion to Remand and the Supreme Court's decisions in either *Baltimore* or *Oakland* cast doubt on the remand.  Finally, the FHR Defendants argue that the State cannot plausibly claim any meaningful harm from such a brief stay.  The State opposes this Motion.

Because the Court finds that neither pending matter relied on by the FHR Defendants bear upon the Court's decision to remand the case for lack of federal jurisdiction, the Court will deny the FRH Defendants' Motion.

### A.      STANDARD OF REVIEW

The Court has the inherent power and broad discretion to stay proceedings to control its docket, to conserve judicial resources, and to ensure that each matter is handled with economy of time and effort. *Sierra Club v. U.S. Army Corp of Engineers*, 446 F.3d 808, 816 (8th Cir. 2006) (citing *Clinton v. Jones*, 520 U.S. 681, 706 (1997)).  A court may consider factors, including "conservation of judicial resources and the parties' resources, maintaining control of the court's docket, providing for the just determination of cases, and hardship or inequity to the party opposing the stay." *Frable v. Synchrony Bank*, 215 F. Supp. 3d 818, 821 (D. Minn. 2016).  The moving party bears the burden of establishing that a stay is necessary. *Jones*, 520 U.S. at 708.  When the stay is requested pending disposition of a petition for certiorari, "[a]pplicants bear the burden of persuasion on two questions: whether there is a balance of hardships in their favor; and whether four Justices of [the Supreme Court] would likely vote to grant a writ of certiorari." *New York Times Co. v. Jascalevich*, 439 U.S. 1304, 1304 (1978).

### B.      ANALYSIS

The question addressed by the Supreme Court in *Baltimore* is specific to the scope of appellate review of remand orders under 28 U.S.C. § 1447(d).  That issue is not present here, and it will arise only if Defendants appeal the Court's decision to grant the motion to remand.  The Eighth Circuit, like the Fourth Circuit, has interpreted 28 U.S.C. § 1447(d) to limit its scope of remand review to the removal grounds established in 28 U.S.C. § 1442

(federal officer removal) or § 1443 (civil rights claims).  *See Jacks*, 701 F.3d at 1229;

*Thornton v. Holloway*, 70 F.3d 522, 524 (8th Cir. 1995).  Accordingly, the Supreme Court's

decision in *Baltimore* will only potentially affect this action at the appellate stage, and

does not bear upon a district court's determination.

While the petition in the *Oakland* case raises issues that are more pertinent to the

instant proceedings, the FHR Defendants speculate that at least four Justices of the

Supreme Court are likely to vote to grant certiorari because the Court granted certiorari

in *Baltimore*.  However, the scope of the *Oakland* defendants' petition is much broader

than the narrow petition granted in *Baltimore*.  The FHR Defendants generally assert that

the Ninth Circuit's rejection of the federal common law as a basis for removal is contrary

to Supreme Court precedent, but provide little else to support their position that

certiorari is likely to be granted.

Additionally, although the FHR Defendants argue that a stay will not prejudice the

State, the State counters that a stay would be highly prejudicial to the public interest by

delaying the proceedings for an indeterminate amount of time for the sake of pending

decisions that do not bear upon the merits of this action.  Of course, Defendants may

appeal this decision which would result inevitably in a much longer delay.  But balancing

the hardships between the two parties, and not knowing whether the Defendants will

appeal the remand, the Court finds that the State would likely be more prejudiced by a

stay than Defendants would be by proceeding, particularly because Defendants cannot

anticipate any relevant relief at this juncture related to the *Baltimore* case and the status of the *Oakland* petition is still very much uncertain.  Ultimately, the possible prejudice to both sides is quite similar, and the Court will choose to try to move the case along as quickly as possible.

The Court therefore finds that Defendants have not met their burden of persuasion that a stay is necessary and denies the Motion.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that**:**

1.  Plaintiff's Motion to Remand [Docket No. 32] is **GRANTED.**

2.  FHR Defendants' Motion to Stay [Docket No. 56] is **DENIED.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED:  March 31, 2021
at Minneapolis, Minnesota.

JOHN R. TUNHEIM
Chief Judge
United States District Court

-37-